**PAGE PROOF**

# 14-1048-cv(L)

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv(XAP)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT



CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND

*(Additional Caption on the Reverse)*

———————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANTS-APPELLANTS-CROSS-APPELLEES

Michael A. Cheah
VIMEO, LLC
555 West 18th Street
New York, New York 10011
212-314-7457

Kathleen M. Sullivan
Robert L. Raskopf
Todd Anten
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212-849-7000

Rachel Herrick Kassabian
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
650-801-5000

*Attorneys for Defendants-Appellants-Cross-Appellees*

MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellees-Cross-Appellants,*

*v.*

VIMEO, LLC, a Delaware Limited Liability Company, a/k/a VIMEO.COM, CONNECTED VENTURES, LLC, a Delaware Limited Liability Company,

*Defendants-Appellants-Cross-Appellees,*

*and*

DOES, 1-20 inclusive,

*Defendants.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellant-Cross-Appellee Vimeo, LLC is a subsidiary of IAC/InterActiveCorp ("IAC"), a publicly held corporation, and no publicly held corporation other than IAC owns 10% or more of its stock.  Defendant-Appellant-Cross-Appellee Connected Ventures, LLC is a subsidiary of IAC, and no publicly held corporation other than IAC owns 10% or more of its stock.  IAC has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES .........................................................................v

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF JURISDICTION.................................................................4

ISSUES PRESENTED...................................................................................4

STATEMENT OF FACTS .............................................................................5

    A.    Vimeo's Video-Hosting And Video-Sharing Business .......................5

    B.    The DMCA ...................................................................................6

    C.    Vimeo's DMCA Procedures And Efforts To Combat Copyright Infringement ................................................................................8

    D.    Proceedings Below ........................................................................10

    E.    The Orders At Issue On Appeal .....................................................11

SUMMARY OF ARGUMENT .......................................................................14

ARGUMENT ..............................................................................................17

I.    THE DISTRICT COURT ERRED IN HOLDING THAT MERE AWARENESS OF THE PRESENCE OF A COPYRIGHTED SONG IN AN ORIGINAL VIDEO RAISES A TRIABLE ISSUE AS TO "RED FLAG" KNOWLEDGE OF INFRINGEMENT ................................17

    A.    "Red Flag" Knowledge Means Knowledge Of Material That Is "Obviously" Infringing, Not Just Potentially Infringing ...................18

    B.    Mere Awareness Of Copyrighted Material Does Not Demonstrate Knowledge Of Infringement..........................................20

    C.    Available Defenses Of Fair Use And License Foreclose Any Triable Issues Of "Red Flag" Knowledge On This Record ...............22

D.    Inferring "Red Flag" Knowledge From The Mere Presence Of Copyrighted Material In A User-Generated Video Would Present Multiple Practical Problems ...................................................31

    1.    The District Court's Focus On "Recognizable" Works Is Unworkable ...............................................................................32

    2.    The District Court's Standard Discourages Beneficial Website Moderation And Encourages Website Censorship.................................................................................32

II.    THE DISTRICT COURT ERRED IN CATEGORICALLY DENYING DMCA SAFE HARBORS AGAINST CLAIMS BASED UPON PRE-1972 SOUND RECORDINGS ...................................................35

A.    The DMCA Safe Harbors Apply To Both Federal And State-Law Claims Of Copyright Infringement ...........................................36

    1.    The Text Of The DMCA Provides That The Safe Harbors Apply To Claims Involving Pre-1972 Sound Recordings........36

    2.    The Structure Of The Copyright Act Confirms That Congress Intended The DMCA Safe Harbors To Apply To Pre-1972 Sound Recordings .................................................39

    3.    The Purpose Of The DMCA Would Be Undermined If Pre-1972 Sound Recordings Were Excluded...........................42

    4.    Public Policy Considerations Support The Application Of The DMCA Safe Harbors To Claims Based On Pre-1972 Sound Recordings ....................................................................44

B.    Section 301(c) Does Not Exclude Infringement Claims Based On Pre-1972 Sound Recordings From The Scope Of The DMCA Safe Harbors ........................................................................46

    1.    Section 301(c) Was An Anti-Abrogation Statute And Was Not Intended To Insulate Pre-1972 Sound Recordings From All Future Legislation ...................................47

    2.    Section 301(c) And The DMCA Safe Harbors Are Compatible Because They Address Two Distinct Issues .........49

3.    The DMCA Does Not "Annul" Or "Limit" Any State Right Or Remedy .................................................................50

CONCLUSION .................................................................................56

TABLE .............................................................................................58

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ...................................61

# TABLE OF AUTHORITIES

**Page**

## Cases

*Bartok v. Boosey & Hawkes, Inc.*,
523 F.2d 941 (2d Cir. 1975) ...................................................35

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ...................................................26

*Bourne v. Walt Disney Co.*,
68 F.3d 621 (2d Cir. 1995) ....................................................28

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ....................................................24, 25, 26

*Capitol Records, Inc. v. MP3tunes, LLC*,
821 F. Supp. 2d 627 (S.D.N.Y. 2011) ................................. 19, 38, 39, 43, 44, 48

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
830 N.E.2d 250 (N.Y. 2005) ...........................37, 38, 47, 53, 54

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ...........................................24, 25, 26

*Carvajal v. Artus*,
633 F.3d 95 (2d Cir. 2011) ....................................................35

*In re Chapman*,
166 U.S. 661 (1897)..............................................................50

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) .......................................20, 25, 30

*Community for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989)..............................................................37

*EEOC v. Commercial Office Prods. Co.*,
486 U.S. 107 (1988)..............................................................46

*EMI Records Ltd. v. Premise Media Corp. L.P.*,
No. 601209/08, 2008 N.Y. Misc. LEXIS 8213
(Sup. Ct. N.Y. Cnty. Aug. 8, 2008) ......................................54

*Fed. Housing Fin. Agency v. UBS Ams. Inc.*,
712 F.3d 136 (2d Cir. 2013) ..................................................38

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998)..............................................................37

*Firth v. State,*
    775 N.E.2d 463 (N.Y. 2002)..................................................................53, 54

*Goldstein v. California,*
    412 U.S. 546 (1973)..................................................................................48, 49

*In re Halpin,*
    566 F.3d 286 (2d Cir. 2009).........................................................................37

*Hendrickson v. Amazon.com, Inc.,*
    298 F. Supp. 2d 914 (C.D. Cal. 2003)..........................................................19

*Hooks v. Forman, Holt, Eliades & Ravin, LLC,*
    717 F.3d 282 (2d Cir. 2013).........................................................................42

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987).....................................................................................41

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    133 S. Ct. 1351 (2013)...........................................................................37, 41

*La. Public Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986).....................................................................................49

*Lockhart v. United States,*
    546 U.S. 142 (2005).....................................................................................49

*Lunney v. Prodigy Services,*
    723 N.E.2d 539 (N.Y. 1999).........................................................................53

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    454 F. Supp. 2d 966 (C.D. Cal. 2006)..........................................................30

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005).....................................................................................52

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007)................................................................20, 55

*Reno v. Am. Civil Liberties Union,*
    521 U.S. 844 (1997).....................................................................................53

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.,*
    489 F.3d 474 (2d Cir. 2007).........................................................................24

*Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.,*
    453 F.2d 552 (2d Cir. 1972).........................................................................52

*Seltzer v. Green Day, Inc.,*
    725 F.3d 1170 (9th Cir. 2013).............................................................24, 25, 26

*Shiamili v. Real Estate Grp. of N.Y., Inc.,*
    952 N.E.2d 1011 (N.Y. 2011).......................................................................55

*Tiffany (NJ) Inc. v. eBay Inc.,*
  600 F.3d 93 (2d Cir. 2010) ........................................................55

*UMG Recordings, Inc. v. Escape Media Grp., Inc.,*
  964 N.Y.S.2d 106 (1st Dep't 2013) ...........................................35

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
  718 F.3d 1006 (9th Cir. 2013) .......................................8, 28, 33

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
  665 F. Supp. 2d 1099 (C.D. Cal. 2009),
  *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital
  Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) ...............................8, 19

*Viacom Int'l, Inc. v. YouTube, Inc.,*
  676 F.3d 19 (2d Cir. 2012) ...................... 2, 6, 8, 14, 17, 18, 33, 34, 42

*Viacom Int'l, Inc. v. YouTube, Inc.,*
  718 F. Supp. 2d 514 (S.D.N.Y. 2010),
  *aff'd in relevant part*, 676 F.3d 19 (2d Cir. 2012) ...............................8

*Yerdon v. Henry,*
  91 F.3d 370 (2d Cir. 1996) ...................................................46, 50

