# 14-1048-cv(L)

## 14-1049-cv(XAP), 14-1067-cv(CON), 14-1068-cv(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation,

*(Caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* PINTEREST, INC., TUMBLR, INC., AND TWITTER, INC. IN SUPPORT OF VIMEO, LLC

BRIAN M. WILLEN
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

SARA E. ROWE
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Counsel for Amici Curiae*
*Pinterest, Inc., Tumblr, Inc., and Twitter, Inc.*

EMI Blackwood Music, Inc., a Connecticut Corporation, EMI April Music, Inc., a Connecticut Corporation, EMI Virgin Music, Inc., a New York Corporation, Colgems-EMI Music, Inc., a Delaware Corporation, EMI Virgin Songs, Inc., a New York Corporation, EMI Gold Horizon Music Corp., a New York Corporation, EMI Unart Catalog Inc., a New York Corporation, Stone Diamond Music Corporation, a Michigan Corporation, EMI U Catalog, Inc., a New York Corporation, Jobete Music Co., Inc., a Michigan Corporation,

> *Plaintiffs-Appellees-Cross Appellants,*

—against—

Vimeo, LLC, a Delaware Limited Liability company, AKA Vimeo.com, Connected Ventures, LLC, a Delaware Limited Liability company,

> *Defendants-Appellants-Cross Appellees,*

Does, 1-20 inclusive,

> *Defendant.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 29(c)(1) of the Federal Rules of Appellate Proce-dure, *amici* make the following disclosures. Pinterest, Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock. Tumblr, Inc.'s parent corporation is Yahoo! Inc.; Yahoo! Inc. does not have a parent corporation, and no publicly held corporation owns 10% or more of its stock. Twitter, Inc. does not have a parent cor-poration and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ..................................................................iv

INTEREST OF THE AMICI ................................................................. 1

SUMMARY OF ARGUMENT ............................................................... 4

ARGUMENT ........................................................................................ 7

I.   Red-Flag Knowledge Plays An Appropriately Limited Role In The DMCA Regime.......................................................................... 7

II.  The DMCA's Knowledge Provisions Reflect The Practical Difficulties That Online Services Face In Trying To Determine Whether User Material Is Infringing.......................... 10

    A.   Determining Infringement Requires Consideration Of Complex Factual And Legal Questions ................................. 10

    B.   Determining Ownership, Authorization, And Fair Use Is Especially Challenging For Online Services ................... 13

III. Broadening The DMCA's Knowledge Standards Would Frustrate The Statute's Goals By Discouraging Providers From Monitoring Content And Helping Users Find It ................. 21

    A.   Congress Gave Online Services Broad Leeway To Review User-Submitted Material For Pornography And Other Objectionable Content ................................................ 22

    B.   The DMCA's Knowledge Provisions Were Crafted To Allow Service Providers To Review Online Material To Help Users Find What They Want ...................................... 26

    C.   Proper Application Of The DMCA's Knowledge Provisions Protects Legitimate Online Expression.............. 31

CONCLUSION ...................................................................... 34

CERTIFICATE OF COMPLIANCE ...................................................... 35

CERTIFICATE OF FILING AND SERVICE ........................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
　　448 F.3d 605 (2d Cir. 2006)............................................................ 18

*Blanch v. Koons*,
　　467 F.3d 244 (2d Cir. 2006).................................................... 18, 33

*Burrow-Giles Lithographic Co. v. Sarony*,
　　111 U.S. 53 (1884) ........................................................................ 10

*Campbell v. Acuff-Rose Music, Inc.*,
　　510 U.S. 569 (1994) ................................................................ 18, 21

*Capitol Records, Inc. v. MP3tunes, LLC*,
　　821 F. Supp. 2d 627 (S.D.N.Y. 2011) ........................................... 17

*Cariou v. Prince*,
　　714 F.3d 694 (2d Cir. 2013)........................................................... 19

*Corbis Corp. v. Amazon.com, Inc.*,
　　351 F. Supp. 2d 1090 (W.D. Wash. 2004) ....................................... 8

*Faulkner v. Nat'l Geographic Soc'y*,
　　211 F. Supp. 2d 450 (S.D.N.Y. 2002) ........................................... 11

*Garcia v. Google, Inc.*,
　　2014 WL 3377343 (9th Cir. July 11, 2014) ................................... 10

*Golan v. Holder*,
　　132 S. Ct. 873 (2012) .................................................................... 10

*Graham v. James*,
　　144 F.3d 229 (2d Cir. 1998)........................................................... 11

iv

*Io Grp., Inc. v. Veoh Network, Inc.,*
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) ......................................... 13

*Jasper v. Sony Music Entm't, Inc.,*
    378 F. Supp. 2d 334 (S.D.N.Y. 2005) ............................................ 15

*Keane Dealer Servs., Inc. v. Harts,*
    968 F. Supp. 944 (S.D.N.Y. 1997) .................................................. 11

*Lenz v. Universal Music Corp.,*
    572 F. Supp. 2d 1150 (N.D. Cal. 2008) .............................. 18, 19, 33

*Suntrust Bank v. Houghton Mifflin Co.,*
    268 F.3d 1257 (11th Cir. 2001) ............................................... 21, 33

*UMG Recordings, Inc. v. Veoh Networks Inc.,*
    665 F. Supp. 2d 1099 (C.D. Cal. 2009)............................... 8, 11, 13

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012).............................................. 7, 12, 13, 30

