# 14-1048-cv(L)

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv-(XAP)

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

CAPITOL RECORDS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, CAROLINE RECORDS, INC., A NEW YORK CORPORATION, VIRGIN RECORDS AMERICA, INC., A CALIFORNIA CORPORATION, EMI BLACKWOOD MUSIC, INC., A CONNECTICUT CORPORATION, EMI APRIL MUSIC, INC., A CONNECTICUT CORPORATION, EMI VIRGIN MUSIC, INC., A NEW YORK CORPORATION, COLGEMS-EMI MUSIC, INC., A DELAWARE CORPORATION, EMI VIRGIN SONGS, INC., A NEW YORK CORPORATION, EMI GOLD HORIZON MUSIC CORP., A NEW YORK CORPORATION, EMI UNART CATALOG INC., A

*(For Continuation of Caption See Inside Cover)*

On Appeal From The United States District Court
For The Southern District of New York (New York City)

### BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, ORGANIZATION FOR TRANSFORMATIVE WORKS, THE CENTER FOR DEMOCRACY AND TECHNOLOGY, PUBLIC KNOWLEDGE, AND NEW MEDIA RIGHTS IN SUPPORT OF DEFENDANT-APPELLANTS

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*

July 30, 2014

*(For Continuation of Counsel Listings See Inside Cover)*

NEW YORK CORPORATION, STONE DIAMOND MUSIC CORPORATION, A MICHIGAN
CORPORATION, EMI U CATALOG, INC., A NEW YORK CORPORATION, JOBETE MUSIC
CO., INC., A MICHIGAN CORPORATION,

PLAINTIFFS-APPELLEES-
CROSS APPELLANTS,

v.

VIMEO, LLC, A DELAWARE LIMITED LIABILITY COMPANY, AKA VIMEO.COM,
CONNECTED VENTURES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,

DEFENDANT- APPELLANTS-
CROSS APPELLEES,

DOES, 1-20 INCLUSIVE,

DEFENDANT.

---

*On the brief:*

Vera Ranieri
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel:  (415) 436-9333
vera@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC  20036
Tel:  (202) 861-0020
ssiy@publicknowledge.org

Art Neill
Teri Karobonik
NEW MEDIA RIGHTS
1855 1st Ave., Suite 102
San Diego, CA 92101
Tel:  (619) 665-9297
art@newmediarights.org

*On the brief:*

Elizabeth Rosenblatt
Rebecca Tushnet
ORGANIZATION FOR TRANSFORMATIVE
WORKS
2576 Broadway, Suite 119
New York, NY  10025
Tel:  (310) 386-4320
betsy_rosenblatt@post.harvard.edu

Emma Llansó
CENTER FOR DEMOCRACY & TECHNOLOGY
1634 I Street NW #1100
Washington, DC  20006
Tel:  (202) 637-9800
ellanso@cdt.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* Electronic Frontier Foundation, Organization for Transformative Works ("OTW"), The Center for Democracy & Technology ("CDT"), Public Knowledge ("PK"), and New Media Rights ("NMR") state that none have a parent corporation and that no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 3

ARGUMENT........................................................................................ 4

    I.    Clear DMCA Safe Harbors Have Been Crucial to the Growth of the
Internet as an Engine for Innovation, Creativity, and Expression ... 4

        A.    Congress Intended Section 512 to Reduce Legal Uncertainty
and Thus Foster the Growth of the Internet. ........................... 4

        B.    Section 512 Has Been Successful In Achieving Congress'
Goals ..................................................................................... 7

        C.    Object Example: Remix Culture............................................. 9

    II.    The District Court's Approach to "Red Flag Knowledge"
Contradicts The Structure and Purpose of Section 512(c) and
Undermines the Legal Certainty Congress Sought to Promote. .... 13

        A.    The District Court's Standards for "Red Flag"
Knowledge Increase Legal Uncertainty and Chill
Innovation and Speech ........................................................ 13

            1.    The District Court's Standard for "Red Flag" Knowledge
Impermissibly Lowers the Burden of Production ......... 14

            2.    The District Court's Standard Requires a Service
Provider to Make Discriminating Judgments Solely
in Favor of Copyright Owners, Contrary to Statutory
Intent................................................................................ 15

            3    The District Court's Standard Would Encourage Service
Providers to Overblock Content .................................... 18

            4.    The Court Should Not Create Work-Dependent Standards
For "Red Flag" Knowledge ........................................... 20

III.  Plaintiffs' Arguments That the DMCA Safe Harbors Do Not Apply to Pre-1972 Sound Recordings Would Virtually Nullify the DMCA for Any Service that Allows Users to Upload Content Containing Audio ............................................................................................ 22

    A.  Excluding Pre-1972 Sound Recordings from the DMCA Would Thwart the Purpose and Operation of the Safe Harbors for Any Service Provider that Allows Users to Upload Audio Content ........................................................ 22

        1.  Denying Safe Harbor Protection for Pre-1972 Sound Recordings Would Create an Impossible Burden for Service Providers and Would Stifle Innovation and the Growth of Valuable Online Speech and Services ......... 23

        2.  Denying Safe Harbor Protection for Pre-1972 Sound Recordings is Inconsistent with the Statutory Language and the Structure of the DMCA ................................... 26

CONCLUSION ............................................................................... 28

# TABLE OF AUTHORITIES

## Federal Cases

*Bill Graham Archives v. Dorling Kingsley Limited*,
    386 F. Supp. 2d 324 (S.D.N.Y. 2005) ....................................................... 12

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................. 12

*Capitol Records, Inc. v. MP3Tunes, LLC*,
    821 F. Supp. 2d 627 (S.D.N.Y. 2011) ..................................... 23, 25, 26, 27

*Capitol Records, LLC v. Vimeo, LLC*,
    972 F. Supp. 2d 537 (S.D.N.Y. 2013) .......................................... 13, 20, 21

*Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*,
    150 F.2d 132 (2d Cir. 1998) ................................................................... 12

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ................................................................ 20

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ................................................................... 6

*Lenz v. Universal Music Corp.*
    No. 5:07–cv–03783–JF, 2013 WL 271673 (N.D. Cal, Jan. 24, 2103) ....... 20

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ................................................................... 5

