# 14-1048-cv(L),

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv(XAP)

# United States Court of Appeals
## for the
# Second Circuit

CAPITOL RECORDS, LLC, a Delaware Limited Liability company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellees-Cross-Appellants,*

– v. –

VIMEO, LLC, a Delaware Limited Liability company, aka Vimeo.com, CONNECTED VENTURES, LLC, a Delaware Limited Liability company,

*Defendants-Appellants-Cross-Appellees,*

DOES, 1–20 inclusive,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR
## PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

RUSSELL J. FRACKMAN
MARC E. MAYER
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064
(310) 312-3119

– and –

CHRISTINE LEPERA
JEFFREY M. MOVIT
12 East 49th Street, 30th Floor
New York, New York 10017
(212) 509-3900

CONSTANTINE L. TRELA, JR. (*Admission Pending*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
(312) 853-7000

– and –

KWAKU A. AKOWUAH (*Admission Pending*)
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Attorneys for Plaintiffs-Appellees-Cross-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiffs-Appellees-Cross-Appellants Caroline Records, Inc. and Virgin Records America, Inc. have merged into Plaintiff-Appellee-Cross-Appellant Capitol Records, LLC. Capitol Records, LLC is a Delaware limited liability company. Capitol Records, LLC's parent companies include Virgin Records CM Holdings, Inc., a Delaware corporation; EMI RM US, Inc., a Delaware corporation; EMI Group Inc., a Delaware corporation; and Universal Music Group, Inc., a Delaware corporation. The ultimate parent of Capitol Records, LLC is Vivendi, S.A., a publicly traded French corporation.

Plaintiffs-Appellees-Cross-Appellants EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music, Inc., Colgems-EMI Music, Inc., EMI Virgin Songs, Inc., EMI Gold Horizon Music Corp., EMI U Catalog, Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., and Stone Diamond Music Corporation are all partially owned, indirect subsidiaries of Sony Corporation, a publicly-traded company organized under the laws of Japan.  No publicly traded company other than Sony Corporation owns more than 10% of their stock.

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF JURISDICTION.................................................... 4

ISSUES PRESENTED......................................................................... 4

STATEMENT OF FACTS ................................................................. 4

SUMMARY OF ARGUMENT ......................................................... 14

ARGUMENT ................................................................................... 16

I.  THE DMCA DOES NOT APPLY TO PRE-1972 RECORDING
   CLAIMS UNDER NEW YORK LAW........................................ 16

   A.  Pre-1972 Recordings Are Governed Exclusively by State Law. ........ 17

       1.  The Copyright Act Cannot Annul or Limit Any State Law
          "Rights or Remedies" Applicable to Pre-1972 Recordings......17

       2.  Application Of The DMCA to Pre-1972 Recordings Would
          Directly Conflict With Section 301(c)....................................21

   B.  The Plain Language And Structure Of The Copyright Act Confirm
       That The DMCA Does Not Apply To State Claims. ......................... 26

       1.  The Term "Infringement of Copyright" In The DMCA
          Plainly Refers To Federal Copyright. ......................................26

       2.  The Phrase "Under This Title" Does Not Change The Plain
          Meaning Or The Scope Of The DMCA...................................30

   C.  Public Policy Is Not Compromised By The District Court's
       Holding. .......................................................................................... 32

i

**TABLE OF CONTENTS**
**(continued)**

Page

II.   THE DISTRICT COURT CORRECTLY DENIED VIMEO'S MOTION
      FOR SUMMARY JUDGMENT ON THE DMCA SAFE-HARBOR
      AFFIRMATIVE DEFENSE. ........................................................ 34

      A.   Vimeo Did Not Meet Its Burden Of Proving The Absence Of
           Facts and Circumstances From Which Infringement Was
           Objectively Apparent. ........................................................ 35

      B.   Vimeo's Interpretation Collapses The Distinction Between Red
           Flag And Actual Knowledge. .............................................. 40

      C.   Speculation Concerning Unsupported Defenses Does Not Entitle
           Vimeo To Summary Judgment. .......................................... 44

      D.   Vimeo's Public Policy Concerns Are Misplaced. ............................. 51

III.  THE DISTRICT COURT ERRED IN GRANTING VIMEO'S MOTION
      ON THE ISSUE OF WILLFUL BLINDNESS. ........................................... 53

      A.   Willful Blindness Is A Substitute For Actual Knowledge and Red
           Flag Knowledge ................................................................. 53

      B.   Vimeo Was Aware Of A High Probability That Plaintiffs' Music
           Was Infringed On Its Website And Deliberately Failed To
           Investigate. ...................................................................... 56

           1.   Vimeo Had Reason To Suspect Its Users Were Infringing
                Music and Infringing Plaintiffs' Copyrights. ........................... 56

           2.   Vimeo Refused to Take "Basic Investigative Steps" or
                Make "Further Inquiry" to Locate "Particular" Infringing
                Activity ...................................................................... 60

      C.   Vimeo's Willful Blindness Caused It To Be Blind To Specific
           Instances of Infringement. .................................................. 65

Conclusion ........................................................................................ 71

ii

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A&M Records, Inc. v. Napster, Inc.*,
114 F. Supp. 2d 896 (N.D. Cal. 2000) ..................................................51

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ...........................................39, 47, 51

*Agee v. Paramount Comm'cns, Inc.*,
59 F.3d 317 (2d Cir. 1995) ...............................................48, 50

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.*,
239 F.3d 619 (4th Cir. 2001) .............................................22, 71

*Apple Corps Ltd. v. The Adirondack Grp.*,
476 N.Y.S.2d 716 (Sup. Ct. 1983).....................................21

*Arista Records LLC v. Lime Grp. LLC*,
715 F. Supp. 481 (S.D.N.Y. 2010) ..............................20, 25, 64

*Atl. Recording Corp. v. Project Playlist, Inc.*,
603 F. Supp. 2d 690 (S.D.N.Y. 2009) ...........................21, 26

*Auburn Hous. Auth. v. Martinez*,
277 F.3d 138 (2d Cir. 2002) ..............................................29

*Bartok v. Boosey & Hawkes*,
523 F.2d 941 (2d Cir. 1975) ..............................................24

*Bill Graham Archives v. Doring Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ..............................................49

*Bourne v. Walt Disney Co.*,
68 F.3d 621 (2d Cir. 1995) ................................................45

*Bridgeport Music, Inc. v. Dimension Films*,
410 F. 3d 792 (6th Cir. 2005) ............................................14

*Bridgeport Music, Inc. v. Justin Combs Pub.*,
507 F. 3d 470 (6th Cir. 2007) ............................................33

iii

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Capitol Records, Inc. v. MP3Tunes, LLC,*
821 F. Supp. 2d 627 (S.D.N.Y. 2011) ............................................................24

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
372 F.3d 471 (2d Cir. 2004) ...........................................................................20

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
4 N.Y.3d 540 (2005) ...............................................................................20, 33

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013) ...........................................................................49

*Columbia Pictures, Indus. v. Fung,*
710 F.3d 1020 (9th Cir. 2013) ..................................................................35, 39

*Firma Melodiya v. ZYX Music,*
882 F. Supp. 1306 (S.D.N.Y. 1995) ...............................................................29

*Fonotipia Ltd. v. Bradley,*
171 F. 951 (E.D.N.Y. 1909) ...........................................................................17

*Goldstein v. California,*
412 U.S. 546 (1973) ........................................................................................19

*Graham v. Connor,*
490 U.S. 386 (1989) ........................................................................................39

*In re Aimster Copyright Litig.,*
334 F.3d 643 (7th Cir. 2003) ....................................................................*passim*

*In re Colonial Realty Co.,*
980 F.2d 125 (2d Cir. 1992) ...........................................................................28

*Infinity Broad. Corp. v. Kirkwood,*
150 F.3d 104 (2d Cir. 1998) ...........................................................................45

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.,*
146 F.3d 66 (2d Cir. 1998) .............................................................................63

iv

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351 (2013) ..................................................................31

*Laperriere v. Vesta Ins. Grp., Inc.*,
  526 F.3d 715 (11th Cir. 2008) ......................................................19

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008) ........................................................48

*Lee v. Bankers Trust Co.*,
  166 F.3d 540 (2d Cir. 1999) ..........................................................26

*Louis Vuitton S.A. v. Lee*,
  875 F.2d 584 (7th Cir. 1989) ........................................................58

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  454 F. Supp. 2d 966 (C.D. Cal. 2006) .....................................37, 52

*Newton v. Diamond*,
  204 F. Supp. 2d 1244 (C.D. Cal. 2002) ..........................................5

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) ......................................................25

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
  213 F. Supp. 2d 1146 (C.D. Cal. 2002) ..........................................45

*Phillip Morris USA Inc. v. Liu*,
  489 F. Supp. 2d 1119 (C.D. Cal. 2007) ..........................................66

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ........................................................44

*Rostropovich v. Koch Int'l Corp.*,
  1995 U.S. Dist. LEXIS 2785, at *17 (S.D.N.Y. Mar. 7, 1995)..........29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) ...........................................................49

*Spinelli v. City of New York*,
   579 F.3d 160 (2d Cir. 2009) ...............................................................39

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978)............................................................................28

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   600 F.3d 93 (2d Cir. 2010) .........................................................*passim*

*UMG Recordings, Inc. v Escape Media Grp., Inc.*,
   948 N.Y.S.2d 881 (Sup. Ct. 2012)......................................................26

*UMG Recordings, Inc. v. Escape Media Grp., Inc.*,
   964 N.Y.S.2d 106 (2013).............................................................*passim*

*United States v. 15 Bosworth St.*,
   236 F.3d 50 (1st Cir. 2001)................................................................67

*United States v. AINA-Marshall*,
   336 F.3d 167 (2d Cir. 2003) ..............................................................54

*United States v. Chavez-Alvarez*,
   594 F.3d 1062 (8th Cir. 2010) ...........................................................54

*United States v. Nektalov*,
   461 F.3d 309 (2d Cir. 2006) ..............................................................67

*United States v. Reyes*,
   302 F.3d 48 (2d Cir. 2002) ..........................................................53, 67

*United States v. Rothrock*,
   806 F.2d 318 (1st Cir. 1986)..............................................................54

*Universal Commc'n. Sys. v. Lycos, Inc.*,
   478 F.3d 413 (1st Cir. 2007)..............................................................25

vi

6441161.9

## TABLE OF AUTHORITIES
### (continued)

<u>**Page(s)**</u>

*Viacom Int'l Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012) ........................................................................*passim*

*WPIX, Inc. v. IVI, Inc.*,
    691 F.3d 275, 283-84 (2d Cir. 2012) .................................................................23

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991) .............................................................................46

*Zomba Enters. v. Panorama Records, Inc.*,
    491 F.3d 574 (6th Cir. 2007) ...........................................................................49

6441161.9

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

### STATUTES

Cal. Civil Code § 980(a)(2) .................................................... 18

Fla. Stat.
  §§ 540.11(2)(a)(1)-(2) ..................................................... 18

Mich. Comp. Laws
  § 752.1052(b)-(c) ............................................................ 18

N.J. Stat. Ann.
  § 2C:21-21(c)(1)-(2) ........................................................ 18

18 Pa. Cons. Stat. Ann. § 4116 ............................................. 18

17 U.S.C. (Copyright Act) ................................................. *passim*
  § 101 ................................................................................ 28
  § 106 ................................................................................ 28
  § 107 ............................................................................ 31, 49
  § 108 ................................................................................ 31
  § 111(a) ........................................................................... 31
  § 112(a) ........................................................................... 31
  § 114(b) ........................................................................... 48
  § 121 ................................................................................ 31
  § 301(c) ...................................................................... *passim*
  § 302 ................................................................................ 34
  § 303 ........................................................................... 19, 34
  § 401(d) ........................................................................... 34
  § 407 ................................................................................ 34
  § 408 ................................................................................ 34
  § 410(c) ........................................................................... 34
  § 512 .......................................................................... *passim*
  § 1101(d) ......................................................................... 19

Tex. Bus. & Com. Code Ann.
  § 641.051 ......................................................................... 18

viii

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Wisc. Stat. Ann.
  § 943.207 .................................................................................................. 18

## OTHER AUTHORITIES

37 C.F.R. 201.2(a)(1) .................................................................................. 24

Pub. L. 92-140, 85 Stat. 391, 392 (1971) .................................................. 18

S.A. Diamond, *Sound Recordings and Phonorecords: History and
  Current Law*, 2 U. Ill. Law Forum 337 (1979) ...................................... 18

*Federal Copyright Protection For Pre-1972 Sound Recordings: A
  Report of the Register of Copyrights* (Dec. 2011) ........................... *passim*

H. R. Rep. No. 105-551 (1998) ....................................... 22, 35, 36, 41

H.R. Rep. No. 94-1476 (1976) .......................................................... 19, 48

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster
  *Goats*, 50 Ariz. L. Rev. 577, 598 (2008) ........................................ 45

2 M.&D. Nimmer, *Nimmer on Copyright*,
  (Rev. Ed. 2013) ................................................................................ 18, 21

M. William Krasilovsky and Sidney Shemel, *This Business of Music:
  The Definitive Guide to the Music Industry* 259-260 (8th ed. 2000) ..... 49

S. Rep. No. 105-90 (1998) ............................................... 22, 41, 43

5 W.F. Patry, *Patry On Copyright*,
  § 18:55 at 188-189 (2010 ed.) ........................................................ 21

6441161.9

## PRELIMINARY STATEMENT

The Copyright Act carefully balances two sets of interests implicated by the issues on appeal.

*First*, for over 40 years, sound recordings "fixed" (*i.e.*, recorded) before February 15, 1972 ("Pre-1972 Recordings") have been denied the benefits of federal copyright protection, and are subject exclusively to state law. In turn, they are not subject to the burdens and limitations that accompany federal protection, including (but not only) the limitations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.[1] *Second*, in the DMCA, Congress carefully delineated the interests of two groups: those who create and own works that are entitled to the protections of the copyright law, and "innocent" service providers that cannot properly be charged with knowledge of infringement on their services and websites.

