# 14-1048-cv(L)

## 14-1049-cv(CON), 14-1067-cv(XAP), 14-1068-cv(XAP)

### United States Court of Appeals

*for the*

### Second Circuit

CAPITOL RECORDS, LLC, a Delaware Limited Liability Company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG, INC., a New York Corporation, STONE DIAMOND

*(FOR CONTINUATION OF CAPTION SEE INSIDE COVER)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR MOTION PICTURE ASSOCIATION OF AMERICA, INC. AS *AMICUS CURIAE* SUPPORTING APPELLEES**

KELLY M. KLAUS
JUSTIN P. RAPHAEL
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, California 94105
(415) 512-4000

*Counsel for Amicus MPAA*

MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellees-Cross-Appellants*,

- *v.* -

VIMEO, LLC, a Delaware Limited Liability Company, a/k/a VIMEO.COM, CONNECTED VENTURES, LLC, a Delaware Limited Liability Company,

*Defendants-Appellants-Cross-Appellees,*

and DOES, 1-20 inclusive,

*Defendant.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure, the Motion Picture Association of America, Inc. certifies that it has no parent or subsidiary corporations and that no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ................................................................1

SUMMARY OF ARGUMENT ....................................................................3

I. VIMEO'S PROPOSED RULE IS INCONSISTENT WITH
   THE TEXT AND PURPOSE OF § 512................................................6

    A. Congress Conditioned the § 512(c) Safe Harbor Defense
   on Service Providers' Removing "Apparent" Infringing
   Activity, Even Where Providers Lack "Actual
   Knowledge"................................................................................6

    B. Vimeo's Proposed Rule Is Inconsistent with § 512(g)(1)..........8

II. VIMEO'S PROPOSED RULE IS INCONSISTENT WITH
    *VIACOM* ..........................................................................10

    A. *Viacom's* Use of the Word "Obvious" Does Not Support
    Vimeo's Argument..................................................................10

    B. Vimeo's Arguments Regarding Potentially "Plausible"
    Affirmative Defenses Show that its Proposed Rule
    Would Leave Nothing of the Red Flag Standard.....................13

        1. License .........................................................................13

        2. Fair Use ......................................................................15

III. VIMEO'S PROPOSED RULE WOULD UNDERMINE
     CONGRESS'S PURPOSES UNDERLYING THE DMCA..............17

CONCLUSION ........................................................................... 20

CERTIFICATE OF COMPLIANCE........................................... 21

CERTIFICATE OF SERVICE .................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ....................................................................15

*Andler v. Clear Channel Broad., Inc.*,
  670 F.3d 717 (6th Cir. 2012) .................................................................11

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ..................................................................16

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ..................................................................16

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  619 F.3d 301 (4th Cir. 2010) .................................................................17

*Bourne v. Walt Disney Co.*,
  68 F.3d 621 (2d Cir. 1995) ....................................................................14

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011), amended in part, 07 Civ.
  9931 (WHP), 2013 WL 1987225 (S.D.N.Y. May 14, 2013) ..................6

*Capitol Records, LLC v. Vimeo, LLC*,
  972 F. Supp. 2d 500 (S.D.N.Y. 2013) ...........................................4, 5, 12

*Capitol Records, LLC v. Vimeo, LLC*,
  972 F. Supp. 2d 537 (S.D.N.Y. 2013) ................................................4, 13

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ............................................................15, 16

*Corley v. United States*,
  556 U.S. 303 (2009).................................................................................12

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ..................................................................15

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012)....................................................................17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Larracuente*,
  952 F.2d 672 (2d Cir. 1992) ...................................................14

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012) ...........................................passim

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .........................................16, 17

**STATE CASES**

*Garrido v. City of New York*,
  9 A.D.3d 267 (N.Y. App. Div. 2004) ....................................11

**FEDERAL STATUTES**

17 U.S.C.
  § 107(1)...................................................................15

  § 512(c) ................................................................1, 3

  § 512(c)(1)(A)(i) ........................................................7

  § 512(c)(1)(A)(ii).....................................................7, 12

  § 512(c)(1)(A)(ii)-(iii) .................................................3

  § 512(g)(1) .........................................................passim

**FEDERAL RULES**

Fed. R. App. P. 29(a) .....................................................1

Fed. R. App. P. 29(c)(5)...................................................1

Second Circuit Rule 29.1(b) ...............................................1

**LEGISLATIVE MATERIALS**

S. Rep. No. 105–190 (1998) .............................................6, 18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**TREATISES**