## Statutes

Act of October 15, 1971, Pub. L. No. 92-140, 85 Stat. 391 ...............47, 48

17 U.S.C. § 101 ..................................................................37, 38

17 U.S.C. § 102(a) ...................................................................40

17 U.S.C. § 104 ...................................................................40, 41

17 U.S.C. § 104(c) ...................................................................41

17 U.S.C. § 105 .......................................................................40

17 U.S.C. § 106 ...............................................................40, 41, 51

17 U.S.C. § 106(3) ...................................................................51

17 U.S.C. § 107 ...............................................................24, 51, 54

17 U.S.C. § 108 .......................................................................51

17 U.S.C. § 109 ...................................................................37, 51

17 U.S.C. § 109(a) ...................................................................51

17 U.S.C. § 109(c) ...................................................................41

17 U.S.C. § 109(e) ...................................................................41

17 U.S.C. § 110 ..................................................................................51

17 U.S.C. § 110(1) .............................................................................41

17 U.S.C. § 111 ..................................................................................51

17 U.S.C. § 112 ..................................................................................51

17 U.S.C. § 117 ..................................................................................51

17 U.S.C. § 119 ..................................................................................51

17 U.S.C. § 121 ..................................................................................51

17 U.S.C. § 122 ..................................................................................51

17 U.S.C. § 201 ..................................................................................40

17 U.S.C. § 301(a) .............................................................................48

17 U.S.C. § 301(c) .............................................. 16, 36, 46, 47, 48, 49, 50

17 U.S.C. § 501(a) .............................................................................38

17 U.S.C. § 512 ................................................................5, 6, 39, 41, 43

17 U.S.C. § 512(a) .............................................................................36

17 U.S.C. § 512(b)(1) ........................................................................37

17 U.S.C. § 512(c) ........................................ 13, 16, 19, 36, 39, 49, 52

17 U.S.C. § 512(c)(1) .........................................................................36

17 U.S.C. § 512(c)(1)(A)(ii) ............................................................2, 4, 18

17 U.S.C. § 512(c)(1)(C) .....................................................................7

17 U.S.C. § 512(c)(2) ..........................................................................7

17 U.S.C. § 512(c)(3) ..........................................................................7

17 U.S.C. § 512(c)(3)(A)(vi) ...............................................................34

17 U.S.C. § 512(d) ........................................................................19, 37

17 U.S.C. § 512(f) ..............................................................................34

17 U.S.C. § 512(g)(2)(B) ....................................................................34

17 U.S.C. § 512(g)(3) .........................................................................34

17 U.S.C. § 512(i) ................................................................................7

17 U.S.C. § 512(j) .................................................................52

17 U.S.C. § 512(m) ...............................................................45

17 U.S.C. § 512(m)(1) .......................................................8, 34

17 U.S.C. § 1201 ............................................................40, 41

17 U.S.C. § 1201(a)(1)(A) ......................................................40

17 U.S.C. § 1201(f)(1) ...........................................................41

17 U.S.C. § 1201(f)(3) ...........................................................41

17 U.S.C. § 1201(g)(2)(D) ......................................................41

17 U.S.C. § 1201(j)(2) ...........................................................41

17 U.S.C. § 1202 ..................................................................41

17 U.S.C. § 1202(b) ..............................................................41

17 U.S.C. § 1202(e)(1)(B) ......................................................41

17 U.S.C. § 1202(e)(2)(A)(ii) ..................................................41

17 U.S.C. § 1202(e)(2)(B) ......................................................41

17 U.S.C. § 1309 ..................................................................39

28 U.S.C. § 1292(b) ...............................................................4

28 U.S.C. § 1331 ....................................................................4

28 U.S.C. § 1338(a) ................................................................4

28 U.S.C. § 1367 ....................................................................4

47 U.S.C. § 230(c) .................................................................55

## **Other Authorities**

H.R. Rep. No. 93-1581 (Dec. 12, 1974) ....................................47

H.R. Rep. No. 94-1476 (Sept. 3, 1976) ....................................48

H.R. Rep. No. 105-551(II) (July 22, 1998) ......................18, 19, 20

S. Rep. No. 105-190 (May 11, 1998)..................3, 7, 17, 18, 19, 33, 42, 43

Damian Kulash, Jr., *WhoseTube?*, N.Y. Times, Feb. 19, 2010 ...............29

Ellen P. Goodman, *Stealth Marketing and Editorial Integrity*, 85 Tex. L. Rev. 83 (2006) .................................................................................................. 30

*Federal Copyright Protection for Pre-1972 Sound Recordings: A Report of the Register of Copyrights* (Dec. 2011) ...................................................... 35, 43, 48

4 Nimmer on Copyright § 12B.04[A][1][b][i] ................................................. 19, 20

## PRELIMINARY STATEMENT

This is an interlocutory appeal from two decisions by the U.S. District Court for the Southern District of New York (Abrams, J.) interpreting the safe harbors afforded by the Digital Millennium Copyright Act of 1998 ("DMCA"). The rulings (1) force online service providers to risk a trial whenever they merely become aware of an original, user-uploaded video on their website containing a "recognizable" song; and (2) foreclose safe harbor altogether whenever their users upload material containing sound recordings fixed before 1972. This Court should reverse: Both rulings contravene the text, structure, and purpose of the DMCA, and each will have drastic implications for service providers like Vimeo that enable users to upload and share original videos.

Vimeo operates a website that hosts and showcases original videos uploaded by its users (http://vimeo.com). Plaintiffs, a group of music publishing and recording companies, sued Vimeo for copyright infringement for hosting 199 user-created, user-uploaded videos with audio components that included Plaintiffs' songs. Plaintiffs did not send Vimeo any DMCA takedown notices for these videos before filing suit. The district court determined on summary judgment that Vimeo was entitled to DMCA safe-harbor protection with respect to 153 of the videos, primarily because there was no evidence that Vimeo was even aware of them, but denied Vimeo summary judgment on two issues:

**"Red Flag" Knowledge.**  The district court denied summary judgment as to 18 videos on the ground that a jury could find that Vimeo was "aware of facts or circumstances from which infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii) (the DMCA's "red flag" provision), because: (1) each of these original videos incorporated one of Plaintiffs' "well-known" songs as an audio component; and (2) Vimeo staff may have viewed at least a portion of each video. This was error, for this Court has held that the DMCA's "red flag" provision applies only where the service provider is subjectively aware of facts and circumstances that make infringement "objectively obvious." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) (quotation marks omitted).  The DMCA's legislative history confirms that "red flag" knowledge is reserved for situations indicating piracy or other "blatant" and "obvious" circumstances.

But where, as here, there are plausible grounds for concluding that a use of copyrighted material is *not* infringing—*e.g.*, due to fair use or license—there can be no "red flag" knowledge of infringement and a service provider cannot be denied the DMCA's safe-harbor protection on that basis as a matter of law.  Each video at issue here presents a plausible fair-use defense because each is an original, user-created work that incorporates some or all of a song as background audio, transforming the music into a new and different work with a new and different purpose.  The videos here also present a plausible license defense, as Vimeo's

2

community includes filmmakers and bands who often post videos containing music with permission of the music rights-holders. Thus, none of the 18 videos could be considered "obviously" infringing so as to permit an inference of "red flag" knowledge, and the district court should have granted summary judgment to Vimeo on this issue.

**Pre-1972 Sound Recordings.** The district court also erred in concluding that the DMCA does not apply to claims involving an entire class of creative works—namely, sound recordings fixed before February 15, 1972. While pre-1972 sound recordings are protected by state copyright law rather than the federal Copyright Act, the DMCA provides safe harbor from *any* claims of "infringement of copyright," regardless of the source of the right. "Copyright infringement" is a common-law term, and the DMCA employs none of the language used in other Copyright Act provisions to limit their scope to federal rights and claims. Further, Congress's purpose in enacting the DMCA's safe-harbor provisions—to provide "greater certainty" to online "service providers concerning their legal exposure for infringements that may occur in the course of their activities," S. Rep. No. 105-190, at 20 (May 11, 1998)—would be negated if safe harbor were denied as to an entire class of works based on whether they were created before or after a particular date.

This Court should reverse the judgment below on these two issues in these consolidated appeals (Nos. 14-1048 and 14-1049), while affirming the district court in the related cross-appeals (Nos. 14-1067 and 14-1068).

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this matter under 28 U.S.C. §§ 1331, 1338(a), and 1367. This Court has appellate jurisdiction over the district court's Opinion and Order dated September 18, 2013, 972 F. Supp. 2d 500 (S.D.N.Y. 2013), *reprinted at* SPA[___-___] (the "September Order"), as amended by its Opinion and Order dated December 31, 2013, 972 F. Supp. 2d 537 (S.D.N.Y. 2013), *reprinted at* SPA[___-___] (the "December Order" and, with the September Order, the "Orders"), pursuant to 28 U.S.C. § 1292(b) because: (1) the district court certified the Orders for interlocutory appeal under 28 U.S.C. § 1292(b) [Dec. Order.26-27]; and (2) this Court granted Vimeo's timely petition to appeal (filed January 10, 2014) in an Order dated April 9, 2014, No. 14-15, Dkt. 1, 57; No. 14-16, Dkt. 1, 56.

## ISSUES PRESENTED

1.      Whether a service provider's mere viewing, without more, of an original, user-generated video containing a recognizable copyrighted song precludes summary judgment that the provider lacks "red flag" knowledge of infringement under 17 U.S.C. § 512(c)(1)(A)(ii).

4

2.    Whether copyright infringement claims involving sound recordings fixed prior to February 15, 1972 are exempt from the DMCA's safe-harbor provisions, 17 U.S.C. § 512, *et seq.*

## STATEMENT OF FACTS

### A.    Vimeo's Video-Hosting And Video-Sharing Business

Vimeo operates an online video-hosting and video-sharing platform, located at http://www.vimeo.com.  [Sept.Order.2].[1]  Launched in 2005, Vimeo allows users to upload, share, and view original videos.  [Sept.Order.2].  Vimeo emphasizes originality and requires that users upload only those videos that they have created or participated in creating.  [Sept.Order.2].

As of September 2012, Vimeo hosted over 31 million videos and had 12.3 million registered users in 49 countries uploading about 43,000 new videos every day.  [Sept.Order.2-3].  The videos hosted by Vimeo are diverse and include original movies, animation, and documentaries uploaded by artists, politicians, educational institutions, and entertainment companies, as well as personal home videos.  [Sept.Order.2].  Vimeo accountholders include the White House, CNN, the Republican Governors Association, award-winning filmmakers such as Jason

---

[1]    Vimeo, LLC ("Vimeo") is the owner and operator of the Vimeo.com website. Its affiliate and co-defendant, Connected Ventures, LLC, is no longer involved in the operations of the website.  [SUF ¶3].

Reitman, and prominent musicians, including those associated with Plaintiffs, such as Beyoncé, Katy Perry, OK Go, and Coldplay. [Mellencamp.Decl.¶¶6-12].

To upload a video to Vimeo, a user first becomes a member by creating an account. Vimeo offers basic (free) accounts, as well as paid "Plus" accounts, which give members more uploading options. [Sept.Order.3]. All members must accept Vimeo's Terms of Service. [Sept.Order.3-4]. The Terms of Service contain various content guidelines, including the requirement that members may upload only videos for which they possess all necessary rights and which do not infringe any third party's rights. [Sept.Order.4; Cheah.Decl. ¶¶2-5 & Ex.1]. The Terms of Service also incorporate by reference Vimeo's Community Guidelines (which reiterate the rights requirement), and its Copyright Policy (which sets forth Vimeo's DMCA notice-and-takedown process). [Sept.Order.4-5].

## B. The DMCA

The DMCA represents Congress's effort to "update domestic copyright laws for the digital age" based upon a broad consensus among service providers and content owners at the time of its unanimous passage. *Viacom*, 676 F.3d at 26-27. Title II of the DMCA—also known as the Online Copyright Infringement Liability Limitation Act, codified at 17 U.S.C. § 512, *et seq.*—provides "[l]imitations on liability relating to material online" for service providers like Vimeo through a series of safe harbors.

6

Congress recognized that "without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet" because "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  S. Rep. No. 105-190, at 8.  Congress thus established a comprehensive set of safe harbors to provide:  (1) "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment"; and (2) "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities."  *Id*. at 20.

At the heart of that safe-harbor regime is the notice-and-takedown process, a mechanism that gives copyright holders a quick and low-cost means of ceasing the dissemination of allegedly infringing user content.  To obtain safe harbor, a service provider must "expeditiously" remove content specifically identified in a valid takedown notice.  17 U.S.C. §§ 512(c)(1)(C) & (c)(3).  Service providers must also undertake a number of other actions, such as designating a copyright agent to receive takedown notices and implementing a policy for terminating the accounts of "repeat" infringers.  *Id*. §§ 512(c)(2), (i).  A service provider is not, however,

7

required to "monitor[] its service or affirmatively seek[] facts indicating infringing activity," *id*. § 512(m)(1), to be eligible for safe-harbor protection.