*Viacom Int'l Inc. v. YouTube, Inc.,*
    940 F. Supp. 2d 110 (S.D.N.Y. 2013) ............................................. 8

*Wolk v. Kodak Imaging Network, Inc.,*
    840 F. Supp. 2d 724 (S.D.N.Y. 2012) ....................................... 8, 32

## STATUTES & LEGISLATIVE HISTORY

17 U.S.C. § 107 ........................................................................... 11

17 U.S.C. § 512 ..................................................................... passim

47 U.S.C. § 230(c)(2) ................................................................... 22

H.R. REP. NO. 105-551 (II) (1998)................................................. 8

H.R. REP. NO. 105-796 (1998) ..................................................... 22

S. REP. NO. 105-190 (1998) ................................................... passim

# OTHER AUTHORITIES

Andrew M. Kaikati & Jack G. Kaikati,
  *Stealth Marketing: How to Reach Consumers
  Surreptitiously,* 46 CAL. MGMT. REV. 6 (2004) .............................. 16

Casey Fiesler, *Everything I Need To Know I Learned from
  Fandom: How Existing Social Norms Can Help Shape
  the Next Generation of User-Generated Content*,
  10 VAND. J. ENT. & TECH. L. 729 (2008) ........................................ 20

Del Harvey, *The Strangeness of Scale at Twitter*,
  TED, March 2014 .......................................................................... 24

Ethan Smith & Peter Lattman, *Download This: YouTube
  Phenom Has a Big Secret*, Wall St. J., Sept. 6, 2007 .................... 15

Kashmir Hill, *Meet Del Harvey, Twitter's Troll Patrol*,
  Forbes, July 21, 2014 ................................................................... 23

Lawrence Lessig, *Free(ing) Culture for Remix*,
  2004 UTAH L. REV. 961 (2004) ...................................................... 19

3 NIMMER ON COPYRIGHT § 10.03[A][7] ................................................ 11

Philip N. Howard, et al., *Opening Closed Regimes: What
  Was the Role of Social Media During the Arab
  Spring?*, Project on Information Technology and
  Political Islam, Sept. 11, 2011 ...................................................... 28

Robert Sprague & Mary Ellen Wells, *Regulating Online
  Buzz Marketing: Untangling a Web of Deceit*,
  47 AM. BUS. L.J. 415 (2010) .......................................................... 16

*Viacom Int'l Inc. v. YouTube, Inc.*,
  Br. for Defendants-Appellees No. 13-1720-CV, 2013
  WL 5870383 (2d Cir. Oct. 25, 2013) .............................................. 17

*Viacom Int'l Inc. v. YouTube, Inc.*,
   Br. for Defendants-Appellees, Nos. 10-3270-CV & 10-
   3342-CV, 2011 WL 1356930 (2d Cir. Mar. 31, 2011)....................17

Pinterest, Inc., Tumblr, Inc., and Twitter, Inc. submit this *amicus curiae* brief to explain some of the serious operational problems that the district court's misapplication of the DMCA's red-flag knowledge provision creates for online services. By making it harder for service providers to obtain DMCA protection when they "interact" with user-submitted content, the otherwise-thoughtful decision below threatens to discourage providers from valuable activities like screening out objectionable content and making useful information easier to locate. This Court should reject that result, which undermines Congress's intent to protect—and certainly not to deter—such responsible behavior by online services.

## INTEREST OF THE *AMICI*

*Amici* are leading online service providers that offer innovative ways for users to express themselves by creating and sharing content.[1]

Pinterest, Inc. ("Pinterest") is an online platform that allows people to discover new things and engage with the people who create them. Users gather images and other objects (known as "Pins") from

---

[1] *Amici* and their counsel are solely responsible for this brief. No one else helped write it or contributed money for its preparation or submission. All parties have consented to the filing of this brief.

their own collections or from across the web and organize them in themed collections called boards. As users browse the millions of boards and more than 30 billion Pins available on Pinterest, they can Pin the content they find onto their own boards, and follow the users and boards they find most useful or inspiring.

Tumblr, Inc. ("Tumblr") provides a platform for users to share their artwork, writing, photos, audio, and video with a worldwide audience. Tumblr is home to over 195 million blogs and nearly 83 billion posts. The platform allows users to connect with others who share their interests, to explore new ideas and creative expressions, and form communities spanning culture, age, and geography.

Twitter, Inc. ("Twitter") is a global platform for public self-expression and conversation. Twitter has more than 255 million monthly active users who share approximately half a billion Tweets each day. The unique format of the speech (Tweets are limited to 140 characters) encourages quick, spontaneous, real-time commentary about issues great and small.

In operating their services, *amici* rely on the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C.

§ 512. *Amici* are the kinds of services for which the DMCA was designed. They provide open platforms where users can store and allow others to view content of their choosing. They also allow users to "link" to material hosted on other online locations. These activities are covered by two separate DMCA safe harbors: Section 512(c) ("storage at the direction of a user"); and Section 512(d) ("referring or linking users to an online location containing infringing material").

Each minute of every day, hundreds of millions of users around the world post all kinds of content on Pinterest, Tumblr, and Twitter. This material allows users to express who they are, what they care about, and what's happening in their lives. The DMCA ensures that legitimate service providers will not as a matter of course face infringement claims based on such material. By balancing the interests of online services, copyright owners, and the public, the safe harbors have helped preserve copyright protection while allowing services like *amici* to flourish. *Amici* have a strong interest in seeing that the DMCA is properly applied, taking account of both Congress's intent and the practical realities that online services face in interacting with user-submitted content. Those interests occasion this brief.