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
    494 F.3d 788 (9th Cir. 2007) ..................................................................... 5

*UMG Recordings, Inc. v. Escape Media Group*,
    964 N.Y.S.2d 106 (1st Dept. 2013) ........................................................ 27

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*,
    718 F.3d 1006 (9th Cir. 2013) ................................................................... 5

## Federal Statutes

17 U.S.C. § 107 ............................................................................................ 20

17 U.S.C. § 512(c) .................................................................................. 20, 26

17 U.S.C. § 512(c)(3)(A) ......................................................................... 16

17 U.S.C. § 512(c)(3)(A)(v) ................................................................... 20

17 U.S.C. § 512(c)(3)(B)(i) .................................................................... 16

17 U.S.C. § 512(g) ................................................................................... 8

17 U.S.C. § 512(m) ................................................................................ 28

## Legislative Materials

H.R. REP. NO. 105-551 (1998) ........................................................... 7, 27

*Hearing on Section 512 of Title 17, Before the Subcomm. On Courts,
    Intellectual Property, and the Internet,* 113th Cong. (2014) ..................... 24

S. REP. NO. 105-190 (1998) ..................................................... 6, 7, 16, 27

## Other Authorities

4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT (Matthew
    Bender rev. ed. 2013) ............................................................................ 5, 16

*April Membership Drive: Spotlight on the Archive of Our Own*, ARCHIVE OF
    OUR OWN (Apr. 9, 2014) ........................................................................ 10

Comments of DeviantArt on Department of Commmerce Green Paper (Nov. 13,
    2013) ..................................................................................................... 25

Comments of the EFF, RM 2011-07 (Dec. 1, 2011) ................................... 10, 11

Comments of the OTW on Department of Commerce Green Paper (Nov. 15,
    2013) ....................................................................................................... 9

David Nimmer, *Puzzles of the Digital Millennium Copyright Act,* 46 J.
    COPYRIGHT SOC'Y  (1999) ........................................................................ 17

*FanFiction.Net Fandoms: Story and Traffic Statistics*, FFN RESEARCH (Jan. 11,
    2011) ..................................................................................................... 10

Henry Jenkins & Wyn Kelley, READING IN A PARTICIPATORY CULTURE:
    REMIXING MOBY-DICK IN THE ENGLISH CLASSROOM (2013) ......................... 9

*How does copyright work in space?*, THE ECONOMIST, May 22, 2013 ............. 19

Joe Sabia, *Remixes*, THE INTERNET PORTFOLIO OF JOE SABIA .......................... 11

Jonathan McIntosh, *Buffy vs. Edward Remixed*, REBELLIOUS PIXELS (June 20, 2009) ...................................................................................................... 11

June M. Besek, Council on Library and Info. Res. and the Library of Congress, COPYRIGHT ISSUES RELEVANT TO DIGITAL PRESERVATION AND DISSEMINATION OF PRE-1972 COMMERCIAL SOUND RECORDINGS BY LIBRARIES AND ARCHIVES (2005) ............................................... 23

Maeve Duggan, Photo and Video Sharing Grow Online, PEW RESEARCH INTERNET PROJECT, Oct. 28, 2013 ............................................. 22

Perry Chan, Yancey Strickler, and Charles Adler, *Accountability on Kickstarter*, KICKSTARTER BLOG (September 4, 2012) ................................................. 15

Peter B. Hirtle, Copyright Term and the Public Domain in the United States, Jan. 3, 2014 ............................................................................ 18

Recommendation of the Register of Copyrights, Section 1201 Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention  (Oct. 12, 2012) ................................................. 12

*The Copyright Infringement Liability of Online and Internet Service Providers: Hearing Before the Committee on the Judiciary United States Senate on S. 1146*, 105th Cong. 29 (1997) ......................................................... 7

United States Copyright Office, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS, A REPORT OF THE REGISTER OF COPYRIGHTS (2011) ............................................................................... 24

Wikipedia, "Megamix" ..................................................................... 25

# STATEMENT OF INTEREST[1]

*Amici curiae* submit this brief pursuant to Fed. R. App. P. 29.  All parties have consented to the filing of this brief.

*Amicus* The Electronic Frontier Foundation ("EFF") is a nonprofit civil liberties organization that has worked for over 20 years to protect consumer interests, innovation, and free expression in the digital world.  EFF and its over 27,000 dues-paying members have a strong interest in assisting the courts and policymakers to help ensure that copyright law serves the interests of creators, innovators, and the general public.

*Amicus* Organization for Transformative Works ("OTW") is a 501(c)(3) nonprofit organization dedicated to protecting and preserving noncommercial fanworks:  works created by fans based on existing works, including popular television shows, books, and movies.   OTW's nonprofit website hosting transformative noncommercial works, the Archive of Our Own ("AO3"), has over 350,000 registered users and receives roughly 50 million page views per week. The OTW submits this brief to make the Court aware of the richness and importance of noncommercial remix communities and the works they produce, and

---

[1] No party's counsel authored this brief in whole or in part.  Neither any party nor any party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person other than *amici*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.  Web sites cited in this brief were last visited on July 29, 2014.

the potential impact of its decision upon nonprofit intermediaries that facilitate the formation and creation of these transformative communities and works.

*Amicus* The Center for Democracy & Technology ("CDT") is a nonprofit public interest group that seeks to promote free expression, privacy, individual liberty, and technological innovation on the open, decentralized Internet. CDT advocates balanced copyright policies that provide appropriate protections to creators without curtailing the unique ability of the Internet and digital media to empower users, speakers, and innovators. Maintaining clear, strong safe harbors for Internet intermediaries plays a critical role in achieving that balance.

*Amicus* Public Knowledge ("PK") is a non-profit public interest organization that defends citizens' rights in the emerging digital culture. Public Knowledge promotes balanced intellectual property policies that ensure that the public can access knowledge while protecting the legitimate interests of authors.