The district court recognized and implemented these statutory balances in two respects, but erred in declining to do so as to a third.

The district court properly held that the limitations in the DMCA do not apply to Pre-1972 Recordings. That conclusion flows inexorably from the plain language of the Copyright Act, which expressly exempts Pre-1972 Recordings from federal protection and provides that state law "rights and remedies" shall not

---

[1]     Unless otherwise specified, all statutory citations are to the Copyright Act, Title 17 of the United States Code.

1

be "annulled" or "limited." 17 U.S.C. § 301(c). Nothing in the DMCA's language or its legislative history suggests that Congress changed that express direction.

The district court also correctly declined to grant summary judgment to defendants Vimeo, LLC and its predecessor Connected Ventures, LLC ("Vimeo") on their affirmative defense that they were entitled to DMCA safe-harbor protection with respect to 18 videos at issue. The court found triable issues as to Vimeo's red flag knowledge with respect to those videos, which Vimeo employees viewed and "with which [they] interacted." [Sept.Order.33.] Contrary to Vimeo's assertions, the court did not base its ruling solely on the admitted fact that the videos contained well-known music owned by Plaintiffs. The court not only reviewed each of these videos, but considered the "totality of the circumstances" revealed by the entire record, including the particular use of Plaintiffs' music and many other factors. Based on the uncontroverted evidence, the court could have and should have granted summary judgment to *Plaintiffs*. The evidence clearly supported its decision to deny Vimeo's motion. The court also properly rejected Vimeo's argument that the unsupported speculation that some user might have a license or that a particular use might be "fair use" required the conclusion that red flag knowledge did not exist. Vimeo's reasoning would eviscerate red flag knowledge, reduce the DMCA to nothing more than a notice-and-take-down

2

statute, and eliminate Vimeo's burden of proof as the party moving for summary judgment and as the proponent of the DMCA affirmative defense.

The district court went astray, however, in its ruling with respect to the "willful blindness" doctrine. This Court in *Viacom Int'l Inc. v. YouTube, Inc.,* 676 F.3d 19 (2d Cir. 2012), recognized that willful blindness "is knowledge" that is distinct from actual and red flag knowledge and separately disqualifies a service provider from safe-harbor protection. The district court feared that holding Vimeo to a willful blindness standard would conflict with the DMCA's directive that a service provider does not have a duty to monitor its service for infringing activity. There is no conflict. Willful blindness, as this Court held, applies where a party has reason to suspect wrongdoing and deliberately avoids investigating to confirm whether what it suspects is in fact true. The willful blindness doctrine does not permit a party to disclaim knowledge, and avoid responsibility, by simply ignoring information in its possession. The record is replete with evidence that Vimeo knew, but consciously avoided confirming, that infringement of music, and specifically infringement of Plaintiffs' music, was occurring on its website, even as it encouraged and endorsed the very conduct that constituted that infringement. To allow Vimeo to blind itself to clear violations of Plaintiffs' rights, and then hide behind its self-inflicted blindness, turns the safe-harbor into a tool for infringement. This aspect of the district court's ruling should be reversed.

3

## STATEMENT OF JURISDICTION

Plaintiffs agree with Vimeo's statement.

## ISSUES PRESENTED

The district court certified two issues:

1.     "Whether the DMCA's safe-harbor provisions are applicable to sound recordings fixed prior to February 15, 1972."

2.     "Whether, under *Viacom Int'l, Inc. v. YouTube, Inc.*, a service provider's viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song may establish 'facts or circumstances' giving rise to 'red flag' knowledge of infringement."

This Court granted Plaintiffs' request for interlocutory review of a third issue:

3.     "What did this Court mean in *Viacom* when it held 'the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement?'"

## STATEMENT OF FACTS

**The Parties.**  Plaintiffs, record companies and music publishing companies, together with the recording artists and songwriters with whom they have

6441161.9

contractual relationships, produce, distribute, and market sound recordings and musical compositions.[2]  Plaintiffs license their music for use in audiovisual works including motion pictures, television, and social media.  The record company Plaintiffs own sound recordings protected under the Copyright Act and Pre-1972 Recordings protected under state law.  All the musical compositions owned by the publishing companies are protected under the Copyright Act.  [SUF.1-5(undisputed)[3];Complaints.]

Vimeo, LLC and its predecessor Connected Ventures, LLC are subsidiaries of the publicly-traded Internet company IAC/InterActive Corp.  Vimeo operates and controls the website located at www.vimeo.com.  [SUF.8-10(undisputed).]

**The Vimeo Website**.  Vimeo.com has become one of the most popular websites on the Internet.  Vimeo attracts users by making audiovisual works available on demand for performing ("streaming") and copying ("downloading").  [SUF.10-11(undisputed).]  To populate its website, Vimeo instructs, encourages, and enables its users (and its employees) to create videos and upload them to its website, among them videos using copyrighted music, including Plaintiffs' music.  [SUF.12,24,50,55,62,67,79,271,290-295,315,318,325-326,351-355,361

---

[2]    "A musical composition captures an artist's music in written form."  "[A] sound recording is the sound produced by the performer's rendition of the musical work."  *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249-50 (C.D. Cal. 2002).

[3]    Citations to the "SUF" refer to Plaintiffs' Statement of Undisputed Facts and Vimeo's Response to the Statement of Undisputed Facts and Plaintiffs' SUF Reply.

5

(undisputed).] Vimeo indexes its audiovisual content, aggregates its videos into categories, inserts "metatags" identifying their content, and sells advertising space that it places with that content. [SUF.13,22,181,242-245,251,269 (undisputed);Pile.Depo.45-54,161-162&Ex.315;ex.161;Verdugo.Depo. 147&Ex.190,pp.54-55;Horowitz.Decl.¶¶1-3,5,Ex.A.¶¶1-12,24,82-90&Exs.67,70-72;Klein.Depo.205-206&Ex.70;Lodwick.Depo.201-202&Ex.19; Frackman.Decl.¶9,Exs.25-27.] Vimeo provides these videos to its users to view, copy, and further distribute. [SUF.12,16-18(undisputed).]

Vimeo promotes and distinguishes its website as a place for "creative" content and "original" works. [SUF.29,31,34,257,299(undisputed).] Thus, Vimeo prohibits and removes videos such as video games, commercials, infomercials, "real estate walkthroughs," "fan vids," "scenes from TV or movies," or "anything else you found on the web that you did not create yourself." [SUF.31-34,100-103,116,127,191-192,212-216,362-366(undisputed);Whitman.Depo.168,170-71&Exs.136-137;Cheah.Depo.133-134.] Vimeo also enforces a set of discretionary, subjective guidelines to eliminate or conceal content that is not "Vimeoesque." [SUF.116,137-138,140-141(undisputed);Verdugo.Depo.66-67;Allen.Depo.65,183-184;Lodwick.Depo.131-134,272-273;VCV003846; VCV010374;VCV014956.]

Vimeo monitors and polices ("curates" in its words) its website to remove

6

works that are not "original."  However, Vimeo's requirement that a video be

"original" applies only to the *visual* component, not the *audio (music)* component.

[SUF.30-31,34,46,84,95,160,163-167,215,301,318(undisputed);Verdugo.Depo.71-

73,118-20,122-123,142-144,251&Exs.180,182,187;Cheah.Depo.78-

79;Lodwick.Depo.182-185&Ex.16;Marcus.Depo.145-147;Allen.Depo.125-

126,195-198,202-203,236-240&Ex.105;Whitman.Depo.221-223&Ex.159

(VCV000424);Ex.160(VCV000547-548);EMI00537(EMI000553);

EMI00558;VCV027427; VCV027552; VCV027564.]  Despite exercising content

control to a far greater extent than other websites, Vimeo does nothing to limit

infringing uses of *music*.  [SUF.34,46,76,95,100-103,123-127,129,133-134,159-

60,163-174,191-192,194-195,198-199,202-204,227-229,264(undisputed);

Cheah.Depo.78-79,133-134;Allen.Depo.94-96,98-101,125-126,158-

159,189,194,198-199,202-203,236&Exs.74,90-91;Verdugo.Depo.77-78,80-81,88-

89,114-116,165-167,216-217&Exs.132,190(p.71), Exs.198,211;

Whitman.Depo.71-73,109-110,124-125,143-145,151&Ex.121; Pile.Depo.76-

79,93,116-122,161&Exs.317,319,320,322, 325,332,334;Horowitz

Decl.¶4,Ex.A.¶76;VCV011423;VCV015218;VCV026165.]  Instead, Vimeo

employees, identifying themselves by name and as Vimeo "Staff," copy and use

popular, commercial music, including music owned by Plaintiffs, in videos they

make available on the website.  [Frackman.Decl.Ex.17;SUF.6-7,47,290-

7

295,297,356,395,398(undisputed);Allen.Depo.217-218.] They also encourage and

provide creative and technical advice to Vimeo users to make and to **"[g]o ahead**

**and post"** videos containing copyrighted music, and advise that "[w]e can't

officially tell you that using copyright music is okay. ***But…***" (emphasis added)

[SUF.301,304,325,353,402(undisputed);Allen.Depo.252-253&Ex.112;Ex.418-

B;Verdugo.Depo.118-120&Ex.180;Whitman.Depo.204-205&Ex.154;EMI00558;

VCV027346;VCV029844;VCV030025.] At one time, Vimeo estimated that 10%-

20% of the videos on its website contained unlicensed music.

[Lodwick.Depo.233-234,236-237&Ex.25(JL00245);Koyfman.Depo.159-

160&Ex.349(JL00245).]

Vimeo Staff have complete access to all videos at all times. [SUF.28,41,

46(undisputed);Whitman.Depo.222-223&Ex.160(VCV000547-548);Pile.Depo.63-

64,80-84&Ex.320;Cheah.Depo.49.] They possess the absolute right to control,

promote, and remove content. [SUF.53,116,134,137,140,167,

366(undisputed);Cheah.Depo.74-76&Ex.304;Mellencamp.Depo.310&Ex.435.]

They interact on a daily basis with content, including videos that use Plaintiffs'

music, and with Vimeo users, in (*inter alia*) the following ways: they design and

participate in "group projects;" designate videos as "likes"; post "comments" about

videos; participate in discussions in "Community Forums" and a Staff Blog; and

create and supervise "groups" (users with shared interests) and "channels"

8

(collections of categories of videos). [SUF.19,22,41-43,45-50,52,53,55, 118,127,164,344,347-348(undisputed);Whitman.Depo.63-64;Lodwick.Depo.177-181&Exs.15 ,15A,15B;Verdugo.Depo.20-21,213;Butler Aff.Ex.A.,p.0044; EMI00930;Frackman.Decl.¶8&Ex.18.] Vimeo Staff also create lists of "contacts" (users with whom they wish to connect) and subscribe to individual users, groups, and channels. As a result, they daily receive videos posted to the website and regularly review them. [SUF.50,55,109,118,121,335(undisputed); Whitman.Depo.37-38,187-189,191-198&Exs.146,148,149; Berkley.Decl.¶¶5-6&Exs.4-5.] Vimeo did not produce any records reflecting the number or description of videos its Staff reviewed.

Vimeo Staff select videos to promote on Vimeo's homepage (as "Obsessions"), or place videos on employee-moderated "channels" such as "Staff Picks." [SUF.53,117,118,268,319,326-327,348(undisputed);Whitman.Depo.163-168&Exs.134-135.] Vimeo Staff also flag videos for deletion, cause selected videos to be more difficult to find ("burying"), or, conversely, prevent specific videos (or all videos by a specified user) from being flagged for deletion ("whitelisting"). [SUF.133-134,137-138,140-143,145,148,150(undisputed); Whitman.Depo.105;Verdugo.Depo.121.] In these ways, Vimeo Staff exercise control over the content on the website. They have used that control, for example, to eliminate an entire category of videos (depicting video games). [SUF.212-

9

216(undisputed);Exs.131,193;VCV030843,032412,033370, 033490.]

Vimeo also created and implemented a unique internal website ("ModWorld") of more than 40 "tools" or "filters."  [SUF.123-127(undisputed);Exs.72,126,128.]  "ModWorld" is available only to Vimeo employees and is used by them to (among other things):  access lists of popular videos; review recent user comments; view a list of users whose videos have been deleted; add or edit video "categories"; search for usernames and review individual user conduct; view "flagged" videos and deleted videos, including those flagged and deleted by Vimeo Staff; send warning notifications to users suspected of uploading "non-original" video content; and look for, view, and systematically remove videos likely to be television shows, motion pictures or other content that is prohibited or disfavored.  [SUF.127,129,133-36,154-57,159-60,163-68,173-174,176-177,180-186, 213(undisputed);Exs.73,75,77,82,85,89-90,93-94,133;Cheah.Depo.78-79;VCV011423;VCV015218.]

The "ModWorld" tools provide Vimeo employees with the unique ability to monitor, police, and control the content on the website ***and*** users' activities: "[W]e are just straight controlling our website."  [SUF.102-103,123-127(undisputed);Verdugo.Depo.122-126&Ex.182.]  However, Vimeo uses these tools, systems, and protocols selectively, refusing to identify and remove videos containing infringing ***music*** or that contain Plaintiffs' music in particular.  Vimeo

10

also successfully tested but refused to license the same "content fingerprinting" technologies used by its competitors, even though its expert opined that they were a "promising way" to limit music infringement. [SUF.76,219-220,227-229(undisputed);Moulin.Depo.299-300;Koyfman.Depo.197-198&Ex.353; Horowitz.Decl.Ex.A.¶¶78-80;Pile.Depo.123,126-127,130-131,133,136-137&Exs.326-328;VCV012575.] Also, unlike other websites (including YouTube), Vimeo refused to negotiate licenses with music copyright owners that would permit it to copy and perform their works. [SUF.6,76,80,220,234,241 (undisputed).]