Restatement (Third) of Agency § 2.03 (2006) ...........................................11

**OTHER AUTHORITIES**

Black's L. Dict. (9th ed. 2009) ...................................................................10

## INTEREST OF *AMICUS CURIAE*

With the consent of all parties, Fed. R. App. P. 29(a), *amicus curiae* the Motion Picture Association of America, Inc. ("MPAA") respectfully submits this brief in support of appellees.[1]

Founded in 1922, the MPAA is the not-for-profit trade association that addresses issues of concern to the United States motion picture industry. The MPAA's members and their affiliates are the leading producers and distributors of audiovisual works in the theatrical, television and home entertainment markets, in all formats and all channels of distribution, including online distribution.[2]

The MPAA's members depend upon effective copyright protection to protect the motion picture and television content that they finance, create and distribute. The MPAA and its members have a significant interest in the question that Vimeo raises on appeal concerning the interpretation of the § 512(c) "safe harbor" defense.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5) and Second Circuit Rule 29.1(b), the MPAA states that no counsel for a party has written this brief in whole or in part; and that no person or entity, other than the MPAA, its members or their counsel has made a monetary contribution that was intended to fund the preparation or submission of this brief.

[2] The members of the MPAA are Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Twentieth Century Fox Film Corporation, Universal City Studios LLC, Walt Disney Studios Motion Pictures and Warner Bros. Entertainment Inc.

Specifically, Vimeo advances an extreme position regarding the circumstances in which a service provider is obligated to remove or block access to "apparent" infringing material, if the service provider wishes to retain its eligibility for the safe harbor. Vimeo contends that, even if a service provider is confronted with facts or circumstances that make specific instances of infringement on its site objectively apparent, the provider has no obligation to remove or block access to that material unless and until the service provider has acquired facts that would negate any plausible affirmative defense to infringement. Vimeo's proposed rule is contrary to law and would eviscerate a key incentive that Congress created to ensure that service providers would cooperate in combatting infringement perpetrated by users of their sites.

## SUMMARY OF ARGUMENT

Vimeo's interlocutory appeal presents a narrow but critically important question concerning the proper construction of the Digital Millennium Copyright Act's ("DMCA") safe harbor. The DMCA expressly states that, for a service provider to maintain its eligibility for the § 512(c) defense, the provider must, *inter alia*, "act[] expeditiously to remove, or disable access to . . . material" "upon obtaining" "aware[ness] of facts or circumstances from which infringing activity is *apparent*." 17 U.S.C. § 512(c)(1)(A)(ii)-(iii) (emphasis added). In *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), this Court held that this "red flag" provision requires the service provider to act when it is "subjectively aware of facts that would [make] the specific infringement 'objectively' obvious to a reasonable person." *Id*. at 31.

Vimeo proposes a rule that would drain the red flag provision of Congress's intended effect. Vimeo argues that infringement cannot be "'objectively' obvious" to a reasonable person if there may be *any* plausible affirmative defense to infringement, such as a license agreement with the copyright owner or a fair use defense. Thus, Vimeo argues, the provider *cannot* have red flag knowledge—and thus does not have to take any action to remove the material—so long as the provider does not acquire facts that

3

rule out the possible application of *any* such affirmative defense. Vimeo Br. at 2. Vimeo insists that this rule holds even where the service provider has viewed in their entirety specific postings that make use of all, or nearly all, of works that obviously are protected by copyright. *See Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 553 (S.D.N.Y. 2013) ("*Vimeo II*"); Vimeo Br. at 21 n.7 (stipulating for purposes of the appeal that a Vimeo "staff member viewed the entirety of each of the 18 videos at issue"). Vimeo's proposed rule is so extreme that, before the district court, the only example of facts or circumstances that Vimeo could hypothesize as "supply[ing] a service provider with red flag knowledge" under the proposed rule was "an e-mail from a user stating, 'I just uploaded to Vimeo a complete rip of a feature-length film that I didn't make . . . and I didn't have permission to do it.'" *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 522 (S.D.N.Y. 2013) ("*Vimeo I*").

Congress did not limit red flag knowledge to such far-fetched situations. The Court should reject Vimeo's proposed rule for at least three reasons.