These provisions make clear that the responsibility for finding and reporting third-party infringement lies with "the copyright holder, not the service provider." *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013). This makes sense because the "provider cannot by inspection determine whether the use has been licensed by the owner, or whether its posting is a 'fair use' of the material, or even whether its copyright owner or licensee objects to its posting." *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 524 (S.D.N.Y. 2010), *aff'd in relevant part*, 676 F.3d 19 (2d Cir. 2012).

## C. Vimeo's DMCA Procedures And Efforts To Combat Copyright Infringement

It is undisputed on the summary judgment record below that Vimeo has adopted and implemented policies and procedures for responding to DMCA takedown notices from copyright holders. *See* [Sept.Order.12-23, 37-54]. For example, Vimeo: (1) has designated an agent to receive notifications of claimed infringement; (2) publishes on its website the information needed to process a takedown notice; (3) informs complainants how and where to submit takedown notices; and (4) upon receiving a valid takedown notice, removes the video at issue. [Sept.Order.12 n.10, 16-17, 53-54; Cheah.Decl. ¶¶10, 19-29].

8

It is similarly undisputed that Vimeo does not—and cannot—screen or otherwise review the tens of thousands of videos uploaded daily by users before they are published. [Sept.Order.5; Vimeo's.56.1.Stmt. ¶8; Pile.Decl. ¶¶10, 18; Cheah.Decl. ¶14]; *see also* [Sept.Order.43-44]. Vimeo does, however, moderate its website and voluntarily remove content and accounts that it believes violate its Terms of Service. [Sept.Order.5; Pile.Decl. ¶¶23-28; Cheah.Decl. ¶¶15-16]. As of September 2012, Vimeo had a 16-person Community Team tasked with this responsibility. [Sept.Order.5]. Vimeo has removed thousands of videos and user accounts for violating its terms of use. [Sept.Order.5]. Among the videos that Vimeo will remove regardless of receipt of a takedown notice are "rips"—*i.e.*, unaltered copies—of movies, television shows, and official music videos. [Cheah.Decl. ¶16; Supp.Cheah.Decl. ¶5; Pile.Decl. ¶¶27-28].

The summary judgment record shows that Vimeo's staff may watch and interact with user-submitted content for purposes of administering and moderating the site. [Pile.Decl. ¶¶23-28; Cheah.Decl. ¶¶15-16]. Vimeo also voluntarily employs automated tools (referred to as "Mod Tools") to help identify and remove impermissible content. [Sept.Order.41; Pile.Decl. ¶¶23-28; Cheah.Decl. ¶15]. In reviewing videos flagged by these tools or otherwise, Vimeo employees may watch all or part of the video—or sometimes none of it, if a violation is apparent from the video's "thumbnail" image. [Supp.Pile.Decl. ¶¶ 2, 7]. Finally, Vimeo

9

staff may comment on or "like" certain videos they encounter in the course of their activities.  [Sept.Order.29].  It is undisputed that, overall, Vimeo staff interacts with only an insubstantial, "arguably *de minimis*," percentage of the videos available on the site.  [Sept.Order.44].

### D.    Proceedings Below

In December 2009, Plaintiffs filed two lawsuits alleging that certain videos located at 199 specific URLs hosted by Vimeo (the "Videos-in-Suit") infringed their musical-composition and sound-recording copyrights.[2]  At no time before or after filing suit did Plaintiffs submit a DMCA takedown notice to Vimeo for any of the Videos-in-Suit.  [Sept.Order.54].  Nevertheless, Vimeo treated Plaintiffs' complaints as takedown notices and removed the subject videos shortly after being served.  [Sept.Order.53].

The district court (Castel, J.) consolidated the cases and bifurcated pre-trial proceedings so that the parties would, in the first stage of the litigation, address only the issue of whether Vimeo is entitled to safe-harbor protection under the DMCA.  [09-cv-10101.Docs.24, 29; 09-cv-10105. Docs.23, 28].  The parties took discovery and filed cross-motions for summary judgment on Vimeo's safe-harbor

---

[2]   *Capitol Records, LLC v. Vimeo, LLC*, No. 09-cv-10101 (S.D.N.Y.) (sound recordings); *EMI Blackwood Music, Inc. v. Vimeo, LLC*, No. 09-cv-10105 (S.D.N.Y.) (musical compositions).

defense.  Prior to briefing, the cases were reassigned to Judge Abrams.  [09-cv-10101.Dkt.46; 09-cv-10105.Dkt.46].

### E.    The Orders At Issue On Appeal

On September 18, 2013, the district court issued an Order determining that Vimeo was entitled to summary judgment as to 136 of the 199 Videos-in-Suit.  The court determined, *inter alia*, that: Vimeo had satisfied the DMCA's preconditions for safe-harbor eligibility; did not have "actual knowledge" of infringement for any video; did not make itself "willfully blind" to acts of infringement; and did not have the "right and ability to control infringing content from which it financially benefits."  [Sept.Order 12-23, 34-53].  Further, the district court granted Vimeo summary judgment on these 136 videos because there was no record evidence that Vimeo was ever aware they had been uploaded to its website, and Vimeo thus could not have "red flag" knowledge of infringing activity.  [Sept.Order.33].

The court denied summary judgment to Vimeo, however, with respect to: (1) 10 videos that were uploaded by employees of Vimeo or an affiliate;[3] (2) 35 videos that Vimeo staff appeared to have viewed on the ground that Vimeo may have had "red flag" knowledge of infringement because the videos contained copyrighted songs; and (3) 20 videos containing pre-1972 sound recordings on the

---

[3]    The district court found issues of fact as to whether these videos were "stored at the direction of a user."  [Sept.Order.24-26].  Vimeo did not seek interlocutory review of this ruling but reserves its rights.

ground that the DMCA provides no safe harbor against claims based on such recordings.  [Sept.Order.24-26, 28-33, 54-55].[4]

More specifically, on the "red flag" issue, the court acknowledged that "a service provider may not be able to determine whether a particular work is infringing solely by the act of viewing it."  [Sept.Order.32] (citing cases).  The court nonetheless was "unprepared" to hold that "red flag" knowledge cannot be found "under any circumstance short of an employee's awareness that the uploader has no legal defense," because that would "collapse the distinction the DMCA makes between actual and red flag knowledge."  [Sept.Order.32-33].  As to pre-1972 sound recordings, the court acknowledged conflicting, non-binding opinions and stated that "it is for Congress, not the courts, to extend the Copyright Act to pre-1972 sound recordings."  [Sept.Order.54] (quotation marks omitted).

Vimeo moved for reconsideration of the "red flag" determination on the grounds that: (1) a service provider's mere awareness of a copyrighted song in an otherwise original video cannot, without more, raise a triable issue as to "red flag" knowledge; and, separately, (2) there was no evidence that Vimeo staff actually viewed 15 of the 35 videos.  On December 31, 2013, the district court issued an Order declining to reconsider the "red flag" standard it applied.  The court

---

[4]  Summary judgment was arguably denied as to some videos on multiple grounds, *e.g.*, both "red flag" and pre-1972 grounds.

12

acknowledged that "the legislative history of 17 U.S.C. § 512(c) suggests that service providers should not be placed in a position of having to assess the viability of a user's legal defense to copyright infringement." [Dec.Order.22] Nonetheless, the Court reasoned that "[a] jury could conclude" that infringement would have been "'objectively' obvious to a reasonable person" because the songs were "recognizable" and "well-known," and the "videos played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song." [Dec.Order.11].

In the same Order, the court granted Vimeo summary judgment on an additional 17 videos. [Dec.Order.1]. The court agreed that there was no evidence that Vimeo staff had watched the 15 videos cited by Vimeo, and *sua sponte* ruled that two of the remaining 20 videos contained portions of songs that were too short to give rise to "red flag" knowledge. [Dec.Order.9, 26]. As a result, the court amended its September ruling to deny summary judgment to Vimeo as to only 18 videos based solely on the "red flag" issue. These 18 videos (described in the attached Table, *infra*) are each original, non-commercial, user-generated videos that use copyrighted songs in background audio. [DVD.Exs.1-18].

At Vimeo's request, the district court certified the Orders for interlocutory review, finding, *inter alia*, that the "red flag" and pre-1972 issues are issues of law as to which there is substantial ground for disagreement. [Dec.Order.18-23].

13

Vimeo timely filed a petition for appeal to this Court, and Plaintiffs filed a cross-petition. No. 14-15, Dkt. 1, 25; No. 14-16, Dkt. 1, 25. On April 9, 2014, this Court granted Vimeo's petition, as well as Plaintiff's cross-petition, and consolidated the appeals for all purposes.[5] No. 14-15, Dkt. 57; No. 14-16, Dkt. 56.

## SUMMARY OF ARGUMENT

The district court erroneously denied Vimeo summary judgment on its safe-harbor defense for: (1) 18 original videos that each contain a well-known copyrighted song; and (2) 20 videos that each incorporate a sound recording fixed prior to February 15, 1972.

## I.

The district court misapprehended the standard for "red flag" knowledge of copyright infringement. Under *Viacom*, "red flag" knowledge exists only when infringement of a work is "objectively obvious" to a reasonable person. 676 F.3d at 31 (quotation marks omitted). The district court erred in concluding that an original video that incorporates a "well-known" song always presents a triable issue as to whether the alleged infringement was "obvious."

---

[5] In its December Order, the district court also granted Plaintiffs leave to file amended complaints that would add more than 1,000 other videos to the lawsuits. [Dec.Order.14-16]. Those additional videos are not part of the record on appeal.

*First*, the district court's ruling effectively lowered the "red flag" standard from one of *obvious* infringement to one of *possible* infringement. Congress intended that "red flag" knowledge would be difficult to attain and generally reserved for awareness of piracy or other blatant acts of infringement. The legislative history of the DMCA makes clear that service providers do not acquire "red flag" knowledge when they merely come across, for example, a "well known photograph," because they cannot know whether the photograph is in the public domain, licensed, or subject to fair use.

*Second*, the district court disregarded the availability of plausible defenses to infringement such as fair use or license. Infringement can be "objectively obvious" only if it is equally obvious that there are no available defenses. Here, because each of the 18 videos incorporating a copyrighted song uses new, original visual elements and is therefore transformative, each presents a plausible case for fair use. Likewise, many Vimeo users post videos containing well-known music with permission from the copyright holder. Under such circumstances, none of these videos presents a triable issue of "red flag" knowledge.

*Third*, the district court's standard is not only unworkable, because it is untethered to objective criteria, but it also undercuts fundamental goals of the DMCA. The court's ruling encourages service providers either to ignore what is on their websites because any encounter with music could lead to a trial on "red

15

flag" knowledge, or to over-police user-posted content, and thereby stifle creativity and expression in the online marketplace of ideas.

## II.

The district court further erred in concluding that the DMCA's safe harbors do not protect against state-law copyright infringement claims based on sound recordings fixed prior to February 15, 1972.