3

## SUMMARY OF ARGUMENT

The DMCA's knowledge provisions reflect Congress's decision to assign the primary responsibility of identifying online infringement to copyright owners, not service providers. In this regime, "red-flag" knowledge can exist only where a given infringement would be "obvious" to any reasonable person. This result is compelled by the DMCA and confirmed by the case law. But there are also important practical considerations that underscore why red-flag knowledge can be found only in limited circumstances.

Congress understood that identifying copyright infringement is very difficult for online services. Determining whether a user-posted item is infringing requires answering various factual and legal questions: Is the material protected by copyright? Who owns the relevant copyright(s)? Who uploaded the item? Did a copyright owner authorize the posting? Is it fair use? Service providers have limited, if any, relevant information on these matters. And these difficulties have only increased as online services such as Pinterest, Tumblr, and Twitter have become home to ever more diverse content from users around the world.

4

In enacting the DMCA, Congress recognized that copyright owners are far better able to determine whether their copyrights are being violated. It crafted the statute's knowledge standards so that service providers don't have to play detective or make judgment calls about infringement. If there's legitimate uncertainty about whether a given item is infringing, there can be no red-flag knowledge. DMCA-disqualifying knowledge can be found only where the facts known to the service provider precluded any reasonable inference that the item at issue was authorized or qualified as fair use.

This strict standard is necessary because Congress did not want to deter online services from interacting with user-submitted content. While the DMCA makes clear that service providers are not *required* to monitor their services, Congress recognized that services have compelling reasons for reviewing content on a voluntary basis. Responsible services often try to limit the availability of material that may be illegal or highly offensive—including obscenity, sexually explicit material, hate speech, graphic violence, and bullying. Without these efforts, even the best online platforms might get drowned in a sea of crude pornography and fake Viagra ads. Interacting with user material also allows desired

5

content to be found in the huge repositories of information that live online. By sorting through and organizing users' posts, service providers can help users locate and identify the items that are the most relevant and interesting to them.

Congress approved of these voluntary forms of content review and intended the DMCA to make room for them. The legislative history specifically recognizes the "valuable role" that "human editors and reviewers" play in "assisting Internet users to identify and locate the information they seek." S. REP. NO. 105-190, at 48 (1998). And the limited sweep of the statute's knowledge provisions play a crucial role in this regard. By relieving service providers of the need to guess about what may be infringing, the DMCA gives providers the breathing room they need to help users find what they want and avoid what they don't want.

Misapplying red-flag knowledge puts all of this at risk. It subjects service providers to a potential loss of safe-harbor protection virtually any time they come into contact with user-submitted content. To avoid that, providers would have to choose between avoiding user content altogether or removing anything that raises even a remote possibility of infringement. Both options are fundamentally at odds with the DMCA.

The first would at once leave online services toothless against the worst kind of anti-social material while making it more difficult for users to find useful content. The second would punish innocent users, silence a host of lawful speech, and erode the open nature of the Internet.

Congress intended the safe harbors to resolve these dilemmas, not exacerbate them. And the statute has worked. As the experiences of *amici* show, the DMCA has helped make online services vital platforms for free expression and creativity. The district court's ruling on red-flag knowledge threatens to undo those benefits. This Court should correct that mistake and hold that Vimeo is entitled to summary judgment.

## ARGUMENT

## I. Red-Flag Knowledge Plays An Appropriately Limited Role In The DMCA Regime

In crafting the DMCA's knowledge provisions, Congress declined to require service providers to make "difficult judgments as to whether conduct is or is not infringing." S. REP. NO. 105-190, at 52. Instead, unless a service provider has actual (subjective) knowledge of infringement, it can be charged with knowledge only where it "turned a blind eye to 'red flags' of obvious infringement." *Id*. at 48; *see also Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012).

7

There is a "high bar" for finding red-flag knowledge. *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009), *aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013). The infringing nature of the material must be "apparent from even a brief and casual viewing." H.R. REP. NO. 105-551 (II), at 58 (1998). The "common-sense result of this 'red flag' test" is that service providers are not "required to make discriminating judgments about potential copyright infringement." *Id*. To the contrary, "if investigation of 'facts and circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'" *Veoh,* 665 F. Supp. 2d at 1108 (citation omitted).[2]

Giving red-flag knowledge a limited role is fundamental to the DMCA's structure. Rather than require service providers to make tough calls about infringement, the DMCA created a balanced notice-and-takedown regime that serves as the primary mechanism for online cop-

---

[2] Courts have repeatedly granted summary judgment to service providers where plaintiffs could not meet the DMCA's strict standard for red-flag knowledge. *See, e.g., Shelter Capital*, 718 F.3d at 1020-26; *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 113-15 (S.D.N.Y. 2013); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 746-47 (S.D.N.Y. 2012), *aff'd sub nom. Wolk v. Photobucket.com, Inc.*, 2014 WL 2723035 (2d Cir. June 17, 2014); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1108 (W.D. Wash. 2004).

yright enforcement. Under this regime, copyright owners must provide service providers with information (in a prescribed form) about what particular material on their systems is infringing. 17 U.S.C. § 512(c)(2)-(3). When it receives a proper notice, the service provider must "expeditiously" remove the identified material (§ 512(c)(1)(C)) and can provide the alleged infringer with a chance to submit a "counter notification" explaining that the material does not infringe (§ 512(g)).