*Amicus* New Media Rights ("NMR") is an independently funded non-profit program of California Western School of Law supporting a wide variety of independent creators (including remix artists); entrepreneurs (including small user-generated content websites); and Internet users though direct legal services, education, and advocacy on media and Internet law.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress deliberately created distinct rules for online service providers in Title II of the Digital Millennium Copyright Act ("DMCA"), codified in Section 512 of the Copyright Act.[2]  In order to stimulate the growth of the Internet and electronic commerce, Congress created a set of statutory "safe harbors" that helped service providers predict and manage their legal exposure to copyright infringement liability.  This effort proved to be a huge success, encouraging not only the growth of the Internet generally, but the growth of innovative platforms for free expression in particular.

The district court's rulings on both "red-flag knowledge" and pre-1972 sound recordings, if accepted, would thwart Congress's intent and turn back the clock on the DMCA.  The first ruling would effectively impose a standard for red flag knowledge that sharply diverges from this Court's own requirement that the alleged infringement be "objectively obvious."  It would also set the copyright owner's burden of production so low that every single service provider could be required to proceed to trial on almost any allegedly infringing material that its employees viewed.   The second would present service providers with an impossible choice:  either screen every audiovisual work it hosts for potential pre-1972 recordings (which could then expose them to a jury trial if the material used

---

[2] All statutory references are to Title 17 of the United States Code unless otherwise noted.

3

is arguably "well-known" and they allow it to remain online), or risk crushing liability. The result: a renewed climate of legal uncertainty for any service hosting expressive works, particularly works that might contain audio, and the loss of the free expression such services foster.

In light of this uncertainty, even moderately cautious service providers may well go a third way, and refuse to host audiovisual works at all. Thus, endorsement of these aspects of the decision below would gravely threaten the profusion of online services and the creative communities that rely upon them to the detriment our common culture. In keeping with Congress' intent, *Amici* urge the Court to reject the both district court's interpretation of the standard for red flag knowledge and its improper exclusion of claims based on pre-1972 sound recordings from Section 512, and protect the predictable legal climate the safe harbors were intended to create.

## ARGUMENT

## I.   CLEAR DMCA SAFE HARBORS HAVE BEEN CRUCIAL TO THE GROWTH OF THE INTERNET AS AN ENGINE FOR INNOVATION, CREATIVITY, AND EXPRESSION

### A.   Congress Intended Section 512 to Reduce Legal Uncertainty and Thus Foster the Growth of the Internet.

In 1998, Congress made a tough yet clear choice that balanced the need for Internet innovation against the need for copyright enforcement. *See UMG*

4

*Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) ("Although Congress was aware that the services provided by companies like [Vimeo] are capable of being misused to facilitate copyright infringement, it was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions."). Copyright holders were concerned that their works were being infringed online in increasing numbers. Service providers were concerned that they would be unable to build platforms for lawful expression and commerce if they could be held liable whenever those platforms were used for unlawful purposes, particularly given the murky, judge-made standards that characterize copyright's secondary liability doctrines. *See* 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 12B.01[A][1] (Matthew Bender rev. ed. 2013) (describing conflicting secondary liability jurisprudence prior to 1998). *Compare Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170-75 (9th Cir. 2007) (discussing secondary liability principles applicable to online service providers) *with Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 811-22 (9th Cir. 2007) (Kozinski, J., dissenting) (pointing out contradictions in secondary liability standards as applied to service providers).

In order to address these concerns, Congress created a set of "safe harbors" designed to "provide '*greater certainty* to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'"

5

*Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (emphasis added) (*quoting* S. REP. NO. 105-190, at 20 (1998)). Congress focused on creating a more predictable legal environment because it recognized that:

> [W]ithout clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make innumerable electronic copies by simply transmitting information over the Internet. Certain electronic copies are made to speed up the delivery of information to users. Other electronic copies are made in order to host World Wide Web sites. Many service providers engage in directing users to sites in response to inquiries by users or they volunteer sites that users may find attractive. Some of these sites might contain infringing material. In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

S. REP. NO. 105-190, at 8. Thus, Congress correctly understood that the application of complex, ambiguous, or uncertain copyright doctrines to new Internet technologies would put service providers in an impossible position. Service providers necessarily must make, manipulate, and transmit multiple copies of content at several stages of their technical processes. These multiple copies might arguably infringe one or more of the display, performance, distribution, reproduction, or other rights in copyrighted content.

During the Senate hearings preceding the DMCA, Roy Neel, President and Chief Executive of the United States Telecom Association, stated the problem as

follows:

> We have no way of knowing what those trillions of bits of information are flowing over our networks. We simply cannot do it, and to be held liable for those transmissions is simply nonsense and it will tie us up in court, create more litigation and more work for lawyers, but won't do anything to advance the construction and deployment of the Internet, nor will it protect copyright owners to any significant degree.

*The Copyright Infringement Liability of Online and Internet Service Providers: Hearing Before the Committee on the Judiciary United States Senate on S. 1146*, 105th Cong. 29 (1997); *see also* S. REP. NO. 105-190, at 8. The DMCA thus set up a regime that would "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment," without creating endless litigation and uncertainty. H.R. REP. NO. 105-551, pt. 2, at 49 (1998).

## B.    Section 512 Has Been Successful In Achieving Congress' Goals

Congress' experiment in reducing legal risk by creating detailed safe harbors for online service providers has proved an extraordinary success in fostering the development of innovative platforms and services.  Since the enactment of the safe harbors, we have seen the emergence of hundreds of such services that provide unprecedented opportunities for user creativity and expression.  In addition to video services like Vimeo and YouTube, we have seen the growth of blogging services such as Tumblr, Automattic's Wordpress.com, and Medium, short

message and location services such as Twitter and FourSquare, funding sites such as Kickstarter, IndieGogo, Upstart, Pave, Patreon, and DonorsChoose.org, and knowledge resources such as Wikipedia and the Internet Archive.

All of these platforms depend on the certainty and systematic nature of the safe harbors to enable this new generation of user creativity and expression. In order for platforms to provide users with this capacity, they must be able to systematize their approach to copyright concerns. The safe harbors allow this by providing for a process that does not require individual legal assessments beyond objectively obvious cases of infringement. For example, removing access to allegedly infringing content at the request of copyright owner does not require any legal assessment by the provider. It merely requires an identification of the work and the location of the allegedly infringing material. The same is true with restoring access to the material pursuant to a valid counter-notification under 17 U.S.C. § 512(g).