**The Infringing Videos.** The complaints identified as "representative samples" 199 videos containing some of Plaintiffs' most valuable music that Vimeo copied, made available, performed, and distributed.[4] [Complaints;SUF.6-7,81-82,84(undisputed).] The videos incorporated legendary Pre-1972 Recordings including by The Beatles, Nat King Cole, and The Beach Boys; copyrighted recordings including by Coldplay and Norah Jones; and copyrighted musical compositions created and/or popularized by Henry Mancini and The Jackson Five.

---

[4]    After Plaintiffs reviewed Vimeo's proprietary database, the district court permitted the filing of amended complaints identifying more than 1,000 additional infringed works contained in more than 1,400 additional videos. [Dec.Order at 14-16; *see also* SUF.260,335,344,346,348,402(undisputed); Amended Complaints.] Only Vimeo can know how many other infringements exist or have existed on its website.

11

Vimeo acknowledged the importance of music to these videos ("The right soundtrack can make the difference between a good video and a great one"). [SUF.59,60,263,271-273,277(undisputed)]. Vimeo has performed videos containing Plaintiffs' music millions of times. [SUF.258,260(undisputed).]

The district court (Abrams, J.) held that Vimeo employees had "interacted" with, and necessarily viewed, specific videos containing music owned by Plaintiffs (the "Infringing Videos"). [Sept.Order.31.] These included videos that Vimeo Staff (prominently identified as such) "commented on," "liked," selected and placed on the "Staff Picks" channel, "whitelisted," or "buried." [SUF.143, 342-43, 345, 348 (undisputed);Frackman.Decl.¶8&Exs.18-20;Berkley.Decl.¶¶35-41&Exs.33-37).] None of the Infringing Videos was voluntarily removed from the website after having been viewed by Vimeo Staff.

**The District Court Action.** In separate complaints, Plaintiffs alleged direct, vicarious, and contributory infringement (of copyrighted works), and common law infringement, unfair competition, misappropriation, and conversion under New York law (of Pre-1972 Recordings). The district court consolidated and bifurcated the actions, ordering that they proceed on Vimeo's affirmative defense based on the "safe-harbor" in Section 512(c) of the DMCA. After discovery, the actions were stayed pending this Court's decision in *Viacom*.

After proceedings resumed, the parties cross-moved for summary judgment

12

on the DMCA affirmative defense.  In its first decision ["Sept.Order"], the district court held that "triable issues exist as to whether Vimeo acquired actual or red flag knowledge of the infringing content in the fifty-five videos with which Vimeo employees interacted and summary judgment is denied as to them." [Sept.Order.33.][5]  (This included 10 videos created by Vimeo employees, not subject to this appeal.  [Frackman.Decl.Ex.17.]  The court rejected Vimeo's contention that "a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's awareness that the uploader has no legal defense for his or her otherwise infringing conduct."  [Sept.Order.32-33.] Additionally, the court granted Plaintiffs' motion as to 20 videos containing Plaintiffs' Pre-1972 Recordings, holding that the DMCA defense did not apply to works that are governed exclusively by state law.  [*Id*.55-56.]

Vimeo moved for reconsideration.  At Vimeo's request, the district court conducted a video-by-video review of certain Infringing Videos, modified its earlier order, and entered summary judgment for Vimeo on 17 additional videos. (The "Dec.Order"; *see* [Berkley.Suppl.Decl.¶¶2-3&Exs.1-2].)   The court held that the evidence was insufficient to conclude that Vimeo had interacted with and viewed 15 of these videos.  [Dec.Order.7-8.]  The court also found that as to two

---

[5]     The chart appended to Vimeo's Brief ("Br.") was not presented to the court. The best evidence of the content of the Infringing Videos are the videos themselves, which Plaintiffs submitted below.

13

other videos Vimeo Staff had viewed, "the copyrighted songs play for only a short time in the background (approximately 38 and 57 seconds, respectively)," and the "evidence of infringement … was not 'objectively obvious.'" [Dec.Order at 9.] *But see Bridgeport Music, Inc. v. Dimension Films*, 410 F. 3d 792, 801-02 (6th Cir. 2005) ("[E]ven when a small part of a sound recording is sampled, the part taken is something of value."). (Plaintiffs reserve their right to challenge this and other rulings by the district court not subject to this appeal.) As to the remaining 18 Infringing Videos, the court again rejected Vimeo's argument that red flag knowledge was lacking as a matter of law. [Dec.Order.14.][6]

## SUMMARY OF ARGUMENT

The two issues raised by Vimeo in its appeal were correctly decided by the district court:

**1.      The DMCA Does Not Apply To Pre-1972 Recordings:**  Section 301(c) of the Copyright Act, provides that "[w]ith respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State ***shall not be annulled or limited by this title*** until February 15, 2067." (emphasis added).  Congress thus explicitly left to state common law and

---

[6]      The categories to which the Infringing Videos belong overlap.  The result is that there are 18 videos that contain Plaintiffs' copyrighted music at issue on this appeal solely because employees viewed or interacted with them.

14

statutes the exclusive protection of Pre-1972 Recordings.  Application of the

DMCA safe-harbors to Pre-1972 Recordings would directly conflict with Section

301(c).  The district court was correct to conclude, as had the New York appellate

court and the Copyright Office, that "it is for Congress, not the Courts, to extend

the Copyright Act to pre-1972 sound recordings, both with respect to the rights

granted under the Act and the limitations on those rights."  [Sept.Order.55.]

  **2.**  **Vimeo Was Not Entitled To Summary Judgment On The Issue Of**

**Red Flag Knowledge:**  This Court held in *Viacom* that the red flag knowledge

standard is objective, based on what a "reasonable person" would conclude under

the circumstances.  676 F.3d at 31.  Vimeo's employees viewed and "interacted

with" the Infringing Videos.  After conducting an individualized review of the

videos, the district court correctly found that the "totality of the circumstances" –

including the popularity of the music used, the manner in which it was used in the

video, and the video's title and description – was such that a reasonable jury ***could***

find that infringing activity was apparent and precluded summary judgment on the

issue of red flag knowledge.  Vimeo's speculation concerning unsupported and

hypothetical defenses to infringement does not and cannot require summary

judgment in its favor.  Therefore, Vimeo did not prove its safe-harbor affirmative

defense.

15

**3.    Willful Blindness**:  That willful blindness is a separate means of establishing knowledge when assessing safe-harbor eligibility was settled in *Viacom*.  This Court held that when a service provider "has reason to suspect" that its website is being used to infringe, it cannot deliberately look the other way to avoid confirming that suspicion.  Vimeo designed and operated its website to invite infringement of a single category of copyrighted works (music), and specifically Plaintiffs' music, and then closed its eyes.  The record compels the conclusion that Vimeo had "reason to suspect" the high likelihood that the infringement it intended actually was taking place.  Among other things, Vimeo employees posted and viewed videos infringing Plaintiffs' music, encouraged and instructed users to infringe Plaintiffs' music, and communicated internally and with users about the use of Plaintiffs' music.  In the face of this knowledge, Vimeo not only refused to confirm or address the violations, but also made clear to its users and its own employees that, as a matter of company policy, no steps were to be taken.  That is willful blindness and disqualifies Vimeo from safe-harbor protection.

## ARGUMENT

## I.    THE DMCA DOES NOT APPLY TO PRE-1972 RECORDING CLAIMS UNDER NEW YORK LAW.

The DMCA does not apply to Pre-1972 Recordings, which are not subject to federal copyright, are not encompassed by the language, structure, and intent of the

16

Copyright Act, and which Congress explicitly left exclusively to the states to protect. This issue was addressed by the U.S. Copyright Office, *Federal Copyright Protection For Pre-1972 Sound Recordings*: *A Report of the Register of Copyrights* (2011)[7] ("*Report*") and by the New York Appellate Division in *UMG Recordings, Inc. v. Escape Media Grp., Inc.*, 964 N.Y.S.2d 106 (2013). After detailed analysis of the relevant statutory provisions and applicable rules of construction, both concluded that the DMCA limitations on liability and remedies do not apply to Pre-1972 Recordings, and that "it is for Congress, not the Courts, to extend the Copyright Act to pre-1972 sound recordings, both with respect to the rights granted under the Act and the limitations on those rights." *Report* at 132; *accord Escape Media*, 964 N.Y.S.2d at 112. The district court agreed. [Sept.Order.55.]

### A. Pre-1972 Recordings Are Governed Exclusively by State Law.

1. The Copyright Act Cannot Annul or Limit Any State Law "Rights or Remedies" Applicable to Pre-1972 Recordings.

New York has afforded common law protection to sound recordings for more than a century. *See, e.g., Fonotipia Ltd. v. Bradley*, 171 F. 951 (E.D.N.Y. 1909) (making and selling copies of commercial recordings constituted unfair competition). This protection of Pre-1972 Recordings is mirrored in virtually

---

[7]     Available at http://www.copyright.gov/docs/sound/pre-72-report.pdf.

17

every state.[8]  When Congress amended the Copyright Act to prospectively cover

sound recordings first "fixed" (*i.e.*, recorded) after February 15, 1972, it decided

that federal copyright would not displace existing and future state laws as to Pre-

1972 Recordings; therefore, Congress declared that the Copyright Act "shall apply

only to sound recordings fixed, published, and copyrighted on and after the

effective date of this Act [February 15, 1972]."  Pub. L. 92-140, 85 Stat. 391, 392

(1971) (previous 17 U.S.C. § 1(f)).  Congress further provided that nothing in the

amendment "shall be applied retrospectively or be construed as affecting in any

way any rights with respect to sound recordings fixed before the effective date of

this Act."  *Id.*

    As part of the revision of the Copyright Act in 1976, Congress reiterated its

decision to leave to the states the exclusive protection of Pre-1972 Recordings:

> "With respect to sound recordings fixed before February 15, 1972, ***any rights or remedies*** under the common law or statutes of any State shall not be ***annulled or limited*** by this title until February 15, 2067.  The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on or after February 15, 2067."  § 301(c) (emphasis added).

---

[8]    *See generally* S.A. Diamond, *Sound Recordings and Phonorecords: History and Current Law*, 2 U. Ill. Law Forum 337 (1979).  State statutes include, *e.g.*, Cal. Civil Code § 980(a)(2), Fla. Stat. §§ 540.11(2)(a)(1)-(2), Mich. Comp. Laws § 752.1052(b)-(c), N.J. Stat. Ann. § 2C:21-21(c)(1)-(2), 18 Pa. Cons. Stat. Ann. § 4116, Tex. Bus. & Com. Code Ann. § 641.051, Wisc. Stat. Ann. § 943.207.  State common law is reviewed in 2 M.&D. Nimmer, *Nimmer on Copyright*, § 8C.03[B] at 8C-8 (Rev. Ed. 2013) (citing cases).

18

Congress not only exempted state law protection for Pre-1972 Recordings from preemption, it precluded federal protection, leaving state law as the only applicable law:

> "Notwithstanding the provisions of section 303 [concerning works unpublished as of January 1, 1978], no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067." *Id.*

Congress knew that sound recordings already were "protected by State statute or common law." H.R. Rep. No. 94-1476, at 133 (1976). Yet it could not have been more explicit in declaring that the extent and nature of state law rights in Pre-1972 Recordings are not to be limited in any way by federal copyright law.[9] The states may even provide a broader scope of protection to Pre-1972 Recordings than the protection the federal Copyright Act provides to copyrighted recordings. *Goldstein v. California*, 412 U.S. 546, 571 (1973). The only limitation is that state protection may not extend beyond February 15, 2067. § 301(c).

In *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 477 (2d Cir. 2004), this Court reiterated the exclusive application of state law to Pre-1972

---

[9] The breadth of Section 301(c) is reflected in the language Congress used: "**any** rights or remedies." *See Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715 (11th Cir. 2008) ("'any' in a statute has a 'broad,' 'powerful,' and 'expansive' meaning; it does not mean 'some' or 'all but a few' but, instead, means 'all'"). Congress repeated similar encompassing language in 1994, to preserve state law claims for "unauthorized fixation and trafficking in sound recordings and music videos." § 1101(d) ("Nothing in this section may be construed to annul or limit any rights or remedies under the common law or statutes of any State.").

Recordings:

> "[B]ecause the original recordings were fixed before February 15, 1972, they are neither protected nor preempted by federal copyright law, and [plaintiff's] copyright claim therefore depends on state law protection until federal preemption occurs on February 15, 2067."

The Court recognized that:

> "the preemption provision of the 1976 Act explicitly preserved until 2067 state law authority over sound recordings fixed before February 15, 1972.  *See* 17 U.S.C. § 301(c) …  [I]t is entirely up to New York to determine the scope of its common law copyright with respect to pre-1972 sound recordings."  *Id.* at 478.[10]

Courts consistently have affirmed the exclusivity of state law in this area.  *See, e.g., Arista Records LLC v. Lime Grp. LLC,* 715 F. Supp. 481, 519 (S.D.N.Y. 2010) ("Federal copyright law does not cover sound recordings made prior to 1972").[11]  Commentators agree.  5 W.F. Patry, *Patry On Copyright*, § 18:55 at 188-189 (2010 ed.) ("Section 301(c) is directed toward material (pre-1972 sound recordings) that Congress has expressly told the states they may protect"); 2 *Nimmer*, § 8C.03[A] at 8C-7 ("[S]tatutory copyright does not extend to sound

---

[10]     The Court therefore certified questions concerning the scope of protection accorded Pre-1972 Recordings to the New York Court of Appeals.  372 F.3d at 484.  *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 560 (2005) (New York "continue[s] to protect sound recordings made before 1972").