*First*, Vimeo's rule would override express language manifesting Congress's understanding of a service provider's obligation when confronted with facts or circumstances demonstrating "apparent" infringing

activity.  In § 512 itself, DMCA, Congress stated that service providers

would not be liable to the persons posting material that the provider removed

"based on facts or circumstances from which infringing activity is apparent,

*regardless of whether the material or activity is ultimately determined to be*

*infringing*."  17 U.S.C. § 512(g)(1) (emphasis added).  This shows, contrary

to Vimeo's argument, that Congress did not intend the standard for

"apparent" infringement to turn on predictions about whether the

infringement would (or would not) ultimately be excused by an affirmative

defense.

Second, Vimeo's rule is inconsistent with *Viacom*.  Vimeo insists that

*Viacom* held that infringement cannot be "'objectively' obvious," *Viacom*,

676 F.3d at 31, to a reasonable person unless that person has knowledge that

negates *any* plausible affirmative defenses.  That is an erroneous reading of

*Viacom*.  *Viacom* holds that the red flag provision deals with *objective*

knowledge that infringement appears to be taking place, regardless of what

the service provider says it subjectively believed.  *Viacom* does not support

Vimeo's argument that the provider has no such objective knowledge until it

has ruled out affirmative defenses.  Vimeo's proposed rule "would collapse

the distinction" the *Viacom* Court drew between subjective and objective

knowledge.  *Vimeo I*, 972 F. Supp. 2d at 523.

5

*Third*, Vimeo's proposed rule would frustrate Congress's policy objectives.  Congress intended the DMCA to create "strong incentives for *service providers and* copyright owners to *cooperate*" in a system of shared responsibility for dealing with infringement occurring online.  S. Rep. No. 105–190, at 20 (1998) ("Senate Report") (emphasis added).  Vimeo's rule would encourage willful blindness and deliberate inaction in situations where Congress clearly intended for service providers to act to remove infringing activity.

The district court's decision regarding the construction of red flag knowledge should be affirmed.

# I.     VIMEO'S PROPOSED RULE IS INCONSISTENT WITH THE TEXT AND PURPOSE OF § 512

## A.     Congress Conditioned the § 512(c) Safe Harbor Defense on Service Providers' Removing "Apparent" Infringing Activity, Even Where Providers Lack "Actual Knowledge"

Congress structured the DMCA's safe harbor provisions to "balance the interests of copyright owners and online service providers by promoting cooperation, minimizing copyright infringement, and providing a higher degree of certainty to service providers on the question of copyright infringement."  *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 636 (S.D.N.Y. 2011), *amended in part*, 07 Civ. 9931 (WHP), 2013 WL 1987225 (S.D.N.Y. May 14, 2013).  To incentivize service providers'

6

cooperation in removing infringing activity from their sites, Congress
required, among other things, that providers wishing to claim the § 512(c)
safe harbor must act when confronted with such activity. The service
provider's obligations go beyond responding to notice and takedown
requests from copyright owners. The service provider must remove or
disable access to material where it has "actual knowledge that the material or
an activity using the material on the system or network is infringing," 17
U.S.C. § 512(c)(1)(A)(i). Even "*in the absence of such actual knowledge*,"
the service provider must remove or disable access to material where the
provider is "aware of facts or circumstances from which infringing activity
is *apparent*," *i.e.*, where the provider has "red flag" knowledge. *Id*.
§ 512(c)(1)(A)(ii) (emphasis added).

In *Viacom*, this Court held that the actual and red flag knowledge
provisions encompass different modes of proving a service provider's
knowledge. "The difference between actual and red flag knowledge is . . .
not between specific and generalized knowledge, but instead between a
subjective and an objective standard." *Viacom,* 676 F.3d at 31. In
particular, "the actual knowledge provision turns on whether the provider
actually or 'subjectively' knew of specific infringement, while the red flag
provision turns on whether the provider was subjectively aware of facts that

7

would have made the specific infringement 'objectively' obvious to a reasonable person." *Id.* "Both provisions do independent work." *Id.*

## B. Vimeo's Proposed Rule Is Inconsistent with § 512(g)(1)

Vimeo and its *amici* argue that Congress could not have intended service providers to act under the red flag provision without ruling out affirmative defenses, because such a requirement would force providers to make "difficult" judgments about whether material might ultimately be held to be infringing. *See* Vimeo Br. at 19; Amicus Br. of Google Inc. et al. at 4; Amicus Br. of Electronic Frontier Foundation et al. at 12. This is a red herring. The statute does not require the service provider to make difficult judgments about licensed use, fair use or other possible affirmative defenses. The statute requires the provider to remove or block access to the material that is actually known to be, or objectively appears to be, infringing—if the provider wishes to retain its claim to safe harbor protection.