*First*, the DMCA's text confirms that the safe harbors apply to both federal and state-law copyright claims:  Section 512(c) confers immunity from liability for *any* "infringement of copyright," which necessarily includes state-law claims.  When Congress has intended to limit the application of a statutory provision to federal copyright claims, it has repeatedly used the language "under this title," yet such language is conspicuously absent from Section 512(c).  Further, such a reading of the safe-harbor provisions fulfills a fundamental purpose of the DMCA—to provide legal certainty to service providers in order to encourage investment in the Internet.

*Second*, Section 301(c) of the Copyright Act does not require a different result.  It is simply an anti-abrogation provision and does not forever preclude any and all regulation of pre-1972 sound recordings.  It addresses a separate and distinct issue and is fully compatible with Section 512(c).  In any event, the DMCA does not limit any state-law rights or remedies afforded rights-holders with

16

respect to pre-1972 sound recordings. It merely confers upon certain service providers a qualified immunity from secondary liability. And in situations where the DMCA applies, it is unlikely that New York common law would impose liability on a service provider in the first place.

## **ARGUMENT**

## I. THE DISTRICT COURT ERRED IN HOLDING THAT MERE AWARENESS OF THE PRESENCE OF A COPYRIGHTED SONG IN AN ORIGINAL VIDEO RAISES A TRIABLE ISSUE AS TO "RED FLAG" KNOWLEDGE OF INFRINGEMENT

The district court's Orders misapprehend the "red flag" knowledge standard: The DMCA, its legislative history, and this Court's decision in *Viacom* all confirm that "red flag" knowledge comprehends only "obvious" and "blatant[]" acts of infringement, such as outright piracy, which any service provider would know are unlawful. *Viacom*, 676 F.3d at 31, 33 (quotation marks omitted); S. Rep. No. 105-190, at 48-49. This is not a "red flag" case. Where, as here, a user has created a new, original video, and uploaded it to a website for original videos, the mere fact that the original video contains a copyrighted song does not, without more, indicate to the service provider that the video is infringing *at all*—let alone that it is "obviously" infringing. To hold otherwise would: (1) improperly equate the mere presence of copyrighted materials with infringement; (2) ignore available defenses such as fair use and license; and (3) ultimately replace the "red flag" standard with

17

a "gray area" inquiry into what "might be infringing" that will deny service providers the certainty and protection that Congress intended.

### A.    "Red Flag" Knowledge Means Knowledge Of Material That Is "Obviously" Infringing, Not Just Potentially Infringing

The burden of establishing "red flag" knowledge—that is, "aware[ness] of facts or circumstances from which infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii)—is an onerous one.  "[T]he red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement *'objectively' obvious* to a reasonable person."  *Viacom*, 676 F.3d at 31 (emphasis added).  It is not enough for the use of copyrighted material to be *possibly* infringing or even on balance infringing; the indicia of infringement must be so great that infringement is downright *obvious*.

The DMCA's legislative history confirms that a service provider does not attain "red flag" knowledge merely by becoming aware of content that might be infringing.  The leading committee reports stated that service providers should not have to "make discriminating judgments about potential copyright infringement." S. Rep. No. 105-190, at 49; H.R. Rep. No. 105-551(II), at 57-58 (July 22, 1998) (similar).  To illustrate the point, the reports explained:

> A directory provider [does not acquire "red flag" knowledge] … merely because it saw one or more *well known photographs* of a celebrity at a site devoted to that person.  The provider could not be expected, during the course of its brief cataloguing visit, to determine *whether*

18

> *the photograph was still protected by copyright* or was in the public domain; if the photograph was still protected by copyright, *whether the use was licensed*; and if the use was not licensed, *whether it was permitted under the fair use doctrine*.

S. Rep. No. 105-190, at 48 (emphases added); H.R. Rep. No. 105-551(II), at 57 (similar).[6]

Accordingly, "red flag" infringement must be obvious "from even a brief and casual viewing." *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 644 (S.D.N.Y. 2011) ("*MP3tunes*") (citation omitted); *Viacom*, 718 F. Supp. 2d at 524 (no "red flag" knowledge as a matter of law because a "provider cannot by inspection determine whether the use" in video is infringing). As a leading commentator has observed:

> [Given] how difficult it can be to determine whether all the elements of infringement are present—from proper ownership and standing to lack of license ... to satisfaction of notice formalities ... to the perennially murky issue of fair use, and beyond[, i]t would seem, therefore, that the "flag" must be brightly red indeed—and be waving blatantly in the provider's face—to serve the statutory goal of making "infringing activity … apparent."

---

[6] This passage applies to the "red flag" knowledge inquiry under § 512(c), though it appears in a discussion of the § 512(d) safe harbor. *See* S. Rep. No. 105-190, at 48; *Viacom*, 718 F. Supp. 2d at 522; *Hendrickson v. Amazon.com, Inc*., 298 F. Supp. 2d 914, 917 (C.D. Cal. 2003).

4 Nimmer on Copyright § 12B.04[A][1][b][i] (footnote omitted) (third ellipsis in original).

Thus, for instance, "red flag" knowledge may be imputed to a service provider in the context of "pirate sites or in similarly obvious and conspicuous circumstances, *and not simply because the provider viewed an infringing site*" during the course of its operations.  H.R. Rep. No. 105-551(II), at 58 (emphasis added).  Consequently, "red flag" knowledge has been found where an individual (1) operated a file-sharing platform that allowed users to exchange illegal copies of movies, software, albums and the like and, (2) "actively encourag[ed] infringement[] by urging his users to both upload and download particular copyrighted works," and did so himself.  *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013).  On the other hand, a service provider that does not engage in such activities has no obligation to investigate content that, on balance, *might* be infringing.  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007) (no "red flag" knowledge as a matter of law where service provider was aware that it hosted websites named "illegal.net" and "stolencelebritypic.com").

## B.    Mere Awareness Of Copyrighted Material Does Not Demonstrate Knowledge Of Infringement

The district court failed to apply this high standard for "red flag" knowledge in denying Vimeo summary judgment as to 18 original videos that each included a

"well-known" song as background music.[7]  The district court erroneously equated the use of a well-known song in a video with "infringement" and, therefore, mere awareness of such content in a video with potential knowledge of "obvious" infringement.  *See* [Dec.Order.9-10].  For example, the district court opined that a user's identification of song and artist names on the video clip's webpage might be "red flags" in and of themselves.  *See* [Dec.Order.9-10].  But such listings are indicia only of the *presence* of copyrighted material in the videos; in the context of a website dedicated to original creative works, they do not suggest "obvious" or "blatant" acts of infringement, as they well might in the context of, say, peer-to-peer file-sharing platforms that encourage movie piracy.

Nothing in the record here, however, raises a triable issue of "red flag" knowledge of infringement as to these 18 videos.  All 18 videos contain original video components, which are not owned by Plaintiffs—new, substantive contributions that confer independent value on the videos and transform the music used in them.  *See* Table, *infra*.  Vimeo's platform is not designed for trafficking in pirated content or unadulterated copies (*i.e.*, "rips") of copyrighted movies or songs, but rather for hosting original, user-created videos.  [Sept.Order.2].  Such a

---

[7]   There is no evidence in the record demonstrating that Vimeo staff actually watched all or part of these videos.  We nonetheless assume, for purposes of this appeal only, that a staff member viewed the entirety of each of the 18 videos at issue.

video-sharing platform, as the district court correctly determined here ([Sept.Order.37-45]), is generally entitled to DMCA safe-harbor protection. Given the nature of Vimeo's business and the nature of the videos themselves, no reasonable factfinder could conclude that, based on the mere presence of a song in a video, Vimeo was aware of circumstances demonstrating "obvious" infringement.

### C.    Available Defenses Of Fair Use And License Foreclose Any Triable Issues Of "Red Flag" Knowledge On This Record

The district court's apparent assumption that the presence of "well-known" copyrighted music in an original video *must* be infringing, and therefore *could* be considered "obviously" infringing by a jury, did not take proper account of available defenses to infringement in this context, particularly fair use and license. The district court expressed concern that the "actual knowledge" and "red flag" knowledge provisions of the DMCA might collapse if a service provider would avoid "red flag" knowledge unless it knew for a certainty that a particular video lacked all potential defenses to infringement. [Sept.Order.32-33]. The district court next found that a trial was required to resolve the "red flag" knowledge issue because the court could not determine as a matter of law whether defenses such as fair use were available for the 18 videos. [Dec.Order.11].

This has the analysis backwards. In assessing whether a service provider might have "red flag" knowledge that would foreclose the safe harbor, the court's function is not to attempt to resolve the merits of an infringement claim, including

22

defenses such as fair use or license. If that were the court's function, and the service provider's concomitant burden, the safe harbor would provide little meaningful protection. Rather, the court need simply determine whether on the record before it there is anything, such as a plausible fair-use or license defense, that indicates that the claimed infringement (if any) was not "obvious" or "blatant." This does not negate the "red flag" provision, but actually gives it meaning: Infringement cannot be "objectively obvious" unless it is also objectively obvious that legitimate defenses are not available.

The district court should have ruled that the record did not permit a conclusion that it was "objectively obvious" that the 18 videos lacked defenses to infringement. Instead, however, the district court proceeded to engage in something akin to a "quick look" merits review, and its incomplete analysis resulted in misapplication of the elements of the fair use doctrine. The district court further erred in failing to credit the availability of a license defense. Had the district court conducted the proper inquiry, it would have concluded as a matter of law that none of the 18 original videos at issue is a candidate for a finding of "obvious" infringement because each presents a plausible case for fair use and/or license.

**Fair Use**. The "fair use" of a copyrighted work is by definition not copyright infringement, but is rather a limitation on a copyright holder's bundle of

exclusive rights vis-à-vis the world.  *See* 17 U.S.C. § 107.  "The fair use doctrine 'permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1175 (9th Cir. 2013) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)).  "As the statute indicates, and as the Supreme Court and [this] court have recognized, the fair use determination is an open-ended and context-sensitive inquiry."  *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013).[8]

Central to the fair-use inquiry is "'whether and to what extent the new work is transformative,'" as transformative works "'lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright.'"  *Seltzer*, 725 F.3d at 1176 (quoting *Campbell*, 510 U.S. at 579).  A new work is transformative when it produces a "different aesthetic" than the original work standing alone.  *Cariou*, 714 F.3d at 708; *see also id.* at 609 (self-styled "appropriation" artist fairly used photographer's works to convey new meaning,

---

[8]  "[F]air use doctrine mediates between the property rights copyright law establishes in creative works, which must be protected up to a point, and the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others, which must be protected up to a point."  *Cariou*, 714 F.3d at 705 (brackets and quotation marks omitted)  The doctrine also prevents copyright laws from running afoul of the First Amendment.  *See Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 482 (2d Cir. 2007).

"transform[ing] those photographs into something new and different"); *see also Seltzer*, 725 F.3d at 1179 (band fairly used street artist's entire graffiti images in music video).