This system is efficient and effective. It provides a streamlined process for removing suspected infringing material from online services. It gives clarity to both service providers and copyright owners, setting the stage for voluntary cooperation. It reflects the significant advantages that copyright owners have in identifying infringement of their works. And it recognizes that not all suspected infringements are actually infringing, allowing users to push back against overreach by copyright holders.

In short, the DMCA's notice-and-takedown regime affords appropriate redress for infringement while letting legitimate service providers offer open platforms for user expression. Unilateral takedowns by service providers have none of those virtues. It is not surprising there-

fore that Congress intended to confine the DMCA's knowledge provisions to cases where the provider needs to exercise no judgment because the infringing nature of the material is truly obvious.

## II. The DMCA's Knowledge Provisions Reflect The Practical Difficulties That Online Services Face In Trying To Determine Whether User Material Is Infringing

The DMCA's knowledge standards reflect a very practical reality: it is extremely difficult for online services to determine, in the mass of material submitted by their users, what items are actually infringing. This fact makes it critical for courts to give red-flag knowledge the limited scope Congress intended it to have.

### A. Determining Infringement Requires Consideration Of Complex Factual And Legal Questions

Assessing copyright infringement is no easy task. "Infringement" is a legal conclusion informed by an array of legal and factual questions:

- Is the material protected by copyright or might it be in the public domain? *See generally Golan v. Holder*, 132 S. Ct. 873 (2012).

- If it's protected by copyright, who is the "author" of the work? *See, e.g.*, *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) (discussing authorship requirement); *Garcia v. Google, Inc.*, 2014 WL 3377343 (9th Cir. July 11, 2014) (addressing whether an individual actor's performance in a movie is copyrightable and, if so, who owns the relevant copyrights).

10

• Who holds the copyright(s) in the work? Is the work co-owned by multiple copyright holders? Has any author assigned or transferred ownership of the copyright to someone else? *See, e.g.*, *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 475 (S.D.N.Y.) (defendant's "lack of knowledge regarding true copyright ownership objectively reasonable" where ownership turned on "complex analysis of contractual arrangements going back twenty years"), *opinion modified*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005).

• Who uploaded the content to the service? Was the item uploaded by the copyright owner or its agent? *See, e.g.*, *Veoh*, 665 F. Supp. 2d at 1110 n.13 (evidence that a popular band uploaded one of the band's videos to online service sued for infringement).

• If not, did the uploader have permission from any of the copyright owners to upload the work? Was there an express license? An implied license? Did the copyright owner encourage or approve the uploading of the work? *See, e.g.*, *Graham v. James*, 144 F.3d 229, 235 (2d Cir. 1998) ("Under federal law, 'nonexclusive licenses may ... be granted orally, or may even be implied from conduct.'") (quoting 3 NIMMER ON COPYRIGHT § 10.03[A][7], at 10-43).

• Even if the initial uploading was unauthorized, did the copyright owners know that the work had been posted and decide to acquiesce in its presence there? *See, e.g.*, *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) (knowledge coupled with acquiescence can amount to implied license).

• Even if the posting was unauthorized, is it a fair use of the copyrighted material? 17 U.S.C. § 107.

These questions must be asked and answered each time an infringement determination is to be made. Copyright infringement, in other words, isn't like obscenity: you don't just know it when you see it.

This bears directly on the red-flag knowledge inquiry. As a matter of law, an item is not infringing if it's in the public domain, or if it was posted by the copyright owner, or has otherwise been authorized by the copyright owner, or if it's a fair use. A service provider thus cannot have actual *knowledge* of infringement unless it *knows* that none of those things is true. Likewise, because red-flag awareness requires facts that make "the specific infringement 'objectively' obvious to a reasonable person" (*Viacom*, 676 F.3d at 31), such awareness does not exist unless the answer to each of those questions is obvious. If there is a reasonable basis for concluding that the item is in the public domain, *or* that it was posted by the copyright owner, *or* that it appears with the copyright owner's express or implied permission, *or* that it's fair use, there cannot be red-flag knowledge.

It is no accident that the DMCA adopts such a stringent standard. Congress understood that online services generally lack the information needed to ascertain infringement. *See* S. REP. NO. 105-190, at 48 (explaining that a service provider "could not be expected" in a brief encounter with material online to determine whether it "was still protected by copyright," "whether the use was licensed," and "whether it was

permitted under the fair use doctrine"); *cf. Io Grp., Inc. v. Veoh Network, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) ("[T]here is no assurance that [the service provider] could have accurately identified the infringing content in question.").

If anyone has the information necessary to answer these questions, it is the copyright owner. Rights holders know (or should know) what works they own, to whom they've licensed those works, whether and on what terms they want their material to appear on various online platforms, and what uses they consider harmful to the market for their works. Online services have little insight into any of these issues. It thus makes sense that the DMCA does not "place the burden of determining whether [materials] are actually illegal on a service provider." *Viacom*, 676 F.3d at 32 (quoting *Shelter Capital*, 718 F.3d at 1023).

B.  Determining Ownership, Authorization, And Fair Use Is Especially Challenging For Online Services

The operational environment faced by online services like *amici* only make it more challenging for them to make the determinations of copyright ownership, authorization, and fair use needed to have knowledge of infringement under the DMCA.

13

***Ownership***. Services like Pinterest, Tumblr, and Twitter are home to a massive and ever-increasing array of content from users around the world. New postings pour onto these platforms every second of every day in every language imaginable, referencing cultural trends, personalities, news events, and political issues big and small, mainstream and niche, earth-shattering and banal. This material comes in many different forms: text, images, videos, music, and spoken-word files. Service providers often have little idea what much of this content is, to say nothing of who owns the relevant copyrights. Indeed, it is often unclear whether material originates with a professional content creator: in today's culture, much of what looks or sounds professional was actually made by amateurs, and vice versa.