Providers big and small, from search engines to hosts, depend on this systemic approach. Indeed, the alternative—requiring companies to invest in sophisticated legal, technological, and artistic training for employees, and then task them with making high-risk legal assessments—would quickly shut out small companies and new entrants that lack the resources to make complex legal determinations. If forced to perform such analyses, even established service

providers would most likely err on the side of caution, which would lead to the censorship of lawful forms of expression.

### C.    Object Example: Remix Culture

To demonstrate how these safe harbors protect Internet creativity, *Amici* focus here on "remix" works, which are expressive works that respond to and build upon existing works. Remix creators follow in the footsteps of literary and artistic greats like Homer and Shakespeare in adding their own creativity to existing characters and settings. *See* Henry Jenkins & Wyn Kelley, READING IN A PARTICIPATORY CULTURE: REMIXING MOBY-DICK IN THE ENGLISH CLASSROOM, at 106 (2013). Remix is particularly popular among creators who are otherwise underrepresented in American mass culture—women, nonwhites, and LGBT individuals, among others—and who use remix to talk back to that culture, to identify what it's leaving out and explain what they see.[3]

Substantial percentages of Americans online create remix works, and millions more enjoy the results. For example, FanFiction.net, the largest general-purpose fan fiction website online, hosted over 3 million individual text-based

---

[3] *See* Comments of the OTW on Department of Commerce Green Paper, at 29-38 (Nov. 15, 2013), *available at* http://www.ntia.doc.gov/files/ntia/organization_for_transformative_works_comments.pdf.

stories as of January 2011 (the last date for which public statistics are available).[4]
The Archive Of Our Own, the OTW's nonprofit archive of fanworks, receives
roughly 50 million page views per week.[5]  Video-based remix, which often
includes cultural and political criticism and commentary, is a growing artistic
medium.  Ethnographer Michael Wesch estimated in 2011 that between 2000 and
6000 original videos that included clips from film or television sources were
uploaded to YouTube each day.[6]

By creating transformative works, remix artists learn crucial personal skills,
such as how to be artists and how to express themselves effectively, and practical
professional skills, such as video editing, computer programming, and language
translation.  *See id. at* 22-28, 40-59.  The noncommercial, make-it-yourself nature
of remix communities makes them easy to enter, even for people who lack
economic resources.  For example, because transformative fan communities thrive
on variation and new works, they encourage even very beginning artists to
experiment, find unique voices, and discover new sources of strength.  *See id.* at

---

[4] *See FanFiction.Net Fandoms: Story and Traffic Statistics*, FFN RESEARCH
(Jan. 11, 2011), http://ffnresearch.blogspot.com/2011/01/fanfictionnet-fandoms-story-and-traffic.html.

[5] *See April Membership Drive: Spotlight on the Archive of Our Own*,
ARCHIVE OF OUR OWN (Apr. 9, 2014), http://archiveofourown.org/admin_posts/664.

[6] *See* Comments of the EFF, RM 2011-07 at 39-40 (Dec. 1, 2011), *available at* http://www.copyright.gov/1201/2011/initial/eff.pdf.

40.    Remix video communities have been particularly valuable as a "female training ground," providing a safe forum for women to learn a variety of technical skills. *See id.* at 33-34.

Remix creation also benefits society at large.  Remix works "talk back" to mass media, providing valuable cultural and political commentary.  *See id.* at 24-30 & 41-43.  For example, Jonathan McIntosh's "Buffy vs. Edward" video remix uses clips from *Buffy the Vampire Slayer* and *Twilight* to comment on how the *Twilight* series celebrates female disempowerment and romanticizes male stalking.[7]  Joe Sabia's video remix "Prime Time Terror" combines clips from several popular primetime television shows depicting the "war on terror" to comment on and critique the way in which television presents and shapes popular understandings of war.[8]

Remix works, by their nature, are necessarily based on preexisting material, most of which is protected by copyright.  However, in most cases they are also clearly non-infringing fair uses.[9]  Indeed, the law favors this sort of creativity and

---

[7] *See* Jonathan McIntosh, *Buffy vs. Edward Remixed*, REBELLIOUS PIXELS (June 20, 2009), http://www.rebelliouspixels.com/2009/buffy-vs-edward-twilight-remixed.

[8] *See* Joe Sabia, *Remixes*, THE INTERNET PORTFOLIO OF JOE SABIA, http://www.joesabia.co/remix.html.

[9] The Copyright Office has specifically cited remixes like these as among the fair uses justifying an exception to the Copyright Act's anticircumvention provisions. *See* Recommendation of the Register of Copyrights, Section 1201

recognizes the social and cultural importance of transformative works like these, which "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). As this Court has explained, transformative work "is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.2d 132, 141 (2d Cir. 1998); *see also Bill Graham Archives v. Dorling Kingsley Limited*, 386 F. Supp. 2d 324, 329 (S.D.N.Y. 2005) *aff'd.* 448 F.3d 605 (2d Cir. 2006).

But these culturally valuable remixes cannot exist without platforms to host them. If hosts were presumed to have "red flag" knowledge of infringement when works incorporate popular copyrighted works—as many remixes must—it would unduly burden sites like the Archive of Our Own that are expressly designed to host noncommercial, transformative remix. Loose standards for red-flag knowledge of infringement are likely to lead quickly to self-censorship.

This is precisely what Section 512 is designed to prevent. For small and nonprofit hosts, like the Archive of Our Own, it would be prohibitively difficult. Unlike the DMCA notice process, moreover, a host-initiated takedown isn't subject to counter-notification and the possibility of neutral judicial resolution of

Rulemaking: Fifth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention 138 (Oct. 12, 2012), http://www.copyright.gov/1201 /2012/Section_1201_Rulemaking_2012_Recommendation.pdf.

fair use claims. Thus, remix would be particularly vulnerable to unreviewable suppression. And without places for remix to reside, the valuable personal, social, political, and cultural statements of remix creations would be stifled.

## II. THE DISTRICT COURT'S APPROACH TO "RED FLAG KNOWLEDGE" CONTRADICTS THE STRUCTURE AND PURPOSE OF SECTION 512(C) AND UNDERMINES THE LEGAL CERTAINTY CONGRESS SOUGHT TO PROMOTE.