[11]     *See also*, *e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 & n.5 (S.D.N.Y. 2009) ("The Copyright Act does not govern sound recordings created before February 15, 1972."); *Apple Corps Ltd. v. The Adirondack Grp.*, 476 N.Y.S.2d 716, 719 (Sup. Ct. 1983) ("The passage of the Sound Recording Copyright Law [sic] in 1972 did not preempt state courts from enforcing claims for unfair competition, common law copyright.")

20

recordings first fixed prior to February 15, 1972.  Concomitantly, an exception to federal pre-emption allows the states to accord their own protection to this category of works.").

> 2.    Application Of The DMCA to Pre-1972 Recordings Would Directly Conflict With Section 301(c).

Vimeo's assertion that the DMCA does not conflict with Section 301(c) because it "does not place any … limitation on the substantive rights of a copyright holder, whether under federal or state law" (Br.51), is belied by the fact that Congress labeled Title II of the DMCA the "Online Copyright Infringement Liability **Limitation** Act," and titled Section 512 "***Limitations*** on liability relating to material online."  Section 512***(c)***, the safe-harbor invoked by Vimeo, refers to "[t]he limitations on liability established ***in this subsection***" (emphasis added). *See also* § 512(e) ("limitation on liability of non-profit educational institutions"); § 512(n) ("Whether a service provider qualifies for the limitation on liability…"). Section 512 also eliminates the remedy of monetary recovery (§§ 512(b),(c),(d) ("a service provider shall not be liable for monetary relief…")), severely limits the remedies of injunctive or other equitable relief (*id*.), and refers to the circumscribed injunctive relief provision as a "limitation on ***remedies***." §§ 512(j)(1)(A),(B) (emphasis added).  The legislative history characterizes the DMCA as a "limitation on liability."  H.R. Rep. No. 105-551, pt. 2, at 50 (1998); S. Rep. No. 105-190, at 19 (1998).  So, too, have the courts.  *See, e.g., ALS Scan,*

*Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 623 (4th Cir. 2001) (Section 512

"defines limitations of liability for copyright infringement").

The court in *Escape Media* explained that applying the DMCA to Pre-1972

Recordings would be an impermissible limitation on rights and remedies under

New York law:

> "[I]t is clear to us that the DMCA, if interpreted in the manner favored by
> defendant, would directly violate section 301(c) of the Copyright Act.
> Had the DMCA never been enacted, there would be no question that
> [Plaintiff] UMG could sue defendant in the New York state courts to
> enforce its copyright in the Pre-1972 recordings, as soon as it learned that
> one of the recordings had been posted on Grooveshark [defendant's
> website]. However, were the DMCA to apply as defendant believes, the
> right to immediately commence an action would be eliminated. … This
> is, at best, a limitation on UMG's rights, and an implicit modification of
> the plain language of Section 301(c).… Any material limitation,
> especially the elimination of the right to assert a common-law
> infringement claim, is violative of section 301(c) of the Copyright Act."
> 964 N.Y.S.2d at 111.

The Copyright Office analyzed the language and structure of the Copyright

Act and reached the same conclusion. *Report*, at 130-32. Vimeo's quotation from

the *Report* that the Copyright Office "sees no reason … why the Section 512 'safe-

harbor' … should not apply to the use of Pre-1972 sound recordings" (Br.43) is

misleading. Vimeo omits that this statement had nothing to do with interpretation

of the current statute, but was part of the Copyright Office's recommendation that

***in the future*** Pre-1972 Recordings be "federalized" for all purposes – something

that has not happened. As things stand, however, the Copyright Office concluded

22

that "it is for Congress, not the courts, to extend the Copyright Act and the limitations on those rights (such as section 512) set forth in the Act." *Report* at 132.

Vimeo wrongly relegates the *Report* and *Escape Media* to a footnote, with the dismissive assertion that "[n]either … is entitled to any deference here." Br.35 n.15. This Court need not "defer" to these authorities, but certainly can consider their analysis and reasoning, which is thorough, detailed and consistent with the language and structure of the Act. As for the *Report*, this Court in *WPIX, Inc. v. IVI, Inc.*, 691 F.3d 275, 283-84 (2d Cir. 2012), explained that "agencies charged with applying a statute … certainly may influence courts facing questions the agencies have already answered" and followed the "reasonable and persuasive" Copyright Office position concerning the meaning of the Act.[12] Instead of dealing with these authorities, Vimeo relies on *Capitol Records, Inc. v. MP3Tunes, LLC*, 821 F. Supp. 2d 627, 641 (S.D.N.Y. 2011), which, as the Copyright Office observed, "ignored the plain text of the statute" and failed to "offer any evidence

---

[12] Vimeo's citation to *Bartok v. Boosey & Hawkes*, 523 F.2d 941, 946 & n.9 (2d Cir. 1975) for the proposition that the "Copyright Office lacks authority to interpret [the] Copyright Act" (Br.35.n.15), is misplaced. *Bartok* cited a federal regulation (37 C.F.R. 201.2(a)(1)) that has been amended to clarify that "the Copyright Office must and does interpret the [Copyright] Act." 50 F.R. 30169 (July 24, 1985).

6441161.9

that Congress intended Section 512(c) to apply to pre-1972 sound recordings." *Report* at 130-31.

Vimeo suggests that even though the DMCA "immunizes service providers from liability" (Br.36) it nevertheless does not limit any state law rights or remedies in Pre-1972 Recordings because it would permit suits against individual direct infringers, authorizes injunctive relief, and purportedly "expands" remedies in the form of notice and takedown procedures. Br.52. That makes no sense. The DMCA eliminates monetary relief and offers only the single remedy of limited injunctive relief under limited circumstances. Further, the DMCA would "annul" claims against an entire category of culpable entities – service providers engaged in acts of infringement – and, as Vimeo would have it, leave owners of Pre-1972 Recordings to pursue innumerable, geographically scattered, and anonymous or judgment-proof individuals. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir. 2003) ("Recognizing the impracticability or futility of a copyright owner's suing a multitude of individual infringers… the law allows a copyright holder to sue a contributor to the infringement instead.").

To support its argument that applying the DMCA to Pre-1972 Recordings would not "annul or limit" state law rights or remedies, Vimeo speculates that "it is doubtful that New York common law would ever impose liability on a service provider that otherwise qualified for DMCA safe-harbor." Br.52. Again, Vimeo is

24

wrong. *Escape Media* ruled that the DMCA safe-harbor is not a defense to common law copyright claims for appropriation of Pre-1972 Recordings. 964 N.Y.S.2d at 112. Vimeo's further speculation that "[i]t is unclear whether a New York court would recognize *any* secondary liability on the part of a service provider such as Vimeo for state-law copyright infringement," and its statement that it is "aware of no common law copyright case recognizing such secondary liability" (Br.52.n.17), likewise ignore direct precedent. *See, e.g., Lime Grp.,* 715 F. Supp. 2d at 519-20 (rejecting claim that "New York common law prohibits only direct infringement, and does not impose secondary liability").

Equally disingenuous (and irrelevant) is Vimeo's assertion that a New York court would limit liability of service providers based on the Communications Decency Act ("CDA"). Br.54-55. Vimeo relies on *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007), for this proposition, doubtless knowing that no other court has nullified state law intellectual property claims based on the CDA and that other courts, including in New York, reached the opposite conclusion. *See Universal Commc'n. Sys. v. Lycos, Inc.*, 478 F.3d 413, 422-23 (1st Cir. 2007); *Atl. Recording Corp. v. Project Playlist*, 603 F. Supp. 2d 690, 704 (S.D.N.Y. 2009); *UMG Recordings, Inc. v Escape Media Grp., Inc.*, 948 N.Y.S.2d 881, 889 (Sup. Ct. 2012).

25

"It is axiomatic that the plain meaning of a statute controls its interpretation … and that judicial review must end at the statute's unambiguous terms." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (citation omitted). The language and meaning of Section 301(c) are direct and clear.

**B.      The Plain Language And Structure Of The Copyright Act Confirm That The DMCA Does Not Apply To State Claims.**

1.      The Term "Infringement of Copyright" In The DMCA Plainly Refers To Federal Copyright.

Just as Section 301(c) is clear, Section 512(c) is unambiguous in limiting liability of service providers ***"for infringement of copyright"*** under federal law. "Infringement of copyright" is not an "undefined term," as Vimeo contends (Br.37):

> "[S]ection 512(c) refers to 'infringement of copyright' which is defined in section 501(a) as the violation of 'any of the exclusive rights of the copyright owner as provided by sections 106 through 122.' The fact that the term 'infringement of copyright' only refers to infringement of rights protected under title 17, and does not include infringement of rights protected under common law or statute of any State, could not be more clear. The statute's plain text reveals a narrow definition of 'copyright infringement' which is buttressed by the language of section 301(c)." *Report* at 131-132.

There is no indication that Congress intended the term "infringement of copyright" in Section 512 to sweep more broadly than in other sections of the Copyright Act to encompass state law claims for Pre-1972 Recordings. *See Escape Media*, 964 N.Y.S.2d at 111 (agreeing that "Congress explicitly, and very clearly, separated the universe of sound recordings into two categories, one for works 'fixed'

26

after February 15, 1972, to which it granted federal copyright protection, and one for those fixed before that date, to which it did not. Defendant has pointed to nothing in the Copyright Act or its legislative history which prevents us from concluding that Congress meant to apply the DMCA to the former category, but not the latter."). Whether Congress **could** enact legislation affecting Pre-1972 Recordings (Br.49) misses the point because Congress plainly did not do so.

Indeed, because Section 301(c) prohibits "limit[ing]" or "annul[ling]" any rights in Pre-1972 Recordings, "for defendant to prevail, [the Court] would have to conclude that Congress intended to modify Section 301(c) when it enacted the DMCA." *Escape Media*, 964 N.Y.S.2d at 111. Congress knew how to refer to "sound recordings fixed before February 15, 1972," and did so twice in Section 301(c). However, Congress never mentioned "sound recordings fixed before February 15, 1972" anywhere in the DMCA. Rather, Section 512 is limited to "copyright owners." *See, e.g.*, §§ 512(c)(3)(B)(i) ("notification from a copyright owner"); 512(h)(1) ("copyright owner … may request … a subpoena to a service provider for identification of an alleged infringer"); 512(i)(2) (standard technical measures used by "copyright owners"). "Copyright owner" is defined as the owner of "any one of the exclusive rights comprised in a copyright" (§ 101), as enumerated in Section 106. There is no basis to conclude that Congress intended

27

that "copyright owner," as used in the DMCA, be defined to include owners of state law rights in Pre-1972 Recordings.

If Congress had intended a major departure from decades of law, it would not have done so silently without any indication of its intent. If it meant to modify, or especially (as Vimeo suggests) "repeal Section 301(c) to the extent necessary" (Br.49, n.16), Congress would have made that clear in Section 512 itself, or would have amended Section 301(c) to carve out the "limitations" in Section 512. *See, e.g., In re Colonial Realty Co.*, 980 F.2d 125, 132-33 (2d Cir. 1992) ("It is … presumed that Congress '"legislate[s] with knowledge of former related statutes," and will expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction.'").

The conclusion that Vimeo asks this Court to reach cannot be squared with the "cardinal rule" of statutory construction that Congress is presumed not to override statutory provisions by implication. *See, e.g.*, *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) (and cases cited); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002); *Escape Media*, 964 N.Y.S.2d at 111 ("[T]here is no reason to conclude that Congress recognized a limitation on common-law copyrights posed by the DMCA but intended to implicitly dilute Section 301(c) nonetheless."). If it were true, as Vimeo claims, that Congress had "the affirmative

28

intent not to limit the DMCA's safe-harbor to claims of federal copyright infringement," Congress would have said so. It did not. There also is no mention of Pre-1972 Recordings in the DMCA legislative history. If Congress intended to regulate for the first time an entire category of works that never before had been subject to federal law, that change would at least have been discussed in the legislative history. It was not.

Vimeo's interpretation of Section 512(c) also ignores the existence of state law claims for unfair competition, conversion, and misappropriation of Pre-1972 Recordings. *See, e.g., Firma Melodiya v. ZYX Music*, 882 F. Supp. 1306, 1316 n.14 (S.D.N.Y. 1995) ("common law copyright and unfair competition claims are not preempted by the Federal Copyright Act"); *Rostropovich v. Koch Int'l Corp.*, 1995 U.S. Dist. LEXIS 2785, at *17 (S.D.N.Y. Mar. 7, 1995) (claims for misappropriation of Pre-1972 Recordings and unfair competition are "property rights [that] arise under New York law"). Vimeo does not argue that these state law claims are covered by the DMCA or that the limitations of Section 512 would apply. Thus, Vimeo's reading of the statute would produce inconsistent treatment of state law claims applicable to Pre-1972 Recordings that arise from the same underlying conduct. Thus, common law copyright claims would be limited by the DMCA, but other state common law claims would not. Congress could not have intended that result.

29

As Vimeo recognizes but tries to evade, the DMCA and Section 301(c) should be interpreted to avoid conflict. Br.49, *citing La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 370 (1986) ("familiar rule of construction that, where possible, provisions of a statute should be read so as not to create a conflict"). This basic principle of statutory construction has particular force here, where the inconsistency between the existing provision, Section 301(c), and Vimeo's interpretation of the later-added provision, Section 512(c), is so stark. The language of Section 301(c) is broad and unequivocal – "***any*** rights or remedies" under state law "shall ***not*** be annulled ***or*** limited" (emphasis added). The only way to harmonize the DMCA and Section 301(c) is to interpret the DMCA to apply only to federal copyrights.