Section 512(g)(1), which is a corollary to the red flag provision, shows that Congress did not envision that a service provider's obligation in response to apparent infringing activity would involve purportedly "difficult" judgment calls about possible affirmative defenses. Section 512(g)(1) provides:

> Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good

faith disabling of access to, or removal of, material or activity claimed to be infringing *or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing*.

17 U.S.C. § 512(g)(1) (emphasis added).[3]

Section 512(g)(1) shows that Congress intended "apparent" infringing activity to mean something other than "ultimately proven" or "sufficient to overcome affirmative defenses" to copyright infringement. Congress intended that service providers would be immune from claims by users whose material was removed under the red flag provision regardless of how those users might fare if the copyright owner were to pursue an infringement action. Congress would have had no need to include the "regardless of" proviso had it intended (as Vimeo argues) that knowledge ruling out plausible affirmative defenses was a requirement for red flag knowledge. If Vimeo's proposed rule were correct, then the service provider would have predicted with certainty how any plausible affirmative defense might be resolved, and thus how the infringement claim would be "ultimately determined." If the service provider had to have that level of knowledge before having an obligation to remove the material, then there would be no need for a proviso stating that the service provider's immunity from the

---

[3] Paragraph 2 of § 512(g) involves so-called "putback" procedures in response to notices from rights owners and is not relevant to the issue here.

user's suit exists "regardless of" the "ultimate[] determin[ation]" of infringement.

Section 512(g)(1) confirms that Congress did not intend for service providers to make judgments about possible affirmative defenses prior to having a duty to act on apparent infringing material. Vimeo's proposed rule cannot be squared with that provision.

## II. VIMEO'S PROPOSED RULE IS INCONSISTENT WITH *VIACOM*

### A. *Viacom's* Use of the Word "Obvious" Does Not Support Vimeo's Argument

Vimeo predicates its argument on a single word in this Court's decision. Specifically, Vimeo seizes on the word "obvious" in the Court's statement that red flag knowledge is established when infringement is "'objectively' *obvious* to a reasonable person." *Viacom,* 676 F.3d at 31 (emphasis added). Vimeo insists that infringement is not "obvious" unless potential affirmative defenses are ruled out. But *Viacom* says nothing of the kind, and Vimeo's argument woven from this single word is unreasonable.

This Court used "obvious" as the dictionary does—as a synonym for "apparent." *See* Black's L. Dict. (9th ed. 2009) ("apparent" means "visible; manifest; obvious," or "ostensible; seeming"). It does not mean "certain" or "proven." As cases from other contexts make clear, something is "apparent"

10

or "obvious" if a reasonable person confronted with the facts would recognize the significance of those facts—not that the person rebut that significance with any other facts that might be marshalled. *See*, *e.g.*, *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 725 (6th Cir. 2012) ("A danger is open and *obvious* if it is reasonably observable and thus would be *seen* by someone acting with ordinary care under the circumstances") (internal quotation marks omitted); *Garrido v. City of New York*, 9 A.D.3d 267, 268 (N.Y. App. Div. 2004) ("For a condition to be open and *obvious* as a matter of law, it must be one that could not be overlooked by any *observer* reasonably using his or her ordinary senses.") (emphasis added).

For example, in the law of agency, where a principal's words or deeds manifest to a third-party that he is bound by an agent, the agent has "apparent" authority regardless of whether the principal has privately limited the agency. *See* Restatement (Third) of Agency § 2.03 (2006) ("As to the third person, apparent authority when present trumps restrictions that the principal has privately imposed on the agent."). The concept would be meaningless if the agency could not be apparent unless the third-party is certain that the principal had actually conferred authority on the agent.

Vimeo's interpretation of how *Viacom* construed the red flag provision is contrary not only to the usual meaning of "obvious," but also to

11

the Court's ultimate conclusion in that case. *Viacom* was clear that the actual knowledge and red flag provisions "do independent work." *Viacom*, 676 F.3d at 31. Under Vimeo's proposed rule, the red flag provision would not "do independent work," but instead would be superfluous.

Any service provider that actually knows what affirmative defenses would be raised and how they would be resolved would satisfy an even more stringent standard than actual knowledge of infringing activity—that the provider would have subjective knowledge sufficient to predict the outcome of an infringement claim. To require proof of that kind of knowledge would leave nothing to § 512(c)(1)(A)(ii). That explains why Vimeo and its *amici* fail to identify any realistic circumstances to which red flag knowledge would apply under their proposed reading. *See Vimeo I*, 972 F. Supp. 2d at 522. It is untenable, of course, to read *Viacom* and its use of the word "obvious" to render § 512(c)(1)(A)(ii) superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous.").