The district court's fair-use analysis, while procedurally inappropriate at this juncture, was also substantively incorrect. *First*, the district court failed to acknowledge the transformation inherent in the 18 videos at issue here, each of which is an original, non-commercial work that incorporates music as part of the audio component of the video.[9]  Thus, unlike the "ripped" movies being exchanged in *Fung*, each of the 18 videos "adds something new" to the song it uses—namely, a visual accompaniment that casts the song in a different light. *Campbell*, 510 U.S. at 579; *compare Fung*, 710 F.3d at 1043.  Indeed, each video produces an aesthetic that is entirely different from the experience of merely listening to the song standing alone:  The videos have their own narratives; some present images unrelated to the subjects of the songs, and some appear to parody the original song. *See* Table, *infra*; *see also Cariou*, 714 F.3d at 708 ("Prince's images … have a different character, give Cariou's photographs a new expression, and employ new aesthetics with creative and communicative results distinct from Cariou's").

---

[9] The district court instead focused on a single video (by the artist "Mims") that may have been non-original.  [Dec.Order.12 & n.8]  However, because there was no evidence that Vimeo was even aware of it, Vimeo was granted summary judgment as to that video. *Id*.

*Second*, the district court suggested that fair use was unavailable because "the videos played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song." [Dec.Order.11].[10] But this elevation of a single fair-use factor (the third) to dispositive status was error. The quantity and quality of the original work used must be assessed "in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178 (finding fair use as a matter of law even though plaintiff's work was used in its entirety). "'[T]he more transformative the new work, the less will be the significance of other factors … that may weigh against a finding of fair use.'" *Cariou*, 714 F.3d at 708 (quoting *Campbell*, 510 U.S. at 579). Further, "copying the entirety of a work is sometimes necessary to make a fair use." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006); *accord Cariou*, 714 F.3d at 710 (in context of art, use of entire work may be consistent with fair use). Because the 18 original videos are all transformative, the court erred in ruling out fair use based upon song and video lengths alone.

---

[10] The district court's observations in this regard are incorrect—as the attached Table demonstrates, many of the videos are much shorter than the song, while some are longer than the song. Moreover, it cannot be presumed that a service provider will not only recognize the song, but will also know its length so that it can make this comparison.

In any event, as explained above, it was not the court's task to definitively resolve fair use in the context of a "red flag" inquiry.  Nor is it the service provider's burden to make such complex fair-use determinations in order to maintain the safe harbor defense, as it is in no position to do so.  Indeed, the parent of the Plaintiff recording companies, Universal Music, recently argued that fair use cannot be determined based upon mere "viewing" of a video containing music because the copyright holder lacks "information uniquely within the knowledge of the user who incorporated the original work."  Appellants' Third Brief on Cross-Appeal at 16, *Lenz v. Universal Music Corp.*, No. 13-16106(L), Dkt. 56 (9th Cir. Feb. 4, 2014).  Moreover, "[e]valuating fair use is not an 'I know it when I see it' exercise," but rather is "time consuming, 'open-ended,' and indeterminate." Appellants' First Brief on Cross-Appeal at 33-34, *id.*, Dkt. 23 (9th Cir. Oct. 9, 2013).[11]  Likewise, the Recording Industry Association of America ("RIAA") has called the fair use doctrine "one of the most confounding doctrines in copyright law" and one that is "notoriously troublesome to apply" and "does not lend itself to rapid or simple judgments."  Brief of RIAA in Support of Appellants at 18, *Lenz*, Dkt. 34 (9th Cir. Oct. 16, 2013) ("RIAA *Lenz* Br.").

---

[11]  In *Lenz*, which involves the use of a Prince song in a video, Universal argues that it should not have to consider the defense of fair use before issuing a DMCA takedown notice.

In this very case, the RIAA effectively conceded that original videos containing copyrighted music could constitute fair use (or otherwise be unobjectionable) when it *withdrew* three DMCA notices it had sent to Vimeo in 2006.  [Cheah.Decl. ¶45 & Ex.8].  If the world's largest music company and the RIAA are reluctant to analyze fair use with respect to the use of their own artists' music in original videos, a service provider like Vimeo cannot be expected to do so.  *See also* RIAA *Lenz* Br. at 19-20 ("[H]ow can a copyright holder be expected to conclude that a use is fair or not? … Indeed, skilled copyright practitioners often cannot counsel clients on this question with any high degree of confidence….").  By the same token, the district court's reluctance to resolve issues of fair use on summary judgment in favor of either party confirms that the alleged infringement could not have been obvious to Vimeo in the first instance.

**License**.  Like fair use, a license is a complete defense to a claim for copyright infringement.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).  The district court should not have dismissed this defense because there are a number of plausible reasons why an original video containing music might be uploaded to a platform like Vimeo with the copyright holder's permission.  *See UMG Recordings, Inc.*, 718 F.3d at 1021 (rejecting argument that Veoh's awareness of "music videos" on its website gave rise to "red flag" knowledge of

infringement because there were many reasons why Veoh could lawfully host music videos).

For example, some musicians upload their own content to services like Vimeo to promote their works, as did EMI-signed band OK Go. [Capitol.Response.to.RFA.34, 36-37].[12]   Other Vimeo users have submitted DMCA counter-notifications, asserting that they had authorization to use the copyrighted music in their videos.  *See* [Cheah.Decl.Ex.7] (counter-notifications received by Vimeo, attesting to authorization).  Some users have complained after Vimeo *voluntarily* removed their videos, objecting that they owned (*e.g.*, [Rose.Decl.Ex.16.VCV005680, VCV007288]) or had permission to use (*e.g.*, [Rose.Decl.Ex.16.VCV006643, VCV006653, VCV007176]) the music in the video. *See generally* [Rose.Decl.Ex.16].   Relatedly, sometimes rights-holders have uploaded videos containing their own copyrighted materials (including music) to video-sharing websites while pretending to be ordinary, unaffiliated users—a tactic known as "stealth" marketing—or have encouraged such users to upload such materials, all for the purpose of generating "buzz" or spawning "viral" videos.  *See*

---

[12]  Plaintiffs originally included two videos including OK Go songs, but their amended complaints have dropped those claims.  *Compare* [Capitol.Compl.Schedule A at 3] *with* [Amended.Capitol.Compl.Schedule.A at 22].  OK Go became famous for making its own music videos and distributing them online.  *See* Damian Kulash, Jr., *WhoseTube?*, N.Y. Times, Feb. 19, 2010, at A17, available at http://www.nytimes.com/2010/02/20/opinion/20kulash.html.

Ellen P. Goodman, *Stealth Marketing and Editorial Integrity*, 85 Tex. L. Rev. 83, 95 (2006).[13]

The district court did not acknowledge these cases. Instead, citing *Fung*, 710 F.3d at 1039, and *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 454 F. Supp. 2d 966, 987-88 (C.D. Cal. 2006), it observed that copyright holders do not generally license their works to ordinary users. [Sept.Order.33; Dec.Order.13-14]. But *Fung* and *Grokster* involved the wholesale copying of movies and songs using peer-to-peer file-sharing platforms—circumstances under which it would be objectively unreasonable to believe that rights-holders had authorized such activity. There is no basis on which to apply such assumptions to Vimeo. In fact, many music rights-holders have licensing programs in which they license so-called "synchronization" and "master use" rights for the purpose of incorporating musical works into audiovisual works—including those created by individual users for online distribution.[14] Mere viewing of a video, without more, cannot reveal the licensing arrangements that may or may not authorize the use of music.

---

[13] In *Viacom*, YouTube cited to multiple instances of Viacom's using "stealth marketing" to promote viral distribution of its own content. *See* Memorandum of Law in Support of Defendants' Motion for Summary Judgment at 40-42, *Viacom*, No. 07-cv-2103, Dkt. 188 (S.D.N.Y. Mar. 18, 2010).

[14] *See, e.g.*, web portals allowing users to request licenses from Plaintiffs and their affiliates: EMI Music (http://www.emimusicpub.com), Sony (https://sonymusiclicensing.com), Universal (http://www.umusicpub.com); *see also* Synch
(*footnote continued*)

*    *    *

The 18 videos in this case are original videos that transform the songs used therein with the addition of new, substantive visual content; when viewed within the context of the Vimeo website, they present plausible defenses of fair use and license. Accordingly, Vimeo's mere awareness that these videos contained recognizable songs does not, without more, create a triable issue of fact as to whether infringement was "objectively obvious." Based upon this record, the district court should therefore have granted summary judgment of safe harbor to Vimeo.

### D. Inferring "Red Flag" Knowledge From The Mere Presence Of Copyrighted Material In A User-Generated Video Would Present Multiple Practical Problems

The district court's Orders would deny summary judgment on safe-harbor grounds, and force a costly trial, whenever: (1) a service provider's employee has "interacted with" an original user-uploaded video—such as by viewing it; and (2) the video includes a "recognizable" song. [Dec.Order.10-11]. That cramped view of the DMCA's scope is not only contrary to law but also presents multiple practical problems for service providers attempting to comply with it.

---

Services, Universal, http://www.umusicpub.com/#contentRequest=servicessynch (negotiable licensing fees for, *inter alia*, "home video[s]").

### 1. The District Court's Focus On "Recognizable" Works Is Unworkable

The district court's standard confers favored status on "recognizable" songs, [Dec.Order.10-11], despite the absence of any special treatment for particular sub-genres of works in the DMCA (or the Copyright Act generally). Regardless, there is no objective means of determining what is "recognizable." An 18-year-old intern, or a 45-year-old employee, or a 60-year-old appellate judge, might or might not be familiar with the works of, say, Gorillaz or Fountains of Wayne. *See* Table, *infra* (listing artist and song names). Whether a song is "recognizable" is in most cases a highly subjective inquiry, dependent upon the tastes, background, and knowledge of the listener. And since virtually any song is "recognizable" to some or another group of people, the district court's standard would in practice likely devolve into an inquiry as to the presence of any song in a video. By forcing service providers to endure an expensive trial whenever any "recognizable" song—whatever that means—is present, the district court's standard would defeat the very purpose of the DMCA safe harbor.

### 2. The District Court's Standard Discourages Beneficial Website Moderation And Encourages Website Censorship

The district court's standard, if upheld, would pose the greatest risk for those service providers who monitor content on their websites for a variety of desirable reasons, including the removal of potentially infringing content. When the "red

flag" standard is set too low, service providers face a Hobson's choice:  either sharply reduce moderation activities (to avoid "interaction" with content) or aggressively police content.  Neither option makes for good policy.

Without a doubt, service providers should have the freedom to improve their sites by voluntarily removing unlawful or unwanted content.  "The knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention." S. Rep. No. 105-190, at 48-49.  Under the district court's standard, however, staff members reviewing a website for unwanted content (*e.g.*, potential pornography uploaded in violation of the site's terms of service) may also be forced to guess whether any content they see is potentially infringing.   That in turn likely will cause some providers to curtail their moderation activities, leading to a poorer user experience and, ironically, an *increase* in actual copyright infringement.