***Authorization***. Similar problems beset online services in trying to determine whether particular material is authorized by the rights holder. Even if the user who posted an item did not create it, that user may have obtained permission (whether through a licensing agreement or something more informal) from a copyright holder to use the content. (It's become increasingly easy for users to obtain such permissions, including though Creative Commons licenses and other off-the-shelf li-

14

censing regimes. *E.g.*, https://creativecommons.org/licenses/.) Moreover, the copyright in many works is shared by separate co-owners, each of whom has the independent right to license use of the work. *See Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 2d 334, 346 (S.D.N.Y. 2005) ("It is basic copyright law that joint authors may legally grant a license to a third party to exploit the work without co-author consent."). And where such an understanding exists between the user and a copyright owner, the service provider is unlikely to know about it. But such arrangements belie any assumption that material not posted by the actual creator is necessarily unauthorized.

Compounding these difficulties are the actual practices of many copyright owners, who often welcome the presence of their material on user-submitted content platforms and take steps to encourage it. Artists and media companies often post their content to online service, in many cases without indication of where it's coming from. *See, e.g.*, Ethan Smith & Peter Lattman, *Download This: YouTube Phenom Has a Big Secret*, Wall St. J., Sept. 6, 2007, at A1, *available at* http://online.wsj.com/news/articles/SB118903788315518780 (describing singer signed by major label who simultaneously was masquerading as an amateur on

15

YouTube and MySpace). There are countless instances of movie studios, television networks, and record labels authorizing their works to appear on online services for promotional purposes outside the context of traditional licensing arrangements. *See, e.g.*, Robert Sprague & Mary Ellen Wells, *Regulating Online Buzz Marketing: Untangling a Web of Deceit*, 47 AM. BUS. L.J. 415, 421-22 (2010); Andrew M. Kaikati & Jack G. Kaikati, *Stealth Marketing: How to Reach Consumers Surreptitiously*, 46 CAL. MGMT. REV. 6, 8-9 (2004) (discussing use of stealth-marketing tactics online).

Copyright owners large and small recognize the value of user-generated content services in helping generate "buzz" for their works and engage more directly with their fans. On Twitter, for example, a studio wishing to market a movie or a television show will often have their staff (including actors, writers, or producers) post Tweets with promotional content. In many cases, it is completely unclear who actually owns the rights to that content. What's more, media companies and other copyright owners may deliberately decide not to request removal of certain user-posted items that include their copyrighted works, be-

cause those items often provide valuable promotional and brand-awareness benefits for the companies.[3]

These marketing practices confirm the need for a tight red-flag knowledge standard. By quietly authorizing and deliberately allowing their content to appear on various online services, major copyright owners have precluded any simple inference that the presence of even "well known" material amounts to infringement. Service providers seldom know which instances of such content have been authorized or tolerated by the rights holder and which have not. And there is no reason to make them guess. Instead, in the face of reasonable uncertainty about whether something is authorized, the DMCA sensibly permits online services to await instructions from the copyright owner in the form of a proper takedown notice. *Cf. Capitol Records, Inc. v. MP3tunes, LLC,* 821 F. Supp. 2d 627, 644 (S.D.N.Y. 2011) ("EMI itself regularly distributes works on the internet for free. Because of these activities, EMI's executives concede that internet users, including MP3tunes' users and execu-

---

[3] All of these practices are vividly demonstrated by the extensive record presented to this Court in the *Viacom v. YouTube* litigation. *See* Br. for Defendants-Appellees, at 44-53, Nos. 10-3270-CV & 10-3342-CV, 2011 WL 1356930 (2d Cir. Mar. 31, 2011); Br. for Defendants-Appellees at 13-14, No. 13-1720-CV, 2013 WL 5870383 (2d Cir. Oct. 25, 2013).

17

tives, have no way of knowing for sure whether free songs on the internet are unauthorized.").

***Fair Use***. Finally, even if a service provider has reason to know that a given item is unauthorized, fair use must still be considered before being required to remove that item under the DMCA. *Cf. Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008) (copyright owners must make a good-faith consideration of fair use before sending takedown notices). This requires answering a number of additional questions: What was the nature of the original work? How much of that work was used? What was the purpose of the use? Is it a parody? Is the use commercial? How much does the use transform the original into something new? What is the effect of the new use on the market for the original work? *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-94 (1994) (assessing whether parody of "Oh, Pretty Woman" was fair use); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) (finding reproduction of concert posters to be fair use).

A fair use determination is a notoriously "open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006); *see also Campbell*, 510 U.S. at 577 (explaining that the task of determining

fair use "is not to be simplified with bright-line rules" and instead calls for a "case-by-case analysis."). Even courts struggle with these issues, often leading to nuanced, highly fact-specific rulings. *See, e.g.*, *Cariou v. Prince*, 714 F.3d 694, 705-11 (2d Cir. 2013) (finding artist's use of certain photographs to be fair, while remanding for further consideration as to other photographs).