### A. The District Court's Standards for "Red Flag" Knowledge Increase Legal Uncertainty and Chill Innovation and Speech

The district court determined that a triable issued existed as to "red flag" knowledge due to "videos' use of recognizable songs, played essentially in their entirety and in unedited form." *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 553 (S.D.N.Y. 2013) ("*Capitol Records*"). However, the court's conclusion that "red flag" knowledge could exist under such circumstances was based on two errors. First, it effectively lowered Plaintiffs' burden of producing evidence of a triable issue, finding that it could be satisfied any time the work in question had been viewed by an employee and was "well-known." Second, it assumed that the mere act of viewing a video and recognizing its contents could be sufficient to raise an issue of fact as to whether infringement was "objectively obvious."

13

### 1. The District Court's Standard for "Red Flag" Knowledge Impermissibly Lowers the Burden of Production

As noted above, Congress intended the safe harbors to protect online service providers from having to make "tough calls" about the legal status of material posted at the direction of users. This included placing the burden of establishing "red flag" knowledge on the copyright owner. To meet that burden, the copyright owner must show that the provider had knowledge of facts and circumstances that would make a determination of infringement objectively obvious. This includes, at summary judgment, the obligation to produce evidence sufficient to raise a triable issue of fact.

On the district court's theory, however, that summary judgment burden will be met, virtually automatically, whenever the host's employee views a video that contains a work that is "well-known" or recognizable. As a practical matter, that means an online service provider risks facing a jury trial for every single work that one of their employees observes, if that work contains material that is "recognizable." To be clear, that requirement could apply to any type of work, including a poster of the famous painting *Nighthawks* in the background of a video. Given that employees for some services likely view hundreds if not thousands of pieces of user-stored online content every day, this places an enormous burden on providers with enormous risks attached—exactly the opposite of Congress' intent for Section 512.

14

This is particularly dangerous for providers who view content for other reasons, such as when content is flagged as inappropriate, fraudulent, harassing, or otherwise illegal.  If every investigation for those purposes triggers a jury trial on red flag knowledge, providers will have every incentive to avoid those legitimate investigations.[10]

This Court should not accept the district court's premise.  Instead, the burden to show the facts and circumstances that establish an objectively obvious case of infringement must be on the copyright owner, and it must require more than a simple showing that an employee viewed the content at issue, no matter how "well-known" that content happens to be.  It must be a case where the copyright owner has shown that likelihood of infringement is indeed objectively obvious.

## 2. The District Court's Standard Requires a Service Provider to Make Discriminating Judgments Solely in Favor of Copyright Owners, Contrary to Statutory Intent

The structure and history of the DMCA make clear that when a service provider learns about potentially infringing activity from sources other than the

---

[10] For example, Kickstarter, a popular site for funding artistic, technological, and other creative projects, dedicates significant employee resources to investigating project fraud on its platform. *See* Perry Chan, Yancey Strickler, and Charles Adler, *Accountability on Kickstarter*, KICKSTARTER BLOG (September 4, 2012), https://www.kickstarter.com/blog/accountability-on-kickstarter ("We've also allocated more staff to trust and safety. We look into projects reported by our community for guidelines violations and suspicious activity, and we take action when necessary. These efforts are focused on fraud and acceptable uses of Kickstarter, not a creator's ability to complete a project and fulfill.").

15

copyright owner, the statutory scheme does not require a service provider "to make discriminating judgments about potential copyright infringement." S. REP. NO. 105-190, at 49.[11]   Yet these are precisely the judgments that service providers would have to make under the district court's approach.   Specifically, online service providers could be potentially forced to litigate jury trials over every user posting their employees view if the posting:   (1) includes an entire third-party work; (2) is recognizable; and (3) is subject to copyright protection.

But as the history and structure of the DMCA make clear, even if it is likely that these conditions exist, the standard for "red flag" knowledge is higher.   "[T]he 'flag' must be brightly red indeed—and be waving blatantly in the provider's face—to serve the statutory goal of making infringing activity . . . apparent. Reference to 'blatant copyright infringement' strikes the right note." 4 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 12B.04[A][1][b][i] (Matthew Bender rev. ed. 2013) (citation and quotation omitted).

Although likely to be unusual, such sources can be imagined.   Professor David Nimmer dissects a number of different hypothetical circumstances in his exhaustive analysis of the "red flag" requirement.   *See* David Nimmer, *Puzzles of*

---

[11]   The "actual knowledge" and "red flag" provisions in the statute apply only where knowledge evidence comes from sources independent of the copyright owner. *Cf.* 17 U.S.C. § 512(c)(3)(B)(i) (notices from copyright owners that fail to substantially comply with § 512(c)(3)(A) are not considered in determining whether service provider has actual or "red flag" knowledge of infringing activity).

*the Digital Millennium Copyright Act*, 46 J. COPYRIGHT SOC'Y 401, 436-37, 445 (1999) (discussing red flag knowledge where a subscriber contacts the service provider and signals infringing intentions and where a senior executive of a service provider chooses to investigate an unauthorized music site).

What is not enough is simple knowledge that a work may be subject to copyright protection (as all expressive works now are upon fixation).[12]  The DMCA's structure and purpose make clear that a service provider does not need to affirmatively seek facts of infringement or non-infringement.  But the standard Plaintiffs advance subverts Congressional intent in that it is a regime that would require service providers to make judgments regarding a work based on whether it uses an "all or virtually all" of a "recognizable" and "copyrighted" work, ignoring the uncertainty of each of these determinations.  At the same time, the proposed standard requires the service provider to ignore the myriad ways the uploaded content—which may or may not be the entire work, be authorized, be recognizable and/or be subject to copyright protection—could have been legally uploaded.  Overall, the standard would create uncertainty for service providers and sets the "red flag" knowledge requirement too low, and too much toward a regime which

---

[12] That a service provider itself does not have a license is immaterial.  The purpose and structure of the DMCA show an attempt to remove legal liability for service providers in exactly the instance where they did ***not*** have a license, so long as it met the DMCA's requirements.  That is, the DMCA would be pointless for a service provider with a license.  It would have already relieved itself of legal liability.

presupposes infringement.