### 2. The Phrase "Under This Title" Does Not Change The Plain Meaning Or The Scope Of The DMCA.

Vimeo's response to the clear statutory language is the contention that because the phrase "under this title" appears in some, but not all, Copyright Act provisions, the absence of that phrase in Section 512 means that Congress intended to include state "copyright" claims within its purview. Vimeo's formalistic construct is without support within the Copyright Act, as virtually every other limitation on rights and remedies of copyright owners articulated within the Act employs the term "***infringement of copyright***," without what Vimeo contends is the limiting phrase "under this title." *See Report* at 132 ("[N]umerous other

30

limitations and exceptions in Title 17, including those in sections 107 [fair use] and 108 [library and archive reproductions], are also express limitations on the right to recover for 'infringement of copyright.'  Yet none of these exceptions in the federal copyright statute has ever been applied directly to any claims under state law") *citing* § 107 ("[T]he fair use of a copyrighted work … is not an infringement of copyright), § 108 ("[I]t is not an infringement of copyright for a library or archives … to reproduce no more than one copy or phonorecord of a work…"), § 111(a) ("[T]he secondary transmission of a performance or display of a work embodied in a primary transmission is not an infringement of copyright…"), § 112(a)(1) ("[I]t is not an infringement of copyright for a transmitting organization … to make no more than one copy or phonorecord [for licensed broadcast]"), § 121(a)-(c) ("not an infringement of copyright" to reproduce copyrighted works for accessibility to the blind and disabled).  Thus, under Vimeo's interpretation, state law Pre-1972 Recording claims would be subject to numerous statutory exceptions and limitations in the Copyright Act, not just the limitations in the DMCA.  That has never been the law, and that is precisely what Section 301(c) precludes.[13]

---

[13]     Vimeo cites *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013). In that case, the Court construed the five words "lawfully made under this title" to determine whether it was intended to "restrict the scope of §109(a)'s 'first sale' doctrine geographically."  *Id.* at 1357.  The Court noted that the word "under" "evades a uniform consistent meaning" and, quoting an earlier opinion, held that

31

## C.     Public Policy Is Not Compromised By The District Court's Holding.

Vimeo and its *amici* raise various purported public policy concerns in an attempt to avoid the plain language of the statute.  All these concerns boil down to the contention that excluding Pre-1972 Recordings from the DMCA would create "uncertainty" and "eviscerate" its purpose.  Br.43-44.  These concerns are illusory.

Congress knew it was creating a dual system when it provided prospective copyright protection limited to sound recordings "fixed" on or after February 15, 1972, and elected not to replace over a century of developed and developing state law protection for Pre-1972 Recordings.  Congress also was well-aware of Section 301(c) when it passed the DMCA in 1998.  In fact, "in the same Congressional session as it enacted the DMCA (indeed, one day before), Congress amended Section 301(c)… to extend for an additional 20 years the amount of time before the Act could be used to 'annul' or 'limit' the rights inherent in pre-72 recordings." *Escape Media*, 964 N.Y.S.2d at 112.  Nevertheless, Congress did not modify Section 301(c) (or Section 512) to extend the DMCA to Pre-1972 Recordings.  *Id.* ("[W]e reject defendant's argument that the very purpose of the DMCA will be thwarted if it is deemed not to apply to the pre-1972 recordings.  The statutory

---

the Court "must draw its meaning from its context." *Id* at 1359.  The Court then proceeded to analyze the subject phrase by reference to its specific "historical and contemporary context." *Id.* at 1360.

language at issue involves two equally clear and compelling Congressional priorities: to promote the existence of intellectual property on the Internet, and to insulate pre-1972 sound recordings from federal regulation.").

As a result of the dual system mandated by Congress, there are many instances – not just the DMCA – where state law protection of sound recordings differs from federal protection. In *Naxos*, 4 N.Y.3d at 561-63, the court held that expiration of copyright protection in Pre-1972 Recordings in their foreign place of origin did not preclude protection of the same recordings under New York law, even though similar post-1972 recordings would not have been protected under the Copyright Act. Other examples are numerous: for example, Vimeo does not dispute that owners of Pre-1972 Recordings are not entitled to ***any*** of the benefits of the Copyright Act, including the remedies described in Sections 502 through 505. Conversely, copyright owners are not entitled to state law remedies. *See*, *e.g.*, *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F. 3d 470, 475-76 (6th Cir. 2007) (awarding statutory damages for infringement of copyright and compensatory and punitive damages for misappropriation of Pre-1972 Recordings). Pre-1972 Recordings cannot be registered or deposited (§§ 407, 408), are not entitled to evidentiary presumptions accompanying copyright registration and notice (§§ 401(d), 410(c)), and are not subject to the duration provisions of Sections 302 and 303. *See also* page 31, *supra*.

33

Congress has maintained the dual system it created over 40 years ago and has expressed its intention to retain it for another 53 years. Plaintiffs and others have operated under that system and continue to do so. As the Court in *Escape Media*, the Copyright Office, and the district court agreed, it is for Congress to depart from the structure it mandated in 1972. It did not abruptly and silently do so in the DMCA.

## II. THE DISTRICT COURT CORRECTLY DENIED VIMEO'S MOTION FOR SUMMARY JUDGMENT ON THE DMCA SAFE-HARBOR AFFIRMATIVE DEFENSE.

The district court did not hold Vimeo ineligible for DMCA safe-harbor protection. It held that, based on the "totality of the circumstances" ([Sept.Order.31]) – including the court's review of the Infringing Videos – triable issues existed as to Vimeo's red flag knowledge. As the party seeking summary judgment on an affirmative defense, Vimeo had the burden to show that there was no issue for trial. Vimeo utterly failed to do so. Vimeo never produced ***any*** evidence that infringement was ***not*** apparent as to the Infringing Videos that Vimeo Staff viewed and "with which they interacted." Plaintiffs submit that the court could have, and should have, granted ***Plaintiffs'*** motion as to these videos. It certainly did not err in holding that a jury could find Vimeo had red flag knowledge.

34

**A.   Vimeo Did Not Meet Its Burden Of Proving The Absence Of Facts And Circumstances From Which Infringement Was Objectively Apparent.**

Safe-harbor protection is available only if a service provider, among other requirements, proves it:

> "(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing; (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent…" § 512(c)(1)(A).

This Court in *Viacom* explained:

> "[t]he difference between actual and red flag knowledge … is between a subjective and an objective standard.  In other words, the actual knowledge provision turns on whether the provider actually or 'subjectively' knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively obvious' to a reasonable person.  The red flag provision, because it incorporates an objective standard, is not swallowed up by the actual knowledge provision under our construction of the § 512(c) safe-harbor."  676 F.3d at 31.

*See* H.R. Rep. No. 105-551, pt. 2, at 53 ("[I]n deciding whether those facts or circumstances constitute a 'red flag,' … an objective standard should be used.").

Vimeo had both the initial burden of production and the ultimate burden of persuasion that there was "no genuine dispute as to any material fact" on its entitlement to the safe-harbor defense, including the absence of red flag knowledge.  *Columbia Pictures, Indus. v. Fung*, 710 F.3d 1020, 1039 (9th Cir. 2013) ("Because the DMCA safe-harbors are affirmative defenses, [defendant] has

35

the burden of establishing that he meets the statutory requirements"); H.R. Rep. No. 105-551, pt. 1, at 26 (1998) ("[A] defendant asserting [Section 512(c)] as an affirmative defense … bears the burden of establishing its entitlement.").

Vimeo does not contest that its Staff viewed in their entirety (and listened to) and "interacted with" the Infringing Videos, and that each contained "well-known" music owned by Plaintiffs.  Br.21.  Vimeo, as well as Vimeo users, provided public comments that evidenced knowledge that the videos contained copyrighted music (*e.g.*, "very cool song selection," and "Haven't heard this song in years") on the same web pages that contained the Infringing Videos.  [SUF.343,345(undisputed); Frackman.Decl.Ex.18(EMI00056,EMI00063).]  Staff "liked" the Infringing Videos (an "indication to a person whose video you watched that you enjoyed it"), placed Infringing Videos on "Channels" (*e.g.*, "Staff Picks" and "Vimeo HD"), and "whitelisted" or "buried" specific videos.  *See* [Sept.Order.29-30;SUF.143,342-43,345,348(undisputed); Allen.Depo.218;Frackman.Decl.Ex.18-20; Berkley.Decl.Exs.34,36.]  These actions resulted in Vimeo being exposed to ***and*** familiar with the Infringing Videos.

In finding that Vimeo failed to meet its burden, the district court pointedly did not hold that "mere awareness of the use of a song in a video – and nothing more – ***automatically*** requires denial of summary judgment to the service provider seeking the safe-harbor."  Br.34 (emphasis added).  Nor did the court rely solely on

36

the fact that the music was "popular" and "legendary," and subject to copyright.

*But see Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 987 (C.D. Cal. 2006) ("Top 40" songs "are almost invariably copyrighted").  Just the opposite:

> "Despite the fact that … most, if not all, of the copyrighted songs used in the videos would be characterized by many as popular, and in some instances legendary, … the Court is ***not*** prepared to hold that this ***automatically*** compels the conclusion that the service provider … was aware of facts and circumstances that would make it objectively obvious to a reasonable person that those videos were infringing."  [Sept.Order.30] (emphasis added).

At Vimeo's request, on reconsideration, the court conducted its own individualized review and analysis of the Infringing Videos with which Vimeo employees indisputably interacted and based on this review refined its analysis:

> "[S]eventeen of these eighteen videos play all or virtually all of the copyrighted song.  The eighteenth video lasts for forty-eight seconds, during the entirety of which the song … plays while the lyrics appear against a blue background.  Sixteen of these eighteen videos display both the artist and song title, either in the video itself or on the web page where viewers could access the video, and the web pages for the other two videos display the copyrighted song's title…  Many of the other videos are 'lip-dubs,' showing individuals walking through their homes or offices – or, in one case, driving a car – mouthing the words to a copyrighted song while it plays.  All of the videos play, in essentially unaltered form, what a reasonable jury could deem recognizable songs by well-known artists."  [Dec.Order at 9-10.]

The court referred "for instance" to a video where a "rational juror could find that virtually every aspect of the video makes it obvious that it is infringing: the music, the lyrics, the visual image (which consists exclusively of the artist

37

singing at her concert), and the description on the website explaining what the video is and when it was recorded," and noted that the music has been described as "one of the best-selling singles of all time." [*Id.*11&n.7;SUF.82,84(undisputed)]; *see* Br.21 (admitting that the "identification of the song and artist names" were "indicia of the *presence* of copyrighted material") (emphasis in original).

Vimeo Staff had reason to know that what they were viewing (and hearing) was infringing. They created and uploaded videos themselves knowing they were using copyrighted music, and provided technical advice and instruction to users *on Vimeo's homepage* to do the same ("Shoot yourself mouthing along with the song. Then synch it with a high quality copy of the song in an editing program"). [SUF.77-79,290-295,317,325-326(undisputed);Exs.17,154.] They warned users that "adding a third party's copyrighted content to a video generally … constitutes copyright infringement," but added: "Go ahead and post it. I don't think you have anything to worry about," and advised users that infringing copyrighted music was "technically" not legal but was "not a big deal." [SUF.78,307(undisputed);Ex.112; Whitman.Depo.229-32&Exs.162-163.] The same Vimeo Staff that served as the "editorial voice" of the website had music industry experience, were familiar with popular music and knowledgeable about music copyrights in general, knew that copyright owners did not permit the use of their music by commercial businesses (like Vimeo), and were familiar with and enforced Vimeo's intellectual property

38

rights.  [SUF.67,74,77-80,235,238,345(undisputed);Whitman.Depo.26-

27&Ex.119;Koyman.Depo.141-147,149,202-203&Ex348;Mellencamp.Depo.25-

26;Marcus.Depo.121-122,234-236;Lodwick.Depo.67-68;Pile.Depo.Ex.333.]  *See,*

*e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 & n.5 (9th Cir.

2001) (knowledge "apparent" where "Napster executives have recording industry

experience," "enforced intellectual property rights in other instances,"

"downloaded copy-righted songs from the system," and "promoted the site with

'screen shots listing infringing files'").

Consistent with this Court's directive to assess the issue of red flag

knowledge after a "detailed examination of the extensive record" (*Viacom*, 676

F.3d at 44), the district court conducted the individualized analysis that Vimeo

requested but did not itself conduct.  *See, e.g., Graham v. Connor*, 490 U.S. 386,

390 (1989) ("proper application" of an objective reasonableness standard "requires

careful attention to the facts and circumstances of each particular case"); *Spinelli v.*

*City of New York*, 579 F.3d 160, 167 (2d Cir. 2009) (same).  Based on that review

and analysis, the court could and should have granted summary judgment to

Plaintiffs.  *See Fung*, 710 F.3d at 1043 (defendants personally used the website to

download infringing material, encouraged infringement, and provided assistance to

users and "[t]he material in question was sufficiently current and well-known that

it would have been objectively obvious to a reasonable person that the material

39

solicited and assisted was both copyrighted and not licensed to random members of the public…."); *see also Viacom*, 676 F.3d at 33-34 (defendants' awareness of videos containing "well-known shows" may suffice to confer actual or red flag knowledge).

After review of the record and considering the "totality of the circumstances," the district court determined that "[a]lthough a jury need not necessarily find that evidence of infringement was obvious in these videos, it certainly ***could*** reach such a conclusion."  [Dec.Order.11] (emphasis added); *see Viacom* 676 F.3d at 34 (vacating summary judgment on red flag knowledge).

## B.  Vimeo's Interpretation Collapses The Distinction Between Red Flag And Actual Knowledge.

*Viacom* held that "actual knowledge of infringing material, awareness of facts or circumstances that make infringing activity apparent [red flag knowledge], or receipt of a takedown notice will each trigger an obligation to expeditiously remove the infringing material."  676 F.3d at 27-28.  As it did in the district court, Vimeo, now joined by its *amici*, attempts to place the entire burden of identifying infringing content on the copyright owner, and to relegate other means of obtaining knowledge to secondary (almost meaningless) status.  But contrary to Vimeo's assertion, the notice-and-take-down provision in Section 512(c)(1)(C) is not the "heart" of the safe-harbor regime.  Br.7.  "A service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable

40

access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, even if the copyright owner or its agent does not notify it of a claimed infringement."  S. Rep. No. 105-190, at 45; *see* H.R. Rep. No. 105-551, pt. 2, at 54 (same).