Simply put, neither *Viacom* nor the DMCA supports Vimeo's extreme rule.

**B.    Vimeo's Arguments Regarding Potentially "Plausible" Affirmative Defenses Show that its Proposed Rule Would Leave Nothing of the Red Flag Standard**

Vimeo asserts that individuals who post content to user-generated content ("UGC") sites may have two affirmative defenses—license and fair use—to infringement that would otherwise be objectively apparent to the service provider upon viewing the material.  Vimeo's arguments as to each defense simply confirm that, under its proposed rule, the red flag provision would be meaningless.

### 1.    License

Vimeo argues that viewing material that makes use of all or nearly all of a clearly copyrighted work can *never* constitute red flag knowledge as a matter of law because "[m]ere viewing of a video, without more, cannot reveal the licensing arrangements that may or may not authorize" copyrighted material used in the video.  Vimeo Br. at 30.  Hence, Vimeo claims that a service provider would have no obligation to remove specific instances of apparent infringing material unless the provider had evidence proving a negative, *i.e.*, "that the user *did not* have permission to upload the work, in order to negate potential legal defenses to copyright infringement." *Vimeo II*, 972 F. Supp. 2d at 547 (emphasis added).  This argument is unfounded and unreasonable.

13

"If the accused infringer has been licensed by a licensee of the copyright owner, that is a matter of affirmative defense." *United States v. Larracuente*, 952 F.2d 672, 673-74 (2d Cir. 1992). "[E]vidence of a license is readily available to the alleged licensee," so "it is sensible to place upon that party the burden of coming forward with evidence of a license." *Bourne v. Walt Disney Co.,* 68 F.3d, 621, 631 (2d Cir. 1995). It is the user's obligation if sued for infringement to show that its use was licensed. Under the red flag provision, it is not for the service provider to speculate about whether a use *might* be licensed.

Allowing service providers to claim the safe harbor because *some* content on their sites "*might* [have been] uploaded to a platform like Vimeo with the copyright holder's permission," Vimeo Br. at 28 (emphasis added), also turns *Viacom*'s logic on its head. After *Viacom*, a service provider's general awareness about infringing material on its site alone does not trigger a provider's duty to act; the service provider has red flag knowledge that triggers the duty to act only when it is aware of "specific and identifiable instances of infringement." *Viacom,* 676 F.3d at 32. The converse must also be true: a service provider's obligation to act when confronted with specific instances of apparent infringing activity cannot be relieved just because the

14

service provider is generally aware of the possibility that some content on its site might be licensed.

## 2. Fair Use

Vimeo and *amici* also argue that the safe harbor should remain available to a service provider who refrains from removing apparent infringing material so long as the provider cannot rule out a "plausible" fair use defense.

As with license, however, "fair use is an affirmative defense to a claim of infringement," and therefore "the burden of proof is on its proponent." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998); *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994). The potential merits of a fair use defense do not factor into the service provider's obligation to act. The decision whether to raise such a defense rests with the person posting the material. The same person has the obligation to come forward with the facts (if any) that he or she may argue support the defense. Indeed, the first of the statutory factors relevant to the fair use defense is the "*purpose* and character of the use," 17 U.S.C. § 107(1) (emphasis added), some or all of which information resides with the person who would claim the defense, here, the person posting the material. *See*, *e.g.*, *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013)

("Prince's deposition testimony further demonstrates his drastically different approach and aesthetic from Cariou's."); *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) ("Koons is, by his own undisputed description, using Blanch's image as fodder for his commentary on the social and aesthetic consequences of mass media.").  Since the facts regarding fair use often reside with the user, a service provider could always claim ignorance as to whether a fair use defense is "plausible" and thus avoid the obligation to act based on apparent infringement.

Indeed, Vimeo's argument regarding fair use confirms that, under its rule, a service provider would be able to rely on "plausible" fair use to negate red flag knowledge in virtually every case.  Vimeo and its *amici* string together a number of inapposite cases for the proposition that UCG postings that incorporate all (or nearly all) of another's copyrighted works might have a strong fair use defense.  But neither the Second Circuit nor any other Circuit "has ever ruled that the copying of an entire work *favors* fair use."  *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (emphasis in original).  To the contrary, the case law is clear that "[w]hile wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use."  *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir.