Alternatively, if the district court's standard is upheld, some providers will likely implement automated content-filtering systems that flag for removal any materials that make use of copyrighted content, regardless of whether the use is infringing.  *See Viacom*, 676 F.3d at 41-42; *UMG Recordings*, 718 F.3d at 1012-13. This too contravenes the DMCA, which expressly rejects conditioning safe harbor upon a service provider's "monitoring its service or affirmatively seeking facts

33

indicating infringing activity."  17 U.S.C. § 512(m)(1); *see also Viacom*, 676 F.3d at 41.

Moreover, content-filtering systems are effectively preemptive takedowns not subject to the safeguards built into the DMCA.  The DMCA requires that takedown notices be submitted under penalty of perjury, and subjects copyright holders to liability for making false statements, thereby discouraging frivolous infringement claims.  17 U.S.C. §§ 512(c)(3)(A)(vi), (f).  Further, the DMCA permits users to file a counter-notification to challenge a takedown notice and have their content restored.  *Id*. §§ 512(g)(2)(B), (g)(3).  None of these protections applies when service providers remove content of their own accord for fear of potential liability.  Given the risk and cost of defending infringement claims, service providers will have little incentive to permit users to challenge the removal of content, particularly if restoring content would put them in a worse legal position.

*      *      *

The district court in effect held that whenever the use of a song in a video might be infringing, it also might be "obviously" infringing.  In so doing, the court created a rule that the mere awareness of the use of a song in a video—and nothing more—automatically requires denial of summary judgment to the service provider seeking the safe harbor.  This rule contradicts the language and purpose of the

34

DMCA, disregards this Court's teachings in *Viacom*, and ignores the robust defenses, particularly fair use and license, that are available in the context of platforms dedicated to hosting and sharing original videos, on a record like that here. The bar for "red flag" knowledge of infringement is far higher. This Court should reverse.

## II.  THE DISTRICT COURT ERRED IN CATEGORICALLY DENYING DMCA SAFE HARBORS AGAINST CLAIMS BASED UPON PRE-1972 SOUND RECORDINGS

The district court's conclusion that the DMCA safe-harbor provisions do not apply to claims based upon sound recordings fixed prior to February 15, 1972 was error:  The DMCA provides safe harbor to service providers for *any* alleged "infringement of copyright," including claims under state laws governing pre-1972 sound recordings.[15]  Unlike other provisions of federal copyright law, the DMCA's safe-harbor provisions are not limited to claims of infringement under federal law. Moreover, the purpose of the safe harbor—to clarify and limit the potential liability

---

[15]  The district court did not independently analyze the applicable statutes; rather, it adopted the views expressed by the Copyright Office and a state appellate court. [Sept.Order.55] (citing *Federal Copyright Protection for Pre-1972 Sound Recordings:  A Report of the Register of Copyrights* at 131-32 (Dec. 2011) ("*Copyright Office Report*"), available at http://www.copyright.gov/docs/sound/pre-72-report.pdf; *UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 964 N.Y.S.2d 106 (1st Dep't 2013)).  Neither of those sources, however, is entitled to any deference here. *See Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941, 946-47 (2d Cir. 1975) (Copyright Office lacks authority to interpret Copyright Act); *Carvajal v. Artus*, 633 F.3d 95, 109 (2d Cir. 2011) (no deference owed to state-court interpretation of federal law).

of service providers like Vimeo—would be undermined if an entire class of works were excluded from its ambit.

Section 301(c) of the Copyright Act—which left protection of pre-1972 sound recordings to the States—does not change this analysis. The DMCA does not annul or limit any substantive right or remedy relating to a pre-1972 sound recording; rather, it merely immunizes service providers (but not direct infringers) from liability under certain circumstances. New York common law, which is applicable here, would likely foreclose liability in those circumstances as well. Consequently, there is no conflict between the DMCA and Section 301(c).

## A. The DMCA Safe Harbors Apply To Both Federal And State-Law Claims Of Copyright Infringement

### 1. The Text Of The DMCA Provides That The Safe Harbors Apply To Claims Involving Pre-1972 Sound Recordings

Plaintiffs' claims for "common law *copyright infringement*" are subject to the DMCA's safe harbors. Section 512(c) states that a service provider "shall not be liable for monetary relief, or … for injunctive or other equitable relief, for *infringement of copyright* by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1) (emphasis added). The DMCA employs identical language for the other safe harbors. *See id.* § 512(a) (no liability for "infringement of copyright" for transitory digital network communications);

36

§ 512(b)(1) (same for system caching); § 512(d) (same for information location tools).  The DMCA does not define the term "infringement of copyright," or contain any language limiting its reach to federal copyright infringement.

"[A]s a general rule, undefined statutory terms should be construed in accordance with their common-law meaning."  *In re Halpin*, 566 F.3d 286, 292 (2d Cir. 2009).  This rule applies to undefined terms in the Copyright Act.  *See*, *e.g.*, *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1358 (2013) (applying common law in interpreting first-sale doctrine under Section 109); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 740-41 (1989) (applying common-law definitions of words "employee" and "scope of employment" in Section 101).  Because the term "infringement of copyright" is not defined in the DMCA, or anywhere else in the Copyright Act, courts must apply its common-law meaning.

"Copyright" and "infringement" are common-law terms that predate the federal copyright statutes.  *See Feltner v. Columbia Pictures Television, Inc*., 523 U.S. 340, 348 (1998) ("Before the adoption of the [Bill of Rights], the common law and statutes in England and this country granted copyright owners causes of action for infringement."); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 830 N.E.2d 250, 262-63 (N.Y. 2005) ("*Naxos*") (recounting common-law protection for copyrights before and after enactment of federal copyright statutes).  In New York at least, musical sound recordings "created before February 15, 1972, are …

37

entitled to *copyright protection* under New York common law until the effective date of federal preemption." *Naxos*, 830 N.E.2d at 263 (emphasis added).  It is on this basis that Plaintiffs plead claims for "common law *copyright infringement*." [Capitol.Compl. ¶62] (emphasis added).

Because "[i]t is beyond dispute that the common law meaning of the term 'copyright infringement' encompasses violations of both federal and state protections," *MP3tunes*, 821 F. Supp. 2d at 641, the DMCA safe harbors apply to any and all claims of "infringement of copyright," whether under federal or state law.  Vimeo is therefore entitled to DMCA safe harbor with respect to Plaintiff's common-law "copyright infringement" claims.  The Court need go no further.  *See Fed. Housing Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) ("Absent ambiguity, our analysis … ends with the statutory language.").

Plaintiffs may argue that the Copyright Act somehow defines "infringement of copyright" to exclude claims brought under state law, but there is no support for this argument in the statute.  The definition section of the Act (Section 101) does not define or even mention "infringement."   While Section 501(a) states that "[a]nyone who violates any of the exclusive rights of the copyright owner *as provided by sections 106 through 122* … is an infringer of the copyright" (emphasis added), this provision "does not provide a comprehensive definition of copyright infringement." *MP3tunes*, 821 F. Supp. 2d at 641.  Indeed, there are

38

other provisions of the Copyright Act that identify as "infringement" acts that do not involve violation of those exclusive rights. *See*, *e.g.*, 17 U.S.C. § 1309 (violation of design rights protected under Section 1301 constitutes "infringement"). For those whose acts are *not* catalogued as infringement in the Copyright Act, common-law principles determine whether they also are "infringer[s]" of the copyright for the DMCA's purposes. *MP3tunes*, 821 F. Supp. 2d at 641. Accordingly, the text of the DMCA includes Plaintiffs' claims of state-law "copyright infringement" within its scope.

### 2. The Structure Of The Copyright Act Confirms That Congress Intended The DMCA Safe Harbors To Apply To Pre-1972 Sound Recordings

While the plain text of Section 512(c) disposes of the issue, the Copyright Act as a whole points to the same result. In particular, Congress did not limit the DMCA safe harbors to acts of copyright infringement "under this title," or "in accordance with this title," or through the use of any other limiting language. Yet, when Congress wanted to limit the reach of a particular section of the Copyright Act to federal copyright law, it has consistently done so by using such limiting provisos. Its decision *not* to do so in Section 512 confirms that it intended the DMCA's safe harbors to encompass both federal and state-law copyright infringement claims.

39

Provisos limiting the reach of the statute to matters "under this title" run through the Copyright Act—a theme likely attributable to the fact that state copyright laws predated federal law. The provision defining the "subject matter of copyright" begins: "Copyright protection subsists, *in accordance with this title*, in original works of authorship fixed in any tangible medium of expression …." 17 U.S.C. § 102(a) (emphasis added). Similarly, the provision enumerating the exclusive rights of copyright holders starts: "Subject to sections 107 through 122, the owner of copyright *under this title* has the exclusive rights to do and to authorize any of the following …." *Id.* § 106 (emphasis added). Other examples abound. *See*, *e.g.*, *id.* §§ 104 (setting forth scope of copyright for works "subject to protection under this title"); 105 ("Copyright protection under this title is not available for any work of the United States Government …."); 201 ("Copyright in a work protected under this title vests initially in the author or authors of the work.").

Congress even used the same "under this title" language to limit the scope of *other* parts of the DMCA. Title I of the DMCA (codified at 17 U.S.C. § 1201) imposes criminal and civil liability for acts that circumvent digital rights management controls—but only insofar as federal copyrights are affected. *See* 17 U.S.C. § 1201(a)(1)(A) ("No person shall circumvent a technological measure that effectively controls access to a work protected under this title."). This textual

40

limitation appears throughout Section 1201, making clear that certain acts "do[] not constitute infringement under this title."  *See*, *e.g.*, *id.* §§ 1201(f)(1), (3) (reverse engineering for interoperability); (g)(2)(D) (encryption research); (j)(2) (security testing).  Likewise, 17 U.S.C. § 1202, which addresses the integrity of copyright management information, repeatedly refers to infringement of a right "under this title."  *See id.* §§ 1202(b), (e)(1)(B), (e)(2)(A)(ii), (e)(2)(B); *see also*, *e.g.*, 17 U.S.C. § 104(c) (DMCA amendment stating that Berne Convention does not affect any "work eligible for protection under this title").

The Supreme Court has made clear that the words "under this title" must be given meaning.  *See Kirtsaeng*, 133 S. Ct. at 1358 ("the … three words, 'under this title,' set forth the standard of lawfulness") (brackets and quotation marks omitted); *see also id.* at 1359 (referencing Section 104's "under this title" language); *id.* at 1362 (referencing "under this title" language in Sections 109(c), 109(e), 110(1) and 106).  If Congress intended to limit the DMCA's safe harbors to federal copyright infringement, it could easily have done so by including yet another "under this title" qualifier in the DMCA.  Congress's decision not to do so in Section 512 manifests an affirmative intent not to limit the DMCA's safe harbors to claims of federal copyright infringement.  *See*, *e.g.*, *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

41

Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

(brackets and quotation marks omitted); *Hooks v. Forman, Holt, Eliades & Ravin,*

*LLC*, 717 F.3d 282, 285 (2d Cir. 2013) (similar).   The reason is clear:   As

explained below, a safe harbor is not truly safe unless it protects against copyright

liability from whatever source.