The fair use issues confronting online services like *amici* are particularly vexing (and important) given the myriad ways that Internet users rely on existing works to create new expression. User-submitted material frequently uses well-known songs, movies, TV shows, and books as springboards for creative expression. Clips or pieces of such works are incorporated in the spirit of analysis, commentary, or parody. Music and video are "remixed," "mashed-up," or otherwise transformed into fan-fictions, image art, tributes, and commentary pieces. *See generally* Lawrence Lessig, *Free(ing) Culture for Remix*, 2004 UTAH L. REV. 961 (2004). Users add popular music to their home videos, add their own words to existing works, and reconfigure the news into comedy. *See, e.g.*, *Lenz*, 572 F. Supp. 2d at 1151-52 (case involving home video of kids dancing to Prince's "Let's Go Crazy"); http://textsfromhillary

clinton.tumblr.com (Tumblr blog combining photograph of Hillary Clinton on her Blackberry with photographs of other politicians and celebrities on their phones with satirical captions); https://twitter.com/NYTMinusContext (Twitter account that creates amusing Tweets by copying short excerpts from The New York Times, but out of context).

Copyright owners often approve of (or tolerate) such uses, believing that they stimulate the market for their works and not wanting to antagonize fans. *See, e.g.*, Casey Fiesler, *Everything I Need To Know I Learned from Fandom: How Existing Social Norms Can Help Shape the Next Generation of User-Generated Content*, 10 VAND. J. ENT. & TECH. L. 729, 758 (2008) ("Just as many authors turn a blind eye to, or even encourage, fan fiction, some media corporations have publicly stated that they have no problem with fanvids and mash-ups."). Properly applied, the red-flag knowledge provision gives fair use the room it needs by not forcing service providers to make judgment calls about whether uses like these are infringing. Instead, any item that raises a legitimate question about fair use cannot be a red flag.

Under this standard, online services can allow users to post items that incorporate even well-known copyrighted material in ways that

have a legitimate claim to fair use. This lets creators create and pre-serves the Internet as an open platform for free expression and trans-formative creation. *Cf. Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1264 (11th Cir. 2001) ("First Amendment privileges are also pre-served through the doctrine of fair use."). By giving space to fair use in this way, the DMCA helps "fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell*, 510 U.S. at 575 (quoting U.S. Const., art. I, § 8, cl. 8.)).

## III. Broadening The DMCA's Knowledge Standards Would Frustrate The Statute's Goals By Discouraging Providers From Monitoring Content And Helping Users Find It

Relieving online services from having to resolve difficult copyright questions advances very practical objectives. The narrow cast of the DMCA's knowledge provisions recognizes that providers interact with user-submitted content in a variety of ways. These interactions are ex-tremely valuable. They protect services from offensive, malicious, and other objectionable material. And they allow services to help users lo-cate the content and information most relevant and interesting to them. Departing from these standards would create serious disincentives for

21

engaging with content in these ways. Congress did not intend that, and it would have pernicious consequences for services and their users.

A.   Congress Gave Online Services Broad Leeway To Review User-Submitted Material For Pornography And Other Objectionable Content

While the DMCA makes clear that service providers have no *obligation* to look through user-submitted content for possible copyright infringements (§ 512(m)), the statute was "not intended to discourage the service provider from monitoring its service." H.R. REP. NO. 105-796, at 73 (1998). That Congress wanted to remove obstacles to voluntary monitoring is confirmed by the Communications Decency Act ("CDA"), which was enacted shortly before the DMCA. Section 230 of the CDA gives broad leeway to online computer services to review and remove objectionable content from their systems. 47 U.S.C. § 230(c)(2) (no online service "shall be held liable" on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable").

Taking up that invitation, most online services, including *amici*, make some effort to review the items posted on their services looking for

illegal or other objectionable material—including obscenity, child pornography, sexually explicit content, hate speech, sexual harassment, bullying, graphic violence, threats, and spam. Such content is prohibited by most providers' terms of use. *See, e.g.*, Pinterest "Acceptable Use Policy," https://about.pinterest.com/en/acceptable-use-policy; "The Twitter Rules," https://support.twitter.com/articles/18311-the-twitter-rules. As Tumblr's "Community Guidelines" explain, online services "draw lines around a few narrowly defined but deeply important categories of content and behavior that jeopardize our users, threaten our infrastructure, and damage our community." http://www.tumblr.com/policy/en/community.

Service providers police these rules in different ways. Pinterest allows users to report objectionable material, which is then reviewed by employees. Tumblr employs a team that works to remove offending content. Twitter's "Trust & Safety" team similarly reviews reports and establishes policies to protect its users from abuse on the service. *See* Kashmir Hill, *Meet Del Harvey, Twitter's Troll Patrol*, Forbes, July 21, 2014, *available at* http://www.forbes.com/sites/kashmirhill/2014/07/02/meet-del-harvey-twitters-troll-patrol/. These efforts require service pro-

23

viders to interact with user-submitted content. Without looking at an item, a provider can't determine whether the content violates its policies. Automated technologies can help, but there's ultimately no substitute for human beings. *See* Del Harvey, *The Strangeness of Scale at Twitter*, TED, March 2014, *available at* http://www.ted.com/talks/del_harvey_the_strangeness_of_scale_at_twitter/.