### 3. The District Court's Standard Would Encourage Service Providers to Overblock Content

The district court's standard, if adopted, would also cause service providers to block legitimate content for fear of losing the safe harbor protections of the DMCA. There can be no debate that even if the entirety of a work is uploaded to a website, that use may be perfectly lawful. But a service provider may have trouble determining that by mere viewing alone. For example, a web host often cannot easily determine whether a work is licensed or otherwise authorized. *See, e.g.*, discussion *infra* regarding Chris Hadfield's "Space Oddity"; *see also, e.g.*, YouTube's Opp'n. To Mot. for Summ. J., Case No. 07-cv-2103 (LLS), ECF No. 283, at 4-6 (S.D.N.Y. filed May 10, 2010, unsealed May 21, 2010) (arguing Viacom itself had uploaded videos to YouTube's service which Viacom later accused of being infringing).[13] Similarly, for the service provider, it may be difficult to determine whether a work is in the public domain.[14]

Faced with the prospect of a jury trial if they guess wrong, most service

---

[13] Although this issue was not finally decided, that the issue was raised shows that it is possible that uploaded works are licensed and that the licensed status of the work is difficult to determine.

[14] *See, e.g.*, Peter B. Hirtle, Copyright Term and the Public Domain in the United States, Jan. 3, 2014, *available at* https://copyright.cornell.edu/resources/publicdomain.cfm (outlining the various considerations for determining when a work is in the public domain).

providers will err on the side of caution—to the detriment of their users.  For example, in May 2013, astronaut Chris Hadfield recorded a version of the well-known (and copyrighted) song "Space Oddity" by David Bowie.[15]  Hadfield secured all needed licenses to create, distribute, and perform his version of the song, but did not include any of that information in or accompanying the video he posted.  *Id*.  Thus, a service provider would have to guess as to whether the video was infringing or not.  Under the district court's test, the only sensible approach, once an employee viewed the video, would be to take it down unless the user (Hadfield) could prove he had the necessary authorizations.  Indeed, unlike a DMCA takedown, which provides for counter-notification, Hadfield would have had no clear way to get this authorized video restored.

By contrast, rights holders are in a much better position to make such determinations. A rights holder should know whether a work is still protected by copyright and to whom she has licensed it.  If need be, the rights holder can send a takedown notice should she believe the content to be infringing under the copyright law.[16]  By placing the principal burden on a rights holder to identify the

---

[15] *See* G.F., *How does copyright work in space?*, THE ECONOMIST, May 22, 2013, *available at* http://www.economist.com/blogs/economist-explains/2013/05/economist-explains-12 (explaining the complexities surrounding copyright in space).

[16] A fair use is by definition a use that is both unlicensed and non-infringing. The rights holder is required to consider the possibility that the use is fair before sending a takedown notice.  *Lenz v. Universal Music Corp.* No. 5:07–cv–03783–

legal status of her works, Congress' recognized that service providers are in a poor position to judge that legal status, even when the entirety of a known work is incorporated into the uploaded content. 17 U.S.C. § 512(c); *Viacom Intern. Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 523 (S.D.N.Y. 2010), *aff'd in part, vacated in part on other grounds*, 676 F.3d 19 (2d. Cir. 2012).

### 4. The Court Should Not Create Work-Dependent Standards For "Red Flag" Knowledge

The district court's standard for "red flag" knowledge contravenes the structure and intent of the DMCA in that it creates a regime where the "objectively obvious" red flag knowledge would turn on whether a work was a "well-known" or "recognizable" song.  This creates a regime where the service provider must consider whether a song is "well-known" and, according to the district court, therefore likely to be infringing, in order to determine whether or not it may be accused of having "red flag" knowledge.  *Capitol Records*, 972 F. Supp. 2d at 548 (citing *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013)).  Indeed, the district court seems to have determined that the notoriety of the song itself largely creates the "red flag" knowledge.  The district court declined to certify for appeal a question as to whether "red flag" knowledge could be based

JF, 2013 WL 271673, at *5 (N.D. Cal, Jan. 24, 2103). The DMCA requires a party sending a takedown notice to state that the material is not "not authorized by the copyright owner, its agent, or *the law*", 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added), which includes 17 U.S.C. § 107 (fair use).

on "mere viewing of a user-generated video containing third party copyrighted music." Instead, it reformulated the question to inquire as to whether viewing videos containing "all or virtually all of a ***recognizable***, copyrighted song" created that knowledge. *Capitol Records*, 972 F. Supp. 2d at 553 (emphasis added).

Thus under the district court's regime, a service provider, upon coming across all or virtually all of song, must ask itself whether that song is "recognizable."[17] If the answer is yes, there is a risk of liability (or at least a jury trial) *even if* the service provider's employee herself did not recognize the song. After this analysis, the service provider would need to remove the work from its servers or else risk its safe harbor protection, even if it is possible that the use was licensed or the use was fair.

Contrary to the clear purpose of the safe harbors, the district court's standard would require service providers to engage in judgment calls regarding whether that work was "well-known," and encourage providers to err in favor of a finding of illegitimacy. A cautious service provider will instruct its employees to remove videos based solely on a perceived notoriety, whether or not the works used in the videos are licensed or otherwise authorized by law. A better rule would allow the

---

[17] It is unclear to whom this reference is made. For example, a song well-known to a Top 40 radio station listener today may be unknown to a listener of campus radio or to a Top 40 radio station listener from years earlier. A "red flag" standard that turns on the notoriety of a work is unmanageable, fraught with uncertainty, and contrary to Congressional intent.

service provider to leave the content in place absent much brighter red flags.