Vimeo characterizes the red flag standard itself as "onerous," contending that the only circumstances where red flag knowledge might be present would be "outright piracy, which any service provider would ***know*** [is] unlawful."  Br.17 (emphasis added).  *Amicus* Pinterest argues that "Congress intended to confine the DMCA's knowledge provision to cases where the provider needs to exercise ***no judgment***...."  Pinterest Br.10 (emphasis added).  *Amicus* Google argues that red flag knowledge "is properly reserved for circumstances where there can be ***no reasonable doubt*** that the material at issue is infringing."  Google Br.4 (emphasis added).  Vimeo and its *amici* all propose that red flag knowledge cannot exist unless the service provider can conclude with absolute certainty that a work is infringing.  Vimeo further contends that the required certainty never can exist if it is possible to articulate some hypothetical (albeit unsupported) facts that would avoid infringement; ***and*** it always is possible to do so.[14]

_____

[14]    *Amicus* Pinterest argues that a service provider cannot determine whether a work is infringing unless it can definitively answer a litany of questions, including whether the work is in the public domain, who authored the work, whether there are co-owners of the work, whether the work has been assigned to a third party, whether the uploader was an agent of the copyright owner, whether the work was

41

Vimeo's proposed standard would read red flag knowledge out of the DMCA by collapsing it into actual knowledge and turning it into "a highly subjective inquiry." Br.32. Congress's intention in creating an objective standard was to prevent service providers from relying on their own claimed lack of "absolute certainty." *Viacom*, 676 F.3d at 31 (red flag knowledge "incorporates an objective standard" and "is not swallowed up by the actual knowledge provision"). However, as Vimeo would interpret it, even the most objectively egregious instances of infringement would not wave red flags because the service provider can never know with "absolute certainty" that the copyright owner did not license the works or acquiesce in their use. Tellingly, neither Vimeo nor its *amici* can identify a single circumstance where red flag knowledge would exist under their impossible-to-meet standard without the service provider also having actual knowledge or having received a take-down notice.

The district court correctly rejected the red flag knowledge test advocated by Vimeo:

> "'Red flag knowledge,' under Defendants' construction of the statute, would seemingly require not only the upload of an unaltered, copyrighted work but also some reliable indication that the user did not have permission to upload the work, in order to negate potential legal defenses to copyright infringement. But such evidence would be practically indistinguishable from proof of actual knowledge – that

---

licensed expressly or impliedly, whether the copyright owner encouraged, approved or acquiesced in the uploading, and whether the use might be a fair use. Pinterest Br.11-12.

42

is, that the provider 'actually' or 'subjectively' knew of specific infringement.  Presented with a copyrighted work and a statement from the user that she did not have permission to upload the file or any other legal defense, a service provider could not plausibly claim that it lacked [actual] knowledge of the specific infringement." [Dec.Order.12.]

*See also* [Sept.Order.33] ("The Court is … unprepared to hold as a matter of law that a service provider may disclaim knowledge of infringing material under any circumstance short of an employee's awareness that the uploader has no legal defense for his or her otherwise infringing conduct.").

Vimeo supports its constricted application of red flag knowledge with a comment in the legislative history of Section 512*(d)* relating to "information location tools" or "directory providers."  Br.18-19.[15]  Internet directories perform, at most, a "brief cataloguing visit" to a ***third party website*** that they may link to. S. Rep. No. 105-90, at 48.  They do not copy, store, aggregate, distribute, perform or otherwise exploit content that resides on their ***own*** websites, as Vimeo does. Nor do they have the ability to remove content, as Vimeo does.  The district court explained that "[e]ven assuming that the [House and Senate] Reports' discussion of §512(d) applies equally to §512(c)… the infringement the Reports describe [i.e. 'well known photographs of a celebrity at a site devoted to that person'] is

---

[15]    Vimeo's contention that the discussion of Section 512(d) "applies to the 'red flag' knowledge inquiry under Section 512(c)" (Br.19.n.6) misreads the legislative history, which noted only that Section 512(d) mimicked the language of Section 512(c) but limited its exposition to directory providers.

43

different in kind than the infringements at issue in this case.  Here, the copyrighted songs constituted an integral part of the videos, the videos played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song."  [Dec.Order.11.]

C.    **Speculation Concerning Unsupported Defenses Does Not Entitle Vimeo To Summary Judgment.**

In *Viacom*, YouTube argued, much as Vimeo does, that "[n]o red flag exists … where circumstances leave uncertain whether the material is protected by copyright at all, or whether a particular use is licensed or, if unlicensed, a fair use." Brief for Appellee, *Viacom Int'l v. YouTube, Inc.*, 2011 U.S. 2d Cir. Briefs LEXIS 47, at *40 (April 8, 2011).  When the Court held that "[o]n these facts a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity or at least was aware of facts or circumstances from which specific infringing activity was apparent" (676 F.3d at 34), it never mentioned the possibility of affirmative defenses.  Whether ***Vimeo users*** could assert the affirmative defenses of fair use or license is irrelevant to determining whether the safe-harbor applies to Vimeo's own infringement resulting from its commercial use of Plaintiffs' music.  *See Princeton Univ. Press v. Mich. Document Servs., Inc.*,

44

99 F.3d 1381, 1386 (6th Cir. 1996).[16]

Vimeo's position ultimately is that red flag knowledge never can exist because a service provider always can articulate an "available" defense to infringement (whether or not there are facts to support it). But if a service provider simply "could claim that the possibility that some files might be fair use... then infringement never can be 'apparent' as to any file," making the red flag knowledge provision of the DMCA a nullity. Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats*, 50 Ariz. L. Rev. 577, 598 (2008); *see Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1169-70 (C.D. Cal. 2002) (rejecting argument that defendant "would not necessarily know [plaintiff's] copyrights were infringed because they might be licensed").

Even if the fair use and license defenses were properly an issue on summary judgment (they were not), Vimeo never provided any evidence that these defenses (or any others) were "available" or "plausible." Vimeo had the burden to prove, as a matter of law, that its failure to remove the Infringing Videos it had viewed was justified. *See, e.g., Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) (burden of proof on fair use defense on the proponent); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630-31 (2d Cir. 1995) (defendant bears burden to prove

---

[16]    Any fair use or license defense that Vimeo might legitimately claim could be adjudicated at trial. *See* § 512(l) (failure to qualify for safe harbor "shall not bear adversely" on any other defense).

45

license defense). Yet Vimeo did not present any evidence that the use of Plaintiffs' music in the Infringing Videos was, or even appeared to have been, fair use or licensed. Vimeo did not submit a declaration from any of its Staff or Moderators who viewed and interacted with the Infringing Videos claiming that he or she reasonably believed a video was subject to an affirmative defense, let alone providing facts supporting that claim. Instead, Vimeo now wrongly claims that it was Plaintiffs' burden to prove that "legitimate defenses are not available" and the district court's task to "simply determine whether *on the record before it* there is anything, such as a plausible fair-use[sic] or license defense." Br.23 (emphasis added). It was not Plaintiffs' burden, and the district court did review the record, including the Infringing Videos. As set forth below, there was no basis in that record for the court to hold, as a matter of law, that a fair use or license defense was "available" or "plausible."

**Fair Use.** The fair use defense presupposes that the copyrighted material was in fact used, and in the absence of that defense, the use would be infringing. *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736, 742 (2d Cir. 1991). Here, Vimeo had reason to know that Plaintiffs' copyrighted music was being used and had no basis to claim fair use. The videos "played the songs essentially unmodified and in their entirety, and the length of the video corresponded to the length of the song." [Dec.Order.11.] The music was not "background" music or merely incidental; it

46

served as a focal point for the video and in all or nearly all cases comprised the entire soundtrack. Vimeo itself recognized and advised its users of the importance of music (posting on the Vimeo Staff Blog: "You know it, I know it, and our ears know it: videos and music go great together"). [SUF.60(undisputed).] *See Napster*, 239 F.3d at 1014-1017 (rejecting fair use defense).

Vimeo's novel claim to blanket immunity because the videos "contain original video components, which are not owned by Plaintiffs – new, substantive contributions that confer independent value of the videos and transform the music used in them" (Br.21) is disingenuous. Vimeo is careful to refer (repeatedly) to "original ***video[s]***." *E.g.*, Br.17 ("original video" used three times in one sentence.) As Vimeo knows, the Infringing Videos did not use "original" ***music*** but copied Plaintiffs' music ("our website is about original videos, not original music"). [Frackman.Decl.Ex.28,EMI00537(00553).] Vimeo's conclusion that synchronizing music with video invariably is fair use means there would be no need for any motion picture, television program, or commercial advertisement to license music. The district court flatly rejected that reasoning:

> "Even for those videos that contain an original visual image set to the unaltered infringing music, for purposes of the 'red flag' inquiry, the Court finds no legally significant difference between the upload of a full-length and unedited copyrighted film and the upload of a full-length and unedited copyrighted song. A rational jury could find that a video playing the entirety of the Four Tops' hit song 'I Can't Help Myself (Sugar Pie Honey Bunch)' or a song by the Beastie Boys, Radiohead, or Usher, provided 'objectively obvious' evidence of

47

infringement to a Vimeo employee who viewed the video."
Dec.Order.13.

That conclusion is plainly correct because synchronizing a sound recording

or musical composition with an audiovisual work is black-letter copyright

infringement. *Agee v. Paramount Comm'cns, Inc.*, 59 F.3d 317, 322 (2d Cir. 1995)

("A synchronization of previously recorded sounds onto the soundtrack of an

audiovisual work is simply an example of the reproduction right explicitly granted

by section 114(b) to the owner of rights in a sound recording."); *Leadsinger, Inc.*

*v. BMG Music Pub.*, 512 F.3d 522, 527 (9th Cir. 2008) ("[C]ourts have recognized

a copyright holder's right to control the synchronization of musical compositions

with the content of audiovisual works."); *see* H.R. Rep. No. 94-1476, at 106

(infringement exists "whenever all or any substantial portion of the actual sounds

that go to make up a copyrighted sound recording are reproduced… in the

soundtrack or audio portion of a motion picture or other audiovisual work"*)*.

Contrary to Vimeo's characterization, none of the *music* in the videos was

"transformed" in any manner. *See, e.g., Leadsinger*, 512 F.3d at 530 (use of

musical compositions in karaoke recordings is not fair use and "does not add to or

alter the copyrighted lyrics").

While Vimeo (wrongly) criticizes the district court for "elevat[ing] a single

fair use factor … to dispositive status" (Br.26), Vimeo does just that by dismissing

every fair use factor other than its contrived "transformative use" by incorrectly

48

characterizing the Infringing Videos as "non-commercial" and as incorporating music "as part of the audio component." Br.25. All fair use factors in Section 107 point to a finding of no fair use: the infringing works are not transformative and are used for commercial purposes, are creative, all or a substantial portion of the works were appropriated, and the market harm to Plaintiffs is self-evident. *See, e.g., Zomba Enters. v. Panorama Records, Inc.,* 491 F.3d 574, 584 (6th Cir. 2007) ("[M]arket harm is a given, as Panorama's unlicensed copying deprived Zomba of licensing revenues it otherwise would have received."); *see also* M. William Krasilovsky and Sidney Shemel, *This Business of Music: The Definitive Guide to the Music Industry* 259-260 (8th ed. 2000) ("Music is very important to the motion picture industry and, reciprocally, motion pictures are of prime importance to the music industry… It is indisputable that motion pictures are a prime source of music evergreens."). Under these circumstances, no court ever has held that the wholesale incorporation of music as the soundtrack to an audiovisual work is fair use.[17]

---

[17] None of the cases Vimeo cites involved analogous circumstances. Br.26. In *Bill Graham Archives v. Doring Kindersley Ltd.*, 448 F.3d 605, 608-09 (2d Cir. 2006), copyrighted concert posters were incorporated in a biographical work and served a scholarly purpose. In *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013), an artist physically altered a set of photographs to "manifest an entirely different aesthetic." In *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1174, 1176-77 (9th Cir. 2013), a "video backdrop" depicted a wall covered in graffiti that included a modified and defaced copy of a poster of the plaintiff's work for the purpose of commenting on religion.

**License**.  Vimeo recognizes that the infringing uses of Plaintiffs' music are precisely the type of use that Plaintiffs license and that form a substantial part of their businesses.  Br.30 ("[M]any music rights-holders have licensing programs in which they license so-called 'synchronization' and 'master use' rights for the purpose of incorporating musical works into audiovisual works – including those created by individual users for online distribution.").  Vimeo recognized that "big media companies might dispute our use of copyrighted music in our videos." [SUF.79(undisputed),Ex.1.]  *See Agee*, 59 F.3d at 324 n.5 (2d Cir. 1995) ("[P]roducers of movies, television shows, and commercials often obtain master use licenses from sound recording copyright owners that allow them to synchronize sound recordings with visual images, as well as to copy and distribute the audiovisual work.").

Vimeo knew that *it* did not have any license for *its* own commercial use of copyrighted music.  At the same time, Vimeo required its users to grant a "worldwide, non-exclusive, royalty-free" license to "use, copy, transmit or otherwise distribute…publicly perform and display" their videos.  [Ex.304.] Vimeo did not identify any instance where the music in any Infringing Video was even claimed to have been licensed.  None of the videos bore any indicia of having been licensed, including language that the music was used "with permission" or "courtesy of" the copyright owner.  [SUF.81(undisputed).]  Vimeo argues that

50

because "some musicians" and "sometimes rights-holders" upload their own content (Br.29) it can never tell whether a work is licensed, and, therefore, it can assume that all such works are licensed. Vimeo's argument means there never could be red flag knowledge, and thus it has been rejected. *See A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 918 (N.D. Cal. 2000) (rejecting argument that defendants could not distinguish between infringing and noninfringing content merely because some prominent artists permitted their concerts to be taped and made available online), *aff'd*, 239 F.3d 1004 (9th Cir. 2001).