2000) (internal quotation marks omitted). *See also Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 62 (1st Cir. 2012); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 311 (4th Cir. 2010). Without more, viewing a video which makes use of all or nearly all of a clearly copyrighted work does not entitle a service provider to draw an inference of fair use. If fair use is "plausible" in those circumstances, then the defense is always "plausible," and infringement will never be "apparent" with respect to the use of all of another's copyrighted work. That cannot be what Congress intended.

Nor does the possibility that a user *might* claim fair use as an affirmative defense make apparent infringing material non-apparent. As Vimeo itself tells its users on its own site, "'Fair Use' isn't a magic phrase you can invoke to excuse your use of someone else's creative work under any circumstances. To be clear: you can't copy someone else's work and then simply claim fair use." http://vimeo.com/help/faq/legal-stuff/fair-use (last visited Oct. 29, 2014).

## III. VIMEO'S PROPOSED RULE WOULD UNDERMINE CONGRESS'S PURPOSES UNDERLYING THE DMCA

More than 15 years after Congress enacted the DMCA, infringing content remains a disturbingly significant feature of online video platforms. One study last year estimated that in January 2013, 28.6 million unique

Internet visitors in North America accessed infringing content on video streaming sites—a 51% increase from November 2011.[4]  Those visits consisted of 1.26 billion page views—a 59% increase over the same period.[5]  According to the study, infringing content accounted for more than 12% of all traffic on video streaming sites that month, or more than 1% of all Internet traffic.[6]

Vimeo's proposed rule would give service providers "strong incentives," Senate Report at 20, to do *nothing* to stem this tide.  If a service provider acquires red flag knowledge only by obtaining information that negates any plausible fair use defense, what service provider confronted with apparent infringing activity is going to try to obtain that information, and thereby risk losing its eligibility for the safe harbor?  It is far more likely that the service provider would structure its activities to avoid obtaining that information.  The Congress that enacted the DMCA to provide "strong incentives" for cooperation in combatting copyright infringement could not have intended to provide such a blueprint for service provider inaction in the face of specific infringing material.

---

[4] "Sizing the piracy universe," David Price (Sept. 2013), at 41-43, 98, available at:  https://copyrightalliance.org/sites/default/files/2013-netnames-piracy.pdf (last visited Oct. 29, 2014).

[5] *Id.* at 99.

[6] *Id.* at 52.

Unable to reconcile its argument with the text or purpose of the red flag provision, Vimeo argues that the district court's reading will either require service providers to do too much (to over-police their site) or incentivize them to do too little (to under-police their sites for misconduct other than copyright infringement). Vimeo Br. at 32-33. Vimeo is wrong on both counts.

Regarding Vimeo's predictions of over-policing: The question is not whether a service provider has a duty to seek out infringing material. The question instead is what the provider is obligated to do when it finds apparent infringing material. Congress answered that question in the red flag provision: the provider must block or disable access to that material, if the provider wishes to retain safe harbor protection.

Vimeo also is wrong that construing the red flag provision as Congress intended it will *dis*-incentivize providers to police their sites for other improper material, lest the provider be confronted with apparent infringing activity, and with it the purported difficult judgment about what to do about that material. As discussed above, Congress made clear what the provider is obligated to do—and also gave the provider who acts in good faith immunity from any claim by the person whose apparently infringing material was removed. 17 U.S.C. § 512(g)(1).

19

## CONCLUSION

The MPAA respectfully submits that the district court's decision construing the red flag provision should be affirmed.

DATED:  October 29, 2014                Respectfully submitted,

                                        */s/  Kelly M. Klaus*
                                        KELLY M. KLAUS

                                        Kelly M. Klaus
                                        Munger, Tolles & Olson LLP
                                        560 Mission Street, 27th Floor
                                        San Francisco, California 94105
                                        (415) 512-4000


                                        Counsel for *Amicus* MPAA

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, I certify that:

1.     This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 4,055 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman.


Dated:  November 4, 2014

                                        */s/  Kelly M. Klaus*
                                        KELLY M. KLAUS
                                        Counsel for *Amicus* MPAA

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of November, 2014, a true and correct copy of the foregoing Brief for Motion Picture Association of America, Inc. as *Amicus Curiae* Supporting Appellees was served on all counsel of record in this appeal via CM/ECF pursuant to Second Circuit Rule 25.1(h)(1)-(2).

Dated: November 4, 2014

/s/ *Kelly M. Klaus*
KELLY M. KLAUS