### 3.   The Purpose Of The DMCA Would Be Undermined If Pre-1972 Sound Recordings Were Excluded

The conclusion that the DMCA applies to claims involving pre-1972 sound

recordings is reinforced by the DMCA's purpose—to establish a comprehensive

regime "'clarif[ying] the liability faced by service providers who transmit

potentially infringing material over their networks.'"   *Viacom*, 676 F.3d at 27

(quoting S. Rep. No. 105-190, at 2).   That purpose can be effectuated only if the

DMCA safe harbors cover all claims of copyright infringement, including state-law

claims based on pre-1972 sound recordings.

As noted earlier, the DMCA represents Congress's effort "to update

domestic copyright law for the digital age." *Viacom*, 676 F.3d at 26.   The leading

Senate report recognized that under principles of common-law secondary liability,

service providers might be exposed to copyright liability based on their

undertaking of "common activities" including hosting content created or posted by

others.   S. Rep. No. 105-190, at 19.   Without clarity as to the scope of their

potential liability, "service providers may hesitate to make the necessary

42

investment in the expansion of the speed and capacity of the Internet." *Id.* at 8. The DMCA safe harbors respond to this problem by "protect[ing] qualifying service providers from liability for *all* monetary relief for direct, vicarious and contributory infringement." *Id.* at 20 (emphasis added).

These goals can be effectuated only if the DMCA safe harbors protect against *all* potential claims of copyright infringement regardless of source, including state-law claims based on pre-1972 sound recordings. Excluding such claims would fail to protect service providers "from liability for all monetary relief," *id.*, that could be awarded for copyright infringement. Given the express purpose and the comprehensive nature of the DMCA, it makes no sense to assume that Congress would have thought it appropriate to exclude a body of works as large as pre-1972 sound recordings from the reach of the statute. *See* Copyright Office Report at 130 (Copyright Office "sees no reason—and none has been offered—why the section 512 'safe harbor' from liability for monetary and some injunctive relief should not apply to the use of pre-1972 sound recordings").

Moreover, such a wholesale exclusion would wrest from service providers the very certainty as to scope of potential liability that Congress sought to confer. "Limiting the DMCA to recordings after 1972, while excluding recordings before 1972, would spawn legal uncertainty and subject otherwise innocent internet service providers to liability for the acts of third parties." *MP3tunes*, 821 F. Supp.

43

2d at 642.   As discussed further below, "it is not always evident (let alone discernable) whether a song was recorded before or after 1972." *Id*.   A service provider that allows users to upload audio or audiovisual works would thus face both factual and legal uncertainty as to its potential exposure—uncertainty that would "eviscerate the purpose of the DMCA." *Id*. at 641.

>        **4.      Public Policy Considerations Support The Application Of The DMCA Safe Harbors To Claims Based On Pre-1972 Sound Recordings**

If pre-1972 recordings were permitted to become outliers in the otherwise comprehensive DMCA safe-harbor regime, service providers would have no acceptable options because in many cases it is virtually impossible to tell what is and what is not a pre-1972 sound recording.   How, for example, is a service provider, merely by watching a video, supposed to know whether a particular song (or portion of a song) used in that video was "fixed" before or after February 15, 1972?   Should all staff be expected to know that most of the tracks on the Rolling Stones' *Exile on Main Street* album were recorded between June 1969 and February 1972, even though the album itself was not released until May 1972?   Should a 20-year-old staff member know that Richard Harris's version of "MacArthur Park" was recorded before 1972, while Donna Summer's version was recorded after?   How many people can distinguish between a 1960 recording and a 1980 recording of Gershwin's "Rhapsody in Blue"?   Should songs from Natalie

Cole's 1991 *Unforgettable* album be treated as pre-1972 sound recordings because they incorporate vocals recorded by her father Nat King Cole before 1972?

Because it is nearly impossible to identify many pre-1972 sound recordings with any certainty, and because the volume of material uploaded to a website like Vimeo's makes individualized human review impracticable, a service provider hosting media capable of including sound recordings of any kind would have to implement a highly advanced music-filtering system that knows when every particular version of a song was *recorded* (and not just published), assuming such a system even exists. Such a "solution" would not only impose onerous financial burdens on service providers, but also undermine the existing DMCA safe harbors. The DMCA already provides that "service providers may not lose safe harbor protection for failure to monitor or affirmatively seek out infringement" [Sept.Order.51] (citing 17 U.S.C. § 512(m)). Yet, because nearly every pre-1972 sound recording contains a copyrighted musical composition (save for those in the public domain), requiring service providers to affirmatively search for and remove these works would effectively gut Section 512(m) by improperly shifting the burden of identifying infringing activity from copyright owners to service providers, thereby destroying the balance of rights and obligations that Congress calibrated in enacting the entire safe-harbor regime.

In enacting the DMCA, Congress could not have intended to doom its own carefully crafted safe-harbor regime by exempting claims based on pre-1972 sound recordings from its scope. "Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to 'absurd or futile results … plainly at variance with the policy of the legislation as a whole,' that interpretation should be rejected." *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996) (quoting *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 120 (1988)) (ellipsis in original). Such is the case here.

### B. Section 301(c) Does Not Exclude Infringement Claims Based On Pre-1972 Sound Recordings From The Scope Of The DMCA Safe Harbors

Plaintiffs may argue that Section 301(c) of the Copyright Act precludes the DMCA safe harbors from applying to infringement claims based on pre-1972 sound recordings. It does not. Section 301(c) provides: "With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067." 17 U.S.C. § 301(c). Read correctly, Section 301(c) has no bearing on whether the DMCA safe harbors encompass infringement claims based on pre-1972 sound recordings.

46

1.    **Section 301(c) Was An Anti-Abrogation Statute And Was Not Intended To Insulate Pre-1972 Sound Recordings From All Future Legislation**

As is evident from its historical context, Section 301(c) was enacted by Congress for a single, clear purpose: to prevent state anti-piracy statutes from being abrogated by the 1976 Copyright Act's broad preemption provision.

Section 301(c) is best understood against the backdrop of federal copyright law's somewhat erratic approach to musical works.  Musical compositions were not protected at all by federal copyright law until 1831, *Naxos*, 830 N.E.2d at 258, and sound recordings were not protected by federal law until 1972.  While this may seem counter-intuitive today, sound recordings were not readily distributed until the beginning of the twentieth century, and would not be susceptible to uncontrolled mass reproduction until decades later.  The introduction of tape cassette recorders in the 1960's led to "widespread unauthorized reproduction of phonograph records and tapes."  H.R. Rep. No. 93-1581, at 6850 (Dec. 12, 1974). Many States, believing their existing common-law regimes unsatisfactory, responded by enacting statutes banning record piracy.  In 1971, Congress responded to record piracy by amending the federal copyright laws to cover sound recordings, but only on a go-forward basis, *i.e.*, "sound recordings fixed, published, and copyrighted" on or after February 15, 1972.  Act of October 15, 1971, Pub. L.

No. 92-140, 85 Stat. 391; *see also Goldstein v. California*, 412 U.S. 546, 551-52 (1973).

In 1976, Congress overhauled federal copyright law. One of the 1976 Act's "bedrock" principles was the elimination of the "dual system of 'common law copyright' for unpublished works and statutory copyright for published works." H.R. Rep. No. 94-1476, at 129 (Sept. 3, 1976). Congress accomplished this objective through express preemption: Section 301 broadly preempted "all legal or equitable rights that are equivalent to any of the exclusive rights" enumerated in the federal statute for protected works, and extinguished protection for "any such work under the common law or statutes of any State." 17 U.S.C. § 301(a).

The executive branch pointed out that that broad language posed "[a] unique and difficult problem … with respect to the status of sound recordings fixed before February 12 [sic], 1972" in that the language "could be read as *abrogating the anti-piracy laws now existing in 29 states* …." H.R. Rep. No. 94-1476, at 133 (emphasis added). To stave off an anticipated "resurgence of piracy," Congress added a provision to "exclude sound recordings fixed before February 15, 1972 from the effect of preemption" for a period of 75 years. *Id.*; *Copyright Office Report* at 15.

Read in this context, it is clear that Section 301(c) is strictly an anti-preemption vehicle whose aim was to prevent the outright abrogation of state anti-

piracy laws protecting pre-1972 sound recordings.  *See MP3tunes*, 821 F. Supp. 2d

at 641 (so holding).  Nothing in the text of Section 301(c) or its sparse legislative

history suggests any intention to preclude any *subsequent* legislation affecting pre-

1972 sound recordings.  *Id.*; *cf. Goldstein*, 412 U.S. at 564 (statutes "should not be

read as if they were written today, for to do so would inevitably distort their

intended meaning; rather, we must read them against the background … in which

they were written").

## 2. Section 301(c) And The DMCA Safe Harbors Are Compatible Because They Address Two Distinct Issues

Section 301(c) prevented the abrogation of anti-piracy statutes and common-

law rights governing pre-1972 sound recordings (*see supra* Part II.B.1), while

Section 512(c) regulates the circumstances under which service providers may be

held liable for acts of copyright infringement occasioned by their users (*see supra*

Part II.A.3).  Because these two statutes and their goals can be readily harmonized,

they are not in conflict.  *See La. Public Serv. Comm'n v. FCC*, 476 U.S. 355, 370

(1986) (applying "the familiar rule of construction that, where possible, provisions

of a statute should be read so as not to create a conflict").[16]

---

[16] Were there to be a conflict, the later-enacted statute, Section 512(c), would repeal Section 301(c) to the extent necessary to resolve the conflict, for the reasons set forth *supra* in Part II.A.2.  *See Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring) (no particular language needed to repeal earlier enactment).

Congress could not have intended in 1976 to relinquish all right to regulate pre-1972 sound recordings in any respect for 75 years, and the actual language of Section 301(c) does not support such a far-reaching result. Nor does it make sense for Congress in 1998 to have left such a gaping hole in its attempt to update the copyright laws for an online world. *See, e.g.*, *In re Chapman*, 166 U.S. 661, 667 (1897) ("nothing is better settled than that statutes should receive a sensible construction … so as to avoid an unjust or an absurd conclusion"); *Yerdon*, 91 F.3d at 376 (similar). To the contrary, the limited goals behind Section 301(c) can still be accomplished without doing violence to the DMCA safe harbors.

### 3. The DMCA Does Not "Annul" Or "Limit" Any State Right Or Remedy

Section 301(c) prohibits annulling or limiting any state statutory or common-law rights or remedies with respect to pre-1972 sound recordings, and the DMCA's safe harbors do not run afoul of this prohibition. The DMCA does not "annul" any state right or remedy with respect to pre-1972 sound recordings. Whatever state rights and remedies a rights-holder had with respect to such recordings before the DMCA was enacted, it continued to have post-enactment. No such right or remedy has been annulled, repealed, or otherwise eliminated by the statute. Nor, as explained below, has the DMCA "limited" any such state right or remedy.