Making efforts to remove offensive, objectionable, or illegal material benefits online services, their users, and the public. While most users of services like Pinterest, Tumblr, and Twitter contribute legitimate content, there is always a minority that abuses the freedom that online platforms offer. Videos depicting child abuse, sexual torture, or graphic violence; postings that harass or bully others; messages aimed at defrauding members of the public—such content deeply offends users and can put them at risk of harm. It also distracts from the legitimate material that more responsible users post and undermines the community that online services are trying to build. Consistent with their commitment to protecting freedom of speech, service providers thus have con-

siderable cause to monitor user-submitted content in ways that have nothing to do with looking for possible copyright infringement.[4]

As indicated above, Congress approved of such review and wanted to eliminate disincentives for service providers to engage in it. The DMCA's knowledge provisions reflect that understanding. By insisting that infringement be truly obvious, the DMCA allows online services to continue their valuable content-review efforts without exposing themselves to loss of the safe harbor because they do not remove material that may turn out to have been infringing. This affords much-needed breathing space to service providers. Without it, they would be faced with a stark choice between preserving their DMCA protection and taking steps to stamp out harmful and even unlawful uses of their services. That is not what Congress wanted.

---

[4] Reviewing content for terms-of-use violations is fundamentally different from investigating infringement. As discussed above, discerning what is infringing requires a complex analysis based on information not readily apparent from the content itself. By contrast, whether material is pornographic or excessively violent can be determined simply by looking at it. And, unlike with copyright infringement, there is typically no third-party better positioned to make the necessary assessments.

**B.    The DMCA's Knowledge Provisions Were Crafted To Allow Service Providers To Review Online Material To Help Users Find What They Want**

Online services also have more positive reasons for interacting with user-submitted content. Service providers play an important role in classifying and organizing material on the Internet, and human review is often needed to do so effectively. By helping users find relevant items in what may be a sea of content, these interactions make online services more useful and better able to facilitate creative expression. In enacting the DMCA, Congress expressly recognized the importance of this kind of manual review and crafted the statute's strict knowledge standard specifically to give services the room needed to do it.

Online services like Pinterest, Tumblr, and Twitter facilitate access by users to a massive amount of content, with new material pouring in constantly from every corner of the globe. Without at least some order and organization, users may not be able to find what they're looking for, and the best and most interesting postings may get lost. To prevent that, service providers take steps to help users identify and more readily access the content that is particularly relevant and interesting to their users.

26

These organizational measures often demand engagement with users' material. Service providers review and classify user-submitted items to make them easier to find. This puts employees of the service in direct contact with those items as they try to determine the appropriate "tag" to place so that subsequent users' searches return responsive material. Likewise, providers may sift through postings in an effort to decide which ones should be placed on what portions of the service, which might be of special value, or which may create unique excitement. Tumblr, for example, categorizes blogs by subject matter (such as architecture, fashion, and travel) to help its users discover relevant and compelling content. Twitter has a custom timelines feature that allows users (and Twitter's own staff) to create a timeline of Tweets related in some useful manner. *See* https://blog.twitter.com/2013/introducing-custom-timelines.

The public benefit of such interactions can be illustrated by the role that Twitter and other services played in the Arab Spring of 2011. By highlighting and tagging relevant posts, these services made it possible for users across the globe to track and join the conversation, for those on the ground to share their experiences with an engaged audi-

27

ence, and for media outlets and governments to observe conditions and trends in real-time. *See* Philip N. Howard, et al., *Opening Closed Regimes: What Was the Role of Social Media During the Arab Spring?*, Project on Information Technology and Political Islam, Sept. 11, 2011, *available at* http://pitpi.org/?p=1051.

Even in less politically impactful scenarios, service providers' content-organization efforts are important. By interacting with user-submitted material, providers can bring the best and most interesting content to the fore. This benefits talented amateur artists and creators, whose works otherwise might not get the recognition they deserve. For example, each day Tumblr's "Radar" feature shines a spotlight on a handful of posts from the service's millions of active bloggers that most captivate Tumblr's staff. Radar sparks conversation across the network and helps inspire users' creativity. Being included in Radar gives the featured bloggers and their content more attention, often significantly increasing their views, followers, and interactions.

Organizing content effectively also helps users find and bond with like-minded individuals. This community-building is one of the most important features offered by online service providers, and it often re-

quires some involvement on the part of service providers' employees. *See, e.g.*, https://www.tumblr.com/meetups. Community managers may need to participate in user groups to respond to questions or complaints, to remove images unrelated to the purpose of the group, or to help identify content that would be especially interesting to the community.

In enacting the DMCA, Congress recognized the importance of allowing service providers to use human review to help make online content more accessible. As the legislative history explains: "Information location tools are essential to operation of the Internet; without them, users would not be able to find the information they need." S. REP. NO. 105-190, at 49. The use of "human judgment and editorial discretion" in organizing content is particularly "valuable" in this regard, and protecting such interactions was a key goal of the DMCA safe harbors:

> [T]here is concern that online directories prepared by human editors and reviewers, who view and classify various Internet sites, would be denied eligibility to the information location tools safe harbor, in an unintended number of cases and circumstances. This is an important concern because such online directories play a valuable role in assisting Internet users to identify and locate the information they seek on the decentralized and dynamic networks of the Internet.

*Id*. at 48-49.