**III.** **PLAINTIFFS' ARGUMENTS THAT THE DMCA SAFE HARBORS DO NOT APPLY TO PRE-1972 SOUND RECORDINGS WOULD VIRTUALLY NULLIFY THE DMCA FOR ANY SERVICE THAT ALLOWS USERS TO UPLOAD CONTENT CONTAINING AUDIO**

**A.    Excluding Pre-1972 Sound Recordings from the DMCA Would Thwart the Purpose and Operation of the Safe Harbors for Any Service Provider that Allows Users to Upload Audio Content**

The touchstone of the safe harbor protections is predictability and certainty that a service provider will not face crippling liability for possibly infringing material uploaded by its users. But that predictability and certainty would be effectively eliminated by Plaintiffs' proposed reading of Section 512 for any service provider or website that allows the upload of music or other audio, a huge proportion of the user-generated content sites on the internet today.[18] As the first federal district court to address this issue recognized, interpreting the preemption limitation provisions of Section 301(c) to deny safe harbor protection to pre-1972 sound recordings "would eviscerate the purpose of the DMCA" and "spawn legal uncertainty and subject otherwise innocent internet service providers to liability for

---

[18]    *See* Maeve Duggan, Photo and Video Sharing Grow Online, PEW RESEARCH INTERNET PROJECT, Oct. 28, 2013, *available at* http://www.pewinternet.org/2013/10/28/photo-and-video-sharing-grow-online/ ("54% of adult internet users post original photos or videos online that they themselves have created…. 47% of adult internet users take photos or videos that they have found online and repost them on sites designed for sharing images with many people.").

the acts of third parties." *Capitol Records, Inc. v. MP3Tunes*, *LLC*, 821 F. Supp. 2d 627, 641-642 (S.D.N.Y. 2011) ("*MP3Tunes*"), *modified in part*, *Capitol Records, Inc. v. MP3Tunes*, *LLC*, 07 Civ. 9931 (WHP), 2013 WL 1987225, (S.D.N.Y. May 14, 2013).

> **1. Denying Safe Harbor Protection for Pre-1972 Sound Recordings Would Create an Impossible Burden for Service Providers and Would Stifle Innovation and the Growth of Valuable Online Speech and Services**

Plaintiffs' position, if adopted, would force service providers that permit users to upload audio to try to operate within two different and inconsistent liability regimes. For any user-generated content that includes a sound recording from 1972 or later, the safe harbor provisions of Section 512 that cover all other user-uploaded content would apply. But for any uploaded content that happens to include all or part of a pre-1972 sound recording, no safe harbor would be available. Rather, the service provider would be subject to a patchwork of varying, shifting and unpredictable state copyright regimes,[19] ranging from statutory civil causes of action to actions for unfair competition and misappropriation to state criminal statutes.[20]

---

[19] *See* June M. Besek, Council on Library and Info. Res. and the Library of Congress, COPYRIGHT ISSUES RELEVANT TO DIGITAL PRESERVATION AND DISSEMINATION OF PRE-1972 COMMERCIAL SOUND RECORDINGS BY LIBRARIES AND ARCHIVES, § 3.5 (2005).

[20] *See* United States Copyright Office, FEDERAL COPYRIGHT PROTECTION

A provider seeking to limit its liability risk could attempt to review in advance every file that could *possibly* contain audio to ensure that it does not include any pre-1972 sound recording. But for all but the smallest and least active site this will be a highly burdensome, expensive and ultimately impossible task—indeed, precisely the impossible task the DMCA was designed to, and in practice so effectively does, avoid. No service could hope to survive and grow to any meaningful scale facing such a burden or, alternatively, facing the potentially crippling liability that could result from not screening for pre-1972 audio. And these uncertainties and risks would drastically chill the possibility of obtaining the venture capital or other funding that innovative startups typically require to launch new services or sites. Investment, innovation and the continued growth of the Internet would be harmed—precisely contrary to Congress' intention.[21]

---

FOR PRE-1972 SOUND RECORDINGS, A REPORT OF THE REGISTER OF COPYRIGHTS at 20, 35 (2011). Although most state criminal statutes for the distribution of pre-1972 recordings include an intent requirement, the mere existence of such harsh penalties may further stifle innovations capable of "distributing" such sound recordings. *Id.* at 25. The Copyright Office Report further concluded that the policy reasons that compelled Congress to create a unitary federal copyright system, including certainty and consistency, all favor uniform treatment for pre- and post-1972 recordings, including application of Section 512. *Id.* at 130 (there is no reason why the Section 512 safe harbor should not apply to the use of pre-1972 sound recordings.). The Office also noted that "it is not settled" whether the safe harbor applies, *id.* at 89, but then opined, erroneously in *amici's* view, that the DMCA currently does not apply. *Id.*

[21] *See Hearing on Section 512 of Title 17, Before the Subcomm. On Courts, Intellectual Property, and the Internet,* 113th Cong. 1-10 (2014) (statement of Katherine Oyama, Sr. Copyright Policy Counsel, Google Inc.). ("YouTube could

Moreover, even if the sheer volume of material to review wasn't already overly burdensome and cost-prohibitive, any service that attempted to screen user-uploaded audio would confront the very difficult task of deciding what content it could safely accept.  For most sound recordings, there is unlikely to be any efficient and reliable way to determine, without considerable effort, whether it dates from before 1972 or after.  *See MP3Tunes*, 821 F. Supp. 2d at 642 ("it is not always evident (let alone discernable) whether a song was recorded before or after 1972"), *see also* Vimeo Br. at 44-45.

The burden would be especially significant for the many small and nonprofit platforms that host remix videos.  Such videos often include music from a variety of sources, but the staff that run these sites won't necessarily be music specialists able to determine when a given track was recorded.  Indeed, many remix videos include multiple tracks, making the task still more challenging.[22]  The effect of this significantly increased cost and burden, combined with the accompanying

---

never have launched as a small start-up in 2005 if it had been required by law to first build a system like Content ID," which cost more than $60 million); *See* Comments of DeviantArt on Department of Commmerce Green Paper, at 28, (Nov. 13, 2013), *available at* http://www.ntia.doc.gov/files/ntia/deviant_art_comments.p df (filtering requires "registration of works, digital fingerprinting and a constant review and frequent interdiction of incoming user generated content. … It hopefully goes without saying that very few enterprises can afford this approach;" the ability to scan uploaded works in realtime is itself difficult and expensive).

[22] *See e.g.*, Wikipedia, "Megamix", *available at* http://en.wikipedia.org/wiki/ Megamix.

uncertainty about potential liability for pre-1972 audio, would almost inevitably be to chill investment in or development of innovative services that might include such content.[23]    That chill, in turn, will inevitably stifle the creative works that depend on those services to reach an audience.