### D. Vimeo's Public Policy Concerns Are Misplaced.

Vimeo and its *amici* vastly overstate the policy implications of the decision below. Far from announcing any sweeping principle, the district court made detailed determinations concerning the content and context of the specific Infringing Videos, and held that a jury could find red flag knowledge. Vimeo's assumption that works may not be "recognizable" to all viewers (Br.32) is not the issue; the issue is whether, in light of the complete record, a "reasonable person" would conclude that the infringing nature of the videos at issue was apparent.

Vimeo's other asserted concerns are equally meritless.

First, the district court did not discourage "beneficial" screening nor did it require that a service provider "monitor" its website. Br.32-33. Rather, if for any reason a service provider becomes aware of facts and circumstances that make

51

infringing activity "apparent" – including because it elects to "curate" its content in order to "brand" its website and create a more commercially viable "user experience," as Vimeo does – it is appropriate to place the basic obligation of removing that infringing content on that service provider. *See* [SUF.46,100-103(undisputed);Exs.121,124,159-160,182;Cheah.Depo.78-79,133-134; Marcus.Depo.183-184&Ex.379]. That is the balance Congress struck when it included the DMCA knowledge provisions in addition to the notice-and-take-down provision.

Second, Vimeo's stated fear that some service providers will implement automated content-filtering systems (Br.33) is difficult to understand. That technology is widely implemented, including by *amicus* YouTube, and, in another context, the Supreme Court has commented on the failure to use such technology. *Grokster*, 545 U.S. at 940 ("evidence of unlawful objective is given added significance by [plaintiffs'] showing that neither [defendant] attempted to develop filtering tools or other mechanisms to diminish infringing activity using their software"). Vimeo itself tested such technology but refused to implement it. Had it done so, it would at least have limited, if not prevented, infringement of Plaintiffs' music.

Third, Vimeo overstates the purported risk of "over-policing." If Vimeo had voluntarily removed the Infringing Videos after it admittedly became aware of

52

them (as it did with many other categories of videos), it could not be liable

"regardless of whether the material or activity is ultimately determined to be

infringing." § 512(g)(1). Further, if a service provider removes content, there is

no reason it cannot require that its users agree to release any potential claim as a

result of having their content removed (and that a user can appeal that decision).

That effectively is no different than a service provider removing material after a

takedown notice, and then restoring it without incurring liability if given a counter-

notification. § 512(g)(2). In either situation, both the service provider *and* the user

are protected.

## III. THE DISTRICT COURT ERRED IN GRANTING VIMEO'S MOTION ON THE ISSUE OF WILLFUL BLINDNESS.

### A. Willful Blindness Is A Substitute For Actual Knowledge And Red Flag Knowledge

The Court in *Viacom* held that "the willful blindness doctrine may be

applied, in appropriate circumstances, to ***demonstrate*** knowledge or awareness of

specific instances of infringement under the DMCA." 676 F.3d at 35 (emphasis

added). Thus, willful blindness is "***tantamount to knowledge,***" *id.* (quoting *Tiffany*

*(NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010)), and "***is knowledge*** in

copyright law … as it is in the law generally." *Id.* (emphasis added) (quoting

*Aimster*, 334 F.3d at 650); *see United States v. Reyes*, 302 F.3d 48, 54 (2d Cir.

2002) ("[O]ur precedents establish that the [willful blindness] doctrine may be

53

invoked to prove defendant had *knowledge* of the [illegal acts].") (emphasis in original).  This "hardly novel" principle rests on the rationale that because the intent and result of willful blindness is to avoid learning of specific acts of wrongdoing, the requisite knowledge is imputed to those who "made a 'deliberate effort to avoid guilty knowledge.'"  *Viacom*, 676 F.3d at 34-35.

"To be willfully blind, a person must suspect wrongdoing ***and deliberately fail to investigate***."  *Tiffany*, 600 F.3d at 109 (quoting *Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148 (7th Cir. 1992) (emphasis added).  In *Viacom*, this Court quoted with approval its opinion in *United States v. AINA-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003), that a person who "was aware of a high probability" of a fact and "consciously avoided confirming that fact" engaged in "conscious avoidance amounting to knowledge."  *Viacom*, 676 F.3d at 35.  Conscious avoidance or willful blindness includes refusing to take "basic investigatory steps," *United States v. Rothrock*, 806 F.2d 318, 323 (1st Cir. 1986), or deliberately failing to "make further inquiries."  *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1067 (8th Cir. 2010).

As this Court made clear in *Viacom* and *Tiffany*, willful blindness is another and different way to establish knowledge beyond that gained by "awareness of facts and circumstances from which infringing activity is apparent" (676 F.3d at 34-35), as, for example, by viewing specific infringing works.  Rather, when a

54

service provider "has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way." *Id*. at 35 (quoting *Tiffany*, 600 F.3d at 109); *see Aimster*, 334 F.3d at 650 (willful blindness where defendant was "prevented from knowing what songs were being copied by users of his system").

A service provider, such as Vimeo, may be guilty of willful blindness, and consequently charged with knowledge of specific instances of infringement, in two ways:

First, a service provider that sets up a business specifically designed and intended to be systematically blind to a particular form of infringement may be found willfully blind to all infringements of that kind. Such a service provider is charged with knowledge and is denied safe-harbor protection with respect to the matters to which it has blinded itself. Here, Vimeo instituted and implemented a corporate policy intended to blind itself to infringement of a single and specific type: ***music***.

Second, a service provider, such as Vimeo, loses any claim to safe harbor protection when, despite all efforts to blind its view, it nonetheless gains knowledge that the infringement its systems have enabled by design actually is occurring. Once confronted with the direct evidence of misconduct, it forfeits all immunity if it fails to act. Here, despite its policy of blinding itself to music

55

infringement, Vimeo acquired specific knowledge of infringement of ***Plaintiffs' music***, yet took no steps to limit infringement (and, to the contrary, participated in and encouraged it).

The district court failed to properly apply the willful blindness doctrine. The record shows that Vimeo turned a blind eye to music infringement altogether, and deliberately refused to investigate when confronted with facts reflecting specific infringements of Plaintiffs' music. Either was sufficient to "demonstrate knowledge or awareness of specific instances of infringement," *Viacom*, 676 F.3d at 35, and both together compelled that conclusion and disqualified Vimeo from the DMCA safe-harbor.

**B.    Vimeo Was Aware Of A High Probability That Plaintiffs' Music Was Infringed On Its Website And Deliberately Failed To Investigate.**

      1.    <u>Vimeo Had Reason To Suspect Its Users Were Infringing Music and Infringing Plaintiffs' Copyrights.</u>

Willful blindness to infringing music was a corporate policy at Vimeo: its mission was to be "about original videos, not original music." [EMI00553.] Thus, Vimeo encouraged and then looked away from, and deliberately avoided learning of, "infringing transactions" of a particular category of copyrighted works, namely, music. Vimeo branded this policy as "***Don't ask, don't tell*** [wink]"; and advised users "***We allow it***." [Whitman.Depo.233-234&Ex.164;Ex.180.] It announced internally that "***we ignore music***" and "***legality doesn't matter when it comes to***

56

*the uploading rules*….". [Verdugo.Depo.122-126&Ex.182;VCV027552; VCV027564.] Vimeo users got the message: "it does seem odd that Vimeo repeatedly turns a blind eye to the many videos on their site that use copyrighted music without permission." [SUF.92(undisputed).] [SUF.202(undisputed)]: "From day one at Vimeo, I've been amazed that Vimeo has no restrictions about copyrighted music being used here illegally." *See also* [SUF.203-204,319(undisputed);Exs.29,131(EMI00803),180,214(EMI00662),418-B].

Vimeo's employees, too, clearly understood and implemented this corporate willful blindness policy, and accordingly would not remove even videos that they *knew* contained infringing music, unless and until they received formal DMCA notice. [SUF.77-78,95,215,290-295,306,318(undisputed);Cheah.Depo.78-79;Verdugo.Depo.77,88-89,118-120,142-143,149&Exs.180,187,192; Allen.Depo.125-126,202-203,236-237&Ex.105;Lodwick.Depo.134-137; Marcus.Depo.145-147;VCV029549; VCV029844;VCV030025.] They looked away, provided no policies, and did not inform users who asked that the use of copyrighted music was not permitted. [SUF.203-204(undisputed);Exs.112,164; VCV005927] ("I've tried searching around in the community guidelines, the help section, and the forums, but I haven't found a solid answer on whether commercial music IS or ISN'T acceptable (the content guidelines don't even touch on audio)"); *see also* [SUF.306,309(undisputed);Exs.136-137,180;Ex.418-B;VCV006236;

57

VCV037470]. They referred internally to other communications from users inquiring about infringing music stating "nobody likes a tattle tale" and "Ignoring, but sharing." [SUF.90,91(undisputed);Exs.116-117.] Rather than investigate, Vimeo "ignored." *See Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) (willful blindness where defendant "was obligated at the very least to ask her supplier whether the items he was selling were … counterfeit" but failed to inquire further).

As a result, Vimeo had much more than a "general awareness" of infringement. It was complicit in and knew of the ongoing infringement of music. And it knew that users were creating, and Vimeo was copying and performing, *Plaintiffs' music*. In fact, Vimeo Staff even set an example by making and posting their own videos that contained *Plaintiffs' music*; forming or joining group projects that required the use of *Plaintiffs' music*; placing on Staff-moderated channels videos that featured *Plaintiffs' music;* commenting favorably on or "liking" videos that contained *Plaintiffs' music*; and subscribing to users who infringed *Plaintiffs' music*. Vimeo created and promoted as its "signature" project an entire category of infringing music videos called "lip dubs," made by "lip-synching" to popular recordings, and its Staff made and instructed users to make "lip dubs" incorporating *Plaintiffs' music*. [SUF.253-254,256-257,261,269,288,292,301,304,315,317-319,322-323,325,329,331-

58

332,338,343,359(undisputed);Exs.12,16.] (If Vimeo "suddenly started to ban videos with copyrighted music, like lipdubs, then I would be pissed." [SUF.321(undisputed)];Ex.131(EMI00786).])

After receiving a cease and desist notice, Vimeo Staff just joked about their own infringement of Plaintiffs' music: "Who wants to start the felon's group where we just film shitty covers of these [*EMI*] songs and write FUCK EMI at the end?"; "*EMI* is the culprit;" and, in response to an email concerning a video making infringing use of Plaintiffs' music, calling *EMI* "fucking goofballs." [SUF.356-360,395(undisputed);Exs.143-145,Exs.199-200;Ex.330(VCV033790); *see* EMI00001-00009] (emphasis added).

Vimeo profited from advertisements that were displayed on the same webpages that offered and described ***Plaintiffs' music***. But Vimeo recognized that "big media companies might dispute our use of copyrighted music in our videos." [SUF.79(undisputed).] *EMI* is one of those companies. [Ex.200] (EMI is one of the "big boys"). It looked away to avoid paying for the right to use Plaintiffs' music, or any music, saving what it estimated was a revenue share of "20-50 percent for use of music" and royalties it calculated to be over $1 million a year, while falsely telling a user who inquired about the legality of using copyrighted music that "[w]e do pay royalties on any music played on Vimeo." [SUF.236,238,240,304(undisputed);Exs.329, 349(JL00245).] That same Vimeo

user then uploaded a video infringing Plaintiffs' music that was not removed by Vimeo. [SUF.304(undisputed);VCV012819; Berkley.Decl.¶51&Ex.47.] Vimeo even used Plaintiffs' music to attract users who otherwise would have gone to its competitors ("The YouTube version of this music video is blocked by *EMI* and WMG, so I hope Vimeo remains a more tolerant environment for music"); ("This video was originally made for youtube but since YT doesn't allow *EMI Music* in videos I couldn't upload it"). [Berkley.Decl.¶46&Ex.42; *see* SUF.276(undisputed)] (emphasis added).

Vimeo plainly had "reason to suspect" that what it intended to transpire did in fact transpire, and that videos on its website infringed copyrighted music and Plaintiffs' rights in their music.

> ### 2. Vimeo Refused to Take "Basic Investigative Steps" Or Make "Further Inquiry" To Locate "Particular" Infringing Activity.

Vimeo's conduct is in stark contrast to this Court's analysis and determination in *Tiffany* that a website owner (eBay) was not willfully blind to suspected infringements (of trademark) on its website.

In *Tiffany*, eBay knew that among the six million listings that were posted daily on the eBay website, and the 100 million total listings at any given time (600 F.3d at 97), some portion of the Tiffany goods sold on its website "might be counterfeit." *Id.* at 98. However, "a substantial number of authentic Tiffany goods are [also] sold on eBay." *Id.* eBay never participated in or encouraged counterfeit

60

sales, never took "physical possession" of any item, and "its ability to determine whether a particular listing was for counterfeit goods was limited." *Id.* at 98.

eBay had and enforced a policy against the sale of counterfeit goods. *Id.* at 100. eBay also implemented an array of anti-counterfeiting measures targeted at both the category of counterfeit goods and, specifically, Tiffany goods. These measures included, among other things, creating and using tools to promote "trust and safety" on its website; employing over 200 employees who focus "exclusively on combating infringement;" creating and enhancing a "fraud engine," "which is principally dedicated to ferreting out illegal listings," including counterfeit listings; employing keyword searches to identify infringement; and implementing various filters to screen for infringement. *Id.* at 98-99. Further, eBay's anti-fraud measures incorporated "Tiffany-specific filters," including 90 different keywords "designed to help identify counterfeit Tiffany goods" (*id* at 99); "special warning messages" when a seller attempted to list a Tiffany item (*id* at 100); and periodic manual reviews of listings in an effort to remove those that were selling counterfeit goods, including specifically Tiffany goods. *Id.* at 99.