50

**Rights.**  The DMCA does not "limit" any state statutory or common-law rights in pre-1972 sound recordings.  "Limitation" has a specific meaning in copyright law:  Various sections of the Copyright Act expressly provide for certain specific "limitations on exclusive rights," ranging from "fair use" to "ephemeral recordings."  *See* 17 U.S.C. §§ 107-112, 117, 119, 121-122 (section headings). These provisions impose limitations on and in effect further define the scope of the bundle of exclusive rights granted under Section 106.  For example, under Section 106(3), a copyright holder has the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending" subject, however, to Section 109(a), which allows for the resale of particular copies or phonorecords without the copyright holder's permission. This "first sale" limitation applies regardless of who the owner of the particular copy or phonorecord is—consumer, thrift store, public library, or online retailer. In this context, the "limitations" define the scope of the copyright owner's bundle of rights.  In contrast, the DMCA does not place any such limitation on the substantive rights of a copyright holder, whether under federal or state law.

**Remedies.**  Nor does the DMCA limit any state-law remedies of a copyright holder with respect to pre-1972 sound recordings.  Notably, nothing in the DMCA precludes copyright holders from pursuing direct infringers—the users who upload the infringing materials in the first place.  Because "[u]nder elementary principles

51

of tort law a plaintiff is entitled to only one recovery for a wrong," *Screen Gems-Columbia Music, Inc. v. Metlis & Lebow Corp.*, 453 F.2d 552, 554 (2d Cir. 1972), Section 512(c) does not limit the ability to recover damages. Nor does it limit the remedy of equitable relief, as Section 512(j) specifically authorizes injunctive relief against service providers. Indeed, the statute gives copyright holders something they never had before: the ability to obtain a quick and low-cost extra-judicial injunction merely by submitting a DMCA takedown notice to a service provider, who must either comply or forfeit the safe harbor. If anything, this *expands* the range of remedies available to copyright holders.

\*    \*    \*

In any event, it is doubtful that New York common law would ever impose liability on a service provider that otherwise qualified for DMCA safe harbor—and thus the DMCA would not have any effect at all on the remedies available to rights-holders with respect to pre-1972 sound recordings.[17] In such circumstances,

---

[17] It is unclear whether a New York court would recognize *any* secondary liability on the part of a service provider such as Vimeo for state-law copyright infringement. The case law concerning secondary liability has all concerned claims of federal copyright infringement. Although these cases drew from common-law principles, *see Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930-31 (2005), we are aware of no common-law copyright case recognizing such secondary liability.

52

New York common law would likely decline to impose on service providers what is tantamount to liability without notice for the actions of third parties.

New York common law is a flexible tool that can be crafted to "reach just and realistic results" given "constantly changing technological and economic aspects." *Naxos*, 830 N.E.2d at 260 (quotation and citation omitted). To that end, the New York Court of Appeals has consistently adopted rules limiting service provider liability to ensure that the Internet remains a "vast platform from which to address and hear from a worldwide audience of millions of readers, viewers, researchers, and buyers." *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 853 (1997)).

In *Lunney v. Prodigy Services*, 723 N.E.2d 539, 540 (N.Y. 1999), for example, the Court of Appeals held that a service provider could not be held liable for vulgar and harassing emails sent by an anonymous user posing as the plaintiff. The court observed that "[t]he public would not be well served by compelling an ISP [Internet service provider] to examine and screen millions of e-mail communications, on pain of liability for defamation." *Id*. at 542. Accordingly, "[t]here is no justification" to "open an ISP to liability for the wrongful acts of countless potential tortfeasors against countless potential victims." *Id*. at 543.

Similarly, in *Firth*, the Court of Appeals held that defamatory statements published on a website are subject to the "single publication" rule because the

policies animating this rule "are even more cogent when considered in connection with the exponential growth of the instantaneous, worldwide ability to communicate through the Internet." 775 N.E.2d at 465. Failing to so limit the liability of websites would result in "endless retriggering of the statute of limitations," which would have "a serious inhibitory effect on the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise." *Id*. at 466. The policy concerns animating *Lunney* and *Firth* are fully consistent with, and indeed much the same as, those behind the DMCA safe harbors.

In determining what is a "just and realistic" result, *Naxos*, 830 N.E.2d at 260, a New York court would likely consider the various federal laws and principles that limit the liability of online service providers, including: (1) the DMCA itself, (2) common-law principles concerning secondary liability for intellectual property infringement; and (3) the Communications Decency Act of 1996, 47 U.S.C. § 230 ("CDA"). *See, e.g.*, *EMI Records Ltd. v. Premise Media Corp. L.P.*, No. 601209/08, 2008 N.Y. Misc. LEXIS 8213, at *16 (Sup. Ct. N.Y. Cnty. Aug. 8, 2008) (applying fair use factors codified at 17 U.S.C. § 107 to common-law copyright claim involving a sound recording).

The DMCA, of course, protects service providers from secondary liability for copyright infringement so long as they do—and don't do—certain things.

54

Although no similar statute limits claims of trademark infringement, this Court held in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010), that a service provider could not be held liable for contributory trademark infringement when it lacked the requisite knowledge of the infringement. The CDA, for its part, shields service providers from state-law claims arising from user-posted content. *See* 47 U.S.C. § 230(c). As with the DMCA, the CDA seeks to encourage the development of "open forum[s] for third parties to post content." *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 952 N.E.2d 1011, 1018 (N.Y. 2011) (rejecting argument that service providers forfeited CDA immunity "because they created and ran a Web site which implicitly encouraged users to post negative comments about the New York City real estate industry"). The Ninth Circuit has held that the CDA preempts state-law intellectual property claims because ruling otherwise "would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes." *Perfect 10*, 488 F.3d at 1118.[18]

Ultimately, in crafting a rule for service provider liability with respect to pre-1972 sound recordings, a New York court would likely, at a minimum, adopt this Court's approach in *Tiffany* and hold that service providers may not be held liable for another's infringement unless they were aware of it. Such a principle

---

[18] Accordingly, in the Ninth Circuit, Plaintiffs' common-law copyright claims would be preempted by the CDA. (This Court has not yet addressed this issue.)

55

would be entirely consistent with the DMCA since the safe harbor does not apply unless a service provider lacks actual or "red flag" knowledge of infringing activity. Consequently, the DMCA does not "limit" a claim of copyright infringement under New York law with respect to a pre-1972 sound recording.

*    *    *

For all of these reasons, this Court should hold that the DMCA's safe-harbor provisions do apply to claims based on pre-1972 sound recordings, and reverse the district court's contrary holding.

## **CONCLUSION**

The district court's Orders should be reversed insofar as they: (1) denied summary judgment to Vimeo as to 18 videos that purportedly raised a triable issue as to "red flag" knowledge of infringement; and (2) held that the DMCA safe harbors do not encompass claims based on pre-1972 sound recordings.

Dated:  July 23, 2014                    Respectfully submitted,

                                         /s/ Kathleen M. Sullivan
                                         Kathleen M. Sullivan
                                         Robert L. Raskopf
                                         Todd Anten
                                         QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
                                         51 Madison Avenue, 22nd Floor
                                         New York, New York 10010

Rachel Herrick Kassabian
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Flr.
Redwood Shores, CA 94065

Michael A. Cheah
VIMEO, LLC
555 West 18th Street
New York, New York 10011

*Attorneys for Defendants-Appellants-*
*Cross-Appellees Vimeo, LLC and*
*Connected Ventures, LLC*

## **TABLE**

### "Red Flag" Videos Denied Summary Judgment

| Video ID | Song | Artist | Song Run Time* | Video Run Time | Video Description |
|---|---|---|---|---|---|
| 2250789 | Stacy's Mom | Fountains of Wayne | 3:17 | 0:48 | Depiction of song lyrics using animation |
| 248786 | Glamorous | Fergie | 4:06 | 1:01 | Individual mouthing words to a song ("lip dub") while driving in a convertible |
| 247846 | Fat Lip | Sum 41 | 2:58 | 1:27 | Individual in costume hopping through pedestrian traffic |
| 169345 | Aerodynamic | Daft Punk | 3:32 | 1:32 | Time-lapse video of individual manipulating objects for various optical illusions |
| 1361586 | Sure Shot | Beastie Boys | 3:19 | 1:42 | Two dogs running around chasing each other |
| 6545602 | Far Out | Blur | 1:37 | 1:43 | Blurry clips of miscellaneous scenes, including a cat playing with a small object, a tennis game, and the skyline of a city |
| 2169237 | Around the World/Harder Better Faster Stronger | Daft Punk | 4:01 (radio version) | 2:03 | "Time lapse" film showing 3,328 photographs of London |

| Video ID | Song | Artist | Song Run Time* | Video Run Time | Video Description |
|---|---|---|---|---|---|
| 3984800 | A Milli | Lil Wayne | 3:41 | 2:03 | Clips of individuals riding bikes and doing tricks |
| 171330 | No Rain | Blind Melon | 3:37 | 2:03 | Individual lip dub in rain storm |
| 3132300 | I Can't Help Myself (Sugar Pie Honey Bunch) | The Four Tops | 2:44 | 2:27 | Clips of individuals riding bikes and doing tricks |
| 1421798 | Ghostbusters | Ray Parker Jr. | 4:04 | 2:32 | Animation of people chasing and fighting ghosts |
| 936486 | Sabotage | Beastie Boys | 2:58 | 2:32 | Parody film of humorous police foot chase |
| 350903 | Peaches | Presidents of the USA | 2:51 | 2:32 | Lip dub in office setting |
| 2021311 | Genie in a Bottle | Christina Aguilera | 3:37 | 2:49 | Personal video of portion of Christina Aguilera concert footage in Kiev |
| 416510 | Feel Good, Inc. | Gorillaz | 3:41 | 3:29 | Lip dub in office setting |
| 1252305 | Everything in Its Right Place | Radiohead | 4:11 | 4:12 | Several fuzzy black-and-white clips of miscellaneous nature scenes |

| Video ID | Song | Artist | Song Run Time* | Video Run Time | Video Description |
|---|---|---|---|---|---|
| 1187654 | Love in This Club | Usher | 4:19 | 4:31 | Animatronic puppets singing and playing instruments |
| 388657 | Girls and Boys | Blur | 4:51 | 4:41 | Office workers acting out a routine with dancing |

\* Song run times gathered from iTunes.

## **<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **<u>13,193</u>** words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using **<u>Microsoft Word</u>** in **<u>14 point Times New Roman</u>**.

Date: July 23, 2014

<u>/s/ Todd Anten</u>
Todd Anten
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 23, 2014, the BRIEF OF DEFENDANTS-APPELLANTS-CROSS-APPELLEES was electronically filed and served on all parties or their counsel of record through the CM/ECF system, pursuant to Second Circuit Local Rule 25.1(h).

Date: July 23, 2014

/s/ Todd Anten
Todd Anten
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010