The strict knowledge rules that Congress crafted were integral to this protection. By precluding a finding of knowledge absent actual knowledge or "red flags" making infringement "obvious" based on a "brief and casual viewing," the DMCA was designed to ensure that online services would be able to "view and classify" online content so that their users can "identify and locate the information they seek." *Id.* And Congress clearly instructed that the "*knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention.*" *Id.* at 49 (emphasis added).[5]

Unfortunately, this is exactly what the decision below does. Suggesting that red-flag knowledge exists merely because Vimeo employees

---

[5] This legislative history relates to the § 512(d) safe harbor, but it applies equally to § 512(c). For one thing, the red-flag knowledge provisions in the two safe harbors are identical. *Compare* § 512(c)(1)(A)(ii) with § 512(d)(1)(B). For another, this Court has squarely held that § 512(c) covers functions "performed for the purpose of facilitating access to user-stored material." *Viacom*, 676 F.3d at 39 (internal marks and citation omitted). This safe harbor does not require services to be passive "storage lockers"; instead, like § 512(d), it allows them to interact with user-submitted content in ways that help users "locate and gain access" to that material. *Id.* at 39-40 (internal marks and citation omitted).

interacted with user-posted items that used "well known" copyrighted works ignores Congress's instruction that a service provider should not lose the safe harbor "merely because it saw one or more well known photographs of a celebrity." *Id.* at 48. By departing from this standard, that ruling threatens to deter providers from using human intervention to help arrange or catalogue the content on their systems. Not only does that frustrate a key purpose of the DMCA, it would materially diminish the quality of online services. They would be less organized, users would have a harder time finding or identifying the items they want, and the most deserving content might get lost amid an undifferentiated mass of user-submitted material.

### C. Proper Application Of The DMCA's Knowledge Provisions Protects Legitimate Online Expression

By removing the need to make difficult judgments about infringement, the DMCA gives service providers freedom to limit objectionable content and to keep the material on their systems organized and accessible. The district court's decision threatens to erode that freedom, by applying red-flag knowledge more expansively than Congress intended. Such an application would have profound consequences for service providers, their users, and the Internet more broadly.

If they are unable to review user-submitted material without fear that every missed infringement might cost them the safe harbor, service providers will be left with two distasteful choices. First, they could stop engaging with user content altogether. While that might help avoid a finding of knowledge, it would profoundly diminish the quality of online services for all the reasons discussed above: it would allow highly offensive and even unlawful content to run unchecked, while leaving service providers unable to make good content more easily available to users.

Alternatively, service providers could respond by removing any user-posted items they find that raise even a question about copyright infringement. That result would be just as bad. Inevitably, much of the material that would be removed in such purges would not be infringing. What seemed questionable would turn out to be original, approved by the copyright owner, or fair use. Eliminating such innocent content does a disservice to users and the public. It would take important voices out of the cultural conversation, demoralize users trying to make themselves heard, and leave online services far less free and open. *Cf. Wolk*, 840 F. Supp. 2d at 747 ("[A] policy under which Photobucket assumes

infringement could result in Photobucket unlawfully blocking others from uploading images to which they hold valid licenses.").

This would be especially problematic when it comes to fair use. Fair use is "an integral part of copyright, whose observance is necessary to achieve the objectives of that law." *Blanch*, 467 F.3d at 250 (internal marks and citation omitted). As described above, services like *amici* host many user-submitted items that are legitimate candidates for fair-use protection—image mash-ups and memes on Tumblr; short, six-second video clips on Twitter; and thumbnail photographs linking to full-size images on other websites posted on Pinterest, just to give a few examples. Removing such material would deprive users of their right to appropriate existing culture into new works. And it would diminish the public's ability to view, enjoy, and be inspired by those creations. This result has serious consequences for free expression online—the "unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved." *Lenz*, 572 F. Supp. 2d at 1156; *cf. Suntrust*, 268 F.3d at 1277 (where a "viable fair use defense is available," issuing an injunction is "at odds with the shared principles of the First Amendment and the copyright

33

law"). And all of this is contrary to the DMCA's purpose to ensure "that the variety and quality of services on the Internet will continue to expand." S. REP. NO. 105-190, at 8.

## CONCLUSION

For nearly two decades, the DMCA has helped the Internet flourish by allowing online services to interact with user-submitted content in various beneficial ways. Proper application of the statute's knowledge standards is integral to the protections that the DMCA provides. The district court misapplied those standards and deprived Vimeo of the safe harbor. This Court should correct that error.

Dated:  July 30, 2014                    Respectfully submitted,

                                         WILSON SONSINI GOODRICH &
                                         ROSATI, P.C.

                                         By:  s/ *Brian M. Willen*
                                              Brian M. Willen
                                              1301 Avenue of the Americas
                                              40th Floor
                                              New York, New York  10019
                                              (212) 999-5800

                                         *Counsel for Amici Curiae*
                                         *Pinterest, Inc., Tumblr, Inc.,*
                                         *and Twitter, Inc.*

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because it contains 6,699 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the typestyle requirement of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  July 30, 2014

WILSON SONSINI GOODRICH & ROSATI, P.C.

By:  s/ *Brian M. Willen*
     Brian M. Willen
     1301 Avenue of the Americas
     40th Floor
     New York, New York  10019
     (212) 999-5800

*Counsel for Amici Curiae*
*Pinterest, Inc., Tumblr, Inc.,*
*and Twitter, Inc.*

35

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on July 30, 2014, the BRIEF FOR *AMICI CURIAE* PINTEREST, INC., TUMBLR, INC., AND TWITTER, INC. IN SUPPORT OF VIMEO, LLC was electronically filed and served on all parties or their counsel of record through the CM/ECF system, pursuant to Second Circuit Local Rule 25.1(h).

Dated:  July 30, 2014

WILSON SONSINI GOODRICH & ROSATI, P.C.

By:  s/ *Brian M. Willen*
      Brian M. Willen
      1301 Avenue of the Americas
      40th Floor
      New York, New York  10019
      (212) 999-5800

*Counsel for Amici Curiae*
*Pinterest, Inc., Tumblr, Inc.,*
*and Twitter, Inc.*