      **2.**    **Denying Safe Harbor Protection for Pre-1972 Sound Recordings is Inconsistent with the Statutory Language and the Structure of the DMCA**

Including pre-1972 sound recordings within the scope of Congressionally mandated safe harbor protection also is consistent with the language of DMCA Section 512.  First, the safe harbor provisions of Section 512 protect qualifying service providers from liability for "infringement of copyright," 17 USC § 512(c), "without drawing any distinction between federal and state law."  *MP3Tunes*, 821 F. Supp. 2d at 641.  Congress made no distinction between state and federal copyright law in the Congressional record, stating that the protection applied to "for *all* monetary relief for direct, vicarious and contributory infringement."  S.

---

[23] Exclusion of pre-1972 recording from the safe harbors would have wide-ranging impacts on numerous service providers, not only those that are directed towards user generated content containing music. For example, Kickstarter is a website where users go to seek funding of projects. *See* Kickstarter, "Seven things to know about Kickstarter", *available at* www.kickstarter.com/hello. In connection with the service, users may upload videos describing their projects. Under the regime proposed by Capitol, Kickstarter could face liability if users include parts of pre-1972 sound recordings, even though the recordings themselves have little direct connection to Kickstarter's business or the platform it provides.

REP. NO. 105-190 at 40 (emphasis added); *see also,* H.R. REP. NO. 105-551, pt. 2 at 50 (1998); *Viacom*, 718 F. Supp. 2d at 520, 526.  In this context, "infringement of copyright" should properly have its common law meaning and not be limited to the exclusive federal rights enumerated in Section 501(a).  *See MP3Tunes*, 821 F. Supp. 2d at 641-642 ("the plain meaning of the DMCA's safe harbors, read in light of their purpose, covers both state and federal copyright claims").[24]

Effectively excluding safe harbor protection for any service that may allow its users to upload audio would create a disjointed and incoherent liability system for Internet intermediaries and destroy certainty when developing new services, a result that all evidence suggests Congress did not intend. To the contrary, Congress anticipated that service providers, unlike traditional users of individual works, would repeatedly encounter large numbers of works and would thus need a general liability protection.

Second, if a service provider should decide to undertake the impossible task of trying to review *all* user submissions in an effort to identify pre-1972 audio content, it might find itself losing *all* DMCA safe harbor protections.  If the district

---

[24] The New York state appellate division, in *UMG Recordings, Inc. v. Escape Media Group,* 964 N.Y.S.2d 106 (1st Dept. 2013), erroneously reached the opposite conclusion by focusing on Section 501(a)'s enumeration of exclusive federal rights without acknowledging that those rights do not constitute comprehensive definitions of infringement for all purposes under the Copyright Act, particularly for purposes of Section 512.  *See MP3Tunes*, 821 F. Supp. 2d at 641.

court's erroneous "red flag" standard is left undisturbed, the provider would risk being deemed to have acquired "red flag" knowledge for *any* infringing material, pre-1972 or otherwise, that happened to be present, by virtue of having examined that material. The result, wholly inconsistent with the purposes of the DMCA, would make safe harbor protection into a Catch-22 for any site or service that allowed users to upload audio.

Further, even if this Court (properly) rejects the district court's analysis, requiring that kind of review of all uploaded material containing sound recordings contravenes the DMCA's express statement that "service providers may not lose safe harbor protection for failure to monitor or affirmatively seek out infringement." 17 U.S.C. § 512(m). If the safe harbors do not apply to claims based on pre-1972 sound recordings, cautious service providers will feel compelled to affirmatively search for works that might include such recordings, which would effectively gut Section 512(m).

Congress did not intend this outcome. Any reading of the DMCA that leads to these results is in conflict with both the intent and language of the statute.

## CONCLUSION

The district court's ruling has reintroduced the very legal uncertainty Congress sought to prevent, and threatens to undermine the continued growth of the Internet as a platform for expression, to the detriment of the many users,

28

especially remix artists, who rely upon that platform to share and discover new creative works.  *Amici* urge this Court to reject the district's court's interpretation of "red flag" knowledge of infringement and its conclusion that the DMCA safe harbors do not encompass claims based on pre-1972 sound recordings.

Dated: July 30, 2014                    By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
corynne@eff.org

*Attorneys for Amici Curiae*

*On the brief:*

Vera Ranieri
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
vera@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N St. NW, Suite 410
Washington, DC 20036
Tel:  (202) 861-0020
ssiy@publicknowledge.org

Elizabeth Rosenblatt
Rebecca Tushnet
ORGANIZATION FOR TRANSFORMATIVE
WORKS
2576 Broadway, Suite 119
New York, NY  10025
Tel: (310) 386-4320
betsy_rosenblatt@post.harvard.edu

Emma Llansó
CENTER FOR DEMOCRACY &
TECHNOLOGY
1634 I Street NW, Suite 1100
Washington, DC  20006
Tel:  (202) 637-9800
ellanso@cdt.org

Art Neill
Teri Karobonik
NEW MEDIA RIGHTS
1855 1st Ave., Suite 102
San Diego, CA 92101
Tel:  (619) 665-9297
art@newmediarights.org

Jason M. Schultz
Associate Professor of Clinical Law
NYU SCHOOL OF LAW
245 Sullivan Street
New York, NY 10012
Tel:  (212) 992-7365
jason.schultz@law.nyu.edu

Phillip R. Malone
Jef Pearlman
JUELSGAARD INTELLECTUAL PROPERTY &
INNOVATION CLINIC
Mills Legal Clinic at Stanford Law
School
559 Nathan Abbott Way

Stanford, CA  94305-8610
Tel:  (650) 725-6369
pmalone@law.stanford.edu

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.    This Brief of *Amici Curiae* Electronic Frontier Foundation, Organization for Transformative Works, The Center for Democracy & Technology, Public Knowledge and New Media Rights in Support of Defendant-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,897 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated:  July 30, 2014

By:   /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*

32

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July, 2014, a true and correct copy of the foregoing Brief of *Amici Curiae* Electronic Frontier Foundation, Organization for Transformative Works, The Center for Democracy & Technology, Public Knowledge, and New Media Rights in Support of Defendant-Appellants was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: July 30, 2014

By: /s/ Corynne McSherry

Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109-7701
Tel: (415) 436-9333
corynne@eff.org

*Counsel for Amici Curiae*