In its separate analysis of the willful blindness doctrine, this Court held that "if eBay had reason to suspect that counterfeit Tiffany goods were being sold through its website, and intentionally shielded itself from discovering the offending listings or the identity of the sellers behind them, eBay might very well have been

61

charged with knowledge of those sales." *Id.* at 109. Notwithstanding that eBay only "knew as a general matter that counterfeit Tiffany products were listed and sold through its website," it "consistently took steps to improve its technology and develop anti-fraud measures as such measures became technologically feasible and reasonably available." *Id.* at 100. The Court affirmed the finding that eBay was not willfully blind to counterfeit sales. *Id.* at 110.

Vimeo's conduct is the direct opposite of eBay's conduct described by the Court in *Tiffany*. Vimeo actually encourages (and participates in) infringement of music, including Plaintiffs' music. Unlike eBay, Vimeo takes possession of infringing videos on its own servers, but nonetheless refused to take "basic investigative steps" or make "further inquiry" (indeed, any inquiry) to locate "particular" infringing activity, even though it was "reasonably capable of doing so." Vimeo refused to implement any measures to identify and deal with the infringing use of music and specifically Plaintiffs' music. It did not spend any money, dedicate any employees, or create any mechanism to "ferret out" infringement that it knew was taking place on its website. [SUF.76,95-97,129,172,227-229,232(undisputed);Cheah.Depo.78-79;Whitman.Depo.109; Allen.Depo.94-101,201-202;Pile.Depo.93-94;Verdugo.Depo.71-72,99-101,246-247;Horowitz.Decl.Ex.A. ¶¶76-80.] It did not adopt specific prohibitions on infringing use of music. [SUF.31,202-204,318(undisputed);Exs.136-

62

137,180,182,304.]  It did not employ anyone to focus on "combating infringement" and did not instruct its employees to focus on music infringement.  [SUF.90-92,95,129, 306(undisputed);Cheah.Depo.78-79;Allen.Depo.125-126,202-203;Verdugo.Depo.77,88-89;Whitman.Depo.124&Ex.164.]

Instead, Vimeo ignored and looked away.  Vimeo made the conscious decision to selectively filter or screen content to determine whether a video was "original" in all respects *other than music*.  [SUF.31,34,95,100-103,116,123-127,129(undisputed); Cheah.Depo.78-79,133-134;Exs.133,182.]  But Vimeo refused to use its own sophisticated technology ("ModWorld") to screen for or locate infringing music.  It refused to license filtering technologies that were used effectively by other websites (including YouTube) and that automatically would identify and remove videos infringing Plaintiffs' music – technology that its own expert agreed would be a "promising way" to limit infringing music.  [SUF.76,127,129,219-220,227-229(undisputed);Moulin.Depo.299-300; Horowitz.Decl.Ex.A.¶¶78-80.]  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*, 146 F.3d 66, 70 n.2 (2d Cir. 1998) ("[I]ndustry custom is relevant to determining whether Hilfiger engaged in willful blindness by refusing to conduct a more comprehensive search….").

Vimeo also developed and partially premiered a "Featured Music" system that could have been used to identify infringing music, but then withdrew it

63

because it "run[s] into copyright issues."  [SUF.96-97(undisputed);

Ex.30(EMI00531-32);Ex.31;EMI00563-64;Klein.Depo.149-151,154-159&Ex.65.]

It used basic keyword and video-length searches to identify and remove videos of

movies and television programs, but not music.  [SUF.154-157(undisputed).]  In

fact, after Vimeo's database covering a limited period was provided in discovery,

Plaintiffs were able to locate more than 1,400 specific videos that infringed their

music that Vimeo easily could have located itself had it looked.  *See Lime Grp.*,

784 F. Supp. 2d 398 ("Failure to utilize existing technology to create meaningful

barriers against infringement is a strong indicator of intent to foster infringement").

[SUF.76,129,219-220,227-229(undisputed);Horowitz.Decl.Ex.A.¶¶76-80.]

More than that, Vimeo developed a notification system to communicate with

users about suspected "non-original" or otherwise disallowed content, but avoided

using it for copyrighted music.  [SUF.100,129,159-160,163-168(undisputed);

Allen.Depo.94-96,98-99,100-101&Ex.74;Cheah.Depo.78-79.]  Vimeo enabled

users and Staff to "flag" for removal many different types of unlawful videos, yet it

deliberately avoided including copyrighted music as a category subject to being

flagged.  [SUF.133-134(undisputed);Allen.Depo.194 &Ex.91.]  Vimeo

promulgated and enforced a set of "Community Guidelines" forbidding many

categories of works, including "movies, TV, trailers," but did not prohibit the use

of infringing music in either those Community Guidelines or its Terms of Service. [Exs.136-137,Ex.304.]

Vimeo adopted a policy of willful blindness to music, and willful blindness to infringement of Plaintiffs' music, by curating its website, selectively implementing its technology and systems, communicating internally and with users, and encouraging and instructing users on the use of Plaintiffs' music and then looking away from the intended consequences. The result was not only a high probability of the existence of infringing "activity" on its website, but a near certainty that Plaintiffs' music was being infringed.

### C. Vimeo's Willful Blindness Caused It To Be Blind To Specific Instances of Infringement.

This case highlights the practical necessity that willful blindness serve as an alternate means of establishing disqualifying knowledge where a service provider invites and ignores specific infringements that it has every reason to suspect exist. Vimeo refused to do anything to use its ability to investigate "particular infringing transactions," despite its undeniable knowledge that only music, including Plaintiffs' music, was systematically and intentionally the subject of infringement on its website.

Vimeo had no excuse for the deliberate failure to investigate: Vimeo employees had direct and complete access at any time to every video on the website. They recognized the available "back-end mechanisms [ModWorld] that

65

allow us to search through everything," ([SUF.123-127(undisputed);

Berkley.Decl.Exs.4-5]), that could be and were used to review any video on the

website.  Vimeo employees surf the Vimeo website "just to see what's on there"

and its Staff "monitor[s] a large volume of videos that are uploaded every day."

[Allen.Depo.273;Verdugo.Depo.145-146&Ex.189; SUF.43,45,199(undisputed).]

They reviewed videos that were sent directly to them as a result of subscribing to

users, channels, or groups, and they reviewed countless other videos on a daily

basis for the specific purpose of curating content and "branding" the website.  In

these and other ways, Vimeo employees viewed innumerable unnamed and

unidentified videos and at one time even boasted of "literally review[ing] every

video that is uploaded." [SUF.43,50,55,109,118,121 (undisputed);

Ex.160(VCV000548);Exs.121,124;Berkley.Decl.Exs.4-5.]  But Vimeo produced

no record of what its employees had seen and reviewed.  *See Phillip Morris USA

Inc. v. Liu*, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007) (defendant "willfully

blinded himself to facts that would put him on notice" of infringement because he,

*inter alia*, "failed to keep the records he would otherwise normally keep").

In the face of denials of knowledge by Vimeo Staff and the absence of

records, and despite Vimeo's exposure to vast numbers of videos and the high

probability that they included infringing "instances" of Plaintiffs' music, Vimeo's

willful blindness provided it with deniability that, in the district court's erroneous

66

view, precluded finding knowledge. Thus, aside from the videos created by Vimeo Staff, the court held that a jury might find disqualifying knowledge only where Vimeo employees left an explicit paper trail that evidenced they actually had viewed specific infringing videos. The result was Vimeo's conduct left Plaintiffs with no way to show that Vimeo employees had viewed or otherwise become aware of other specific videos that used Plaintiffs' music, and Plaintiffs could not prove knowledge under the standard applied by the court. *See, e.g., United States v. 15 Bosworth St.*, 236 F.3d 50, 54-55 (1st Cir. 2001) (on an affirmative defense defendant "bears the burden of proving absence of knowledge").

That is exactly where the willful blindness doctrine applies – to prevent a service provider from avoiding the requisite knowledge and thereby qualify for safe-harbor by saying "I did not see" after deliberately looking away. *See United States v. Nektalov*, 461 F.3d 309, 315 (2d Cir. 2006) ("rationale" for the willful blindness doctrine is that "a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil'"); *Reyes*, 302 F.3d at 54 (willful blindness doctrine is a "practical necessity, given the ease with which a defendant could otherwise escape justice by deliberately refusing to confirm the existence of one or more facts he believes to be true"). Unlike red flag knowledge, knowledge imputed through willful blindness obviates the need to be aware of the specific facts and circumstances that make a

67

particular infringement apparent, since the very rationale for willful blindness is that the service provider consciously prevented itself from discovering those facts and circumstances. *See Aimster*, 334 F.3d at 650 (self-imposed blindness to infringement of music results in liability for all such infringements on website).[18]

Here, had Vimeo not adopted a policy of intentionally "looking away" from suspected infringement taking place on its website, it readily would have observed the infringing nature of the remaining *specific* videos alleged to be infringing. Just like the videos that Vimeo employees actually viewed, these videos used Plaintiffs' music and displayed various indicia of infringement, including the names of artists and/or song titles and/or record companies in their title, description, or tags, or in comments ([SUF.80-84(undisputed)]); and/or they incorporated popular, often legendary, music that was copied in its entirety or in substantial part; and/or the music was the only audio portion and was played throughout or in a large part of the video. *See* [Frackman.Decl.¶8,Exs.17-24;Berkley.Suppl.Decl.Ex.2].

---

[18]    The district court distinguished *Aimster* because the Vimeo website "has many non-infringing purposes" and there was "no evidence that Vimeo took affirmative steps to blind itself to infringement on a wholesale basis." [Sept.Order.36.]  However, whether a website has non-infringing uses (such as eBay) was not mentioned by this Court as a factor, and does not eliminate the willful blindness doctrine.  And the court simply was wrong about Vimeo's actions (and inactions), did not cite *Tiffany*, and ignored all the affirmative steps Vimeo took to blind itself "on a wholesale basis" to music that it invited, and Plaintiffs' music particularly.

68

The district court gave no weight to Plaintiffs' description of these other videos, or to Vimeo's institutional decision to "ignore" them, but limited its own review and analysis to those videos that Plaintiffs could prove Vimeo Staff had viewed. The court never determined whether the remaining videos that indisputably copied Plaintiffs' music would have provided knowledge had Vimeo not made itself blind to them. Although the court found a "sample" of this evidence "disconcerting" [Sept.Order.34-35], it dismissed it as "insufficient to establish willful blindness of specific instances of infringement at issue." *Id.* at 35. In doing so, the court failed to apply the willful blindness doctrine in the way this Court described it in both *Viacom* and *Tiffany*:  as "tantamount to knowledge" and as "demonstra[ting] knowledge or awareness of specific acts of infringement." *Viacom*, 676 F.3d at 34-35. Instead, the court's erroneous analysis effectively eliminates willful blindness as a separate means of proving knowledge. In fact, neither the court (in its Orders) nor Vimeo (in its one page argument) described any example of willful blindness that would not constitute red flag knowledge.

The district court reached its conclusion and misapplied the willful blindness doctrine in order to avoid what it erroneously perceived as "tension between the doctrine of willful blindness and the DMCA's explicit repudiation [in Section 512(m)] of any affirmative duty on the part of service providers to monitor user content." [Sept.Order.34.] Finding "little guidance" in *Viacom* , the court

69

interpreted Section 512(m) as essentially eliminating the duty to investigate highly likely wrongdoing. [*Id*.34,36.] *Viacom* and *Tiffany* made clear, however, that taking steps necessary to avoid willful blindness cannot be equated to an "***affirmative duty*** to monitor and seek out infringement." 676 F.3d at 35. That duty plainly does not conflict with Section 512(m), which complements and "limits – but does not abrogate" – the willful blindness doctrine. *Id.*; *see Ginsburg*, 50 Ariz. L. Rev. at 598 ("512(m)'s dispensation of service providers from 'affirmatively seeking facts indicating infringing activity' should not entitle the service provider to remain militantly ignorant"). It is the very failure to investigate when a service provider "suspects wrongdoing" that constitutes willful blindness.

The willful blindness doctrine is fully consistent with the need to protect copyright owners and "innocent" service providers that is reflected in the DMCA. *ALS Scan Inc. v. RemarQ Cmtys, Inc.,* 239 F.3d 619, 625 (4th Cir. 2001). Vimeo is anything but innocent. This Court should hold, based on the uncontroverted facts, that Vimeo "made a deliberate effort to avoid guilty knowledge" of infringing music (and specifically Plaintiffs' music); therefore Vimeo is charged with knowledge of the infringing music it encourages and fosters, and cannot claim safe-harbor. Applying the willful blindness doctrine in that way will not affect "innocent" service providers but will restore the balance Congress intended.

70

## **Conclusion**

This Court should affirm the district court's Orders that (1) Vimeo is not entitled to safe-harbor with respect to Pre-72 Recordings, and (2) Vimeo is not entitled to safe-harbor with respect to the videos at issue on this appeal. This Court should reverse the district court's Orders insofar as the court held that Vimeo was not disqualified from safe-harbor protection because of its willful blindness.


Date: October 22, 2014             Respectfully submitted,

                                    /s/ Russell J. Frackman
                                   Russell J. Frackman
                                   Marc E. Mayer
                                   MITCHELL SILBERBERG & KNUPP LLP
                                   11377 W. Olympic Boulevard
                                   Los Angeles, CA 90064

71

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 15,951 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14 point Times New Roman.

Date: October 22, 2014   /s/ Russell J. Frackman
            Russell J. Frackman
            MITCHELL SILBERBERG & KNUPP LLP
            11377 W. Olympic Boulevard
            Los Angeles, CA 90064

6441161.9