# 14-1048-cv(L)

## 14-1049-cv (CON), 14-1067-cv (XAP), 14-1068-cv (XAP)

In the United States Court of Appeals

for the Second Circuit

CAPITOL RECORDS, LLC, a Delaware Limited Liability Company,
CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS
AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC, INC., a
Connecticut Corporation, EMI APRIL MUSIC, INC., a Connecticut
Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation,
COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS,

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICUS CURIAE* THE COPYRIGHT ALLIANCE**

ANDREW H. BART
JENNER & BLOCK LLP
919 THIRD AVENUE
NEW YORK NY 10022
(212) 891-1600
*AND*
LUKE C. PLATZER
J. DOUGLAS WILSON
JENNER & BLOCK LLP
1099 NEW YORK AVENUE #900
WASHINGTON, DC 20001
(202) 639-6000

INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG, INC., a New York Corporation, and JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellees-Cross-Appellants*,

v.

VIMEO, LLC, a Delaware Limited Company, a/k/a VIMEO.COM and CONNECTED VENTURES, LLC, a Delaware Limited Liability Company,

*Defendants-Appellants-Cross-Appellees*,

DOES, 1-20 INCLUSIVE,

*Defendants.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the

Copyright Alliance discloses that it has no parent corporation nor does

any publicly held company holds more than 10% of its stock.


Dated: October 29, 2014             <u>/S/ *ANDREW H. BART*    </u>

                                        ANDREW H. BART

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF CONTENTS ..............................................................ii

TABLE OF AUTHORITIES ........................................................iv

INTERESTS OF *AMICUS CURIAE* ............................................ 1

SUMMARY OF ARGUMENT .................................................... 3

ARGUMENT ........................................................................... 5

I. Congress Intended the DMCA to Balance the Rights of
Copyright Holders with Internet Service Providers, and
Vimeo's Interpretation of Section 512 Would Destroy this
Balance................................................................................ 5

    A. The DMCA's Carefully Balanced Enforcement Regime
       Requires an Effective Red Flag Knowledge Eligibility
       Component to Ensure Cooperation by Service
       Providers................................................................... 6

    B. Vimeo's Interpretation of Section 512 Would Turn the
       DMCA Into a Mere Notice & Takedown Statute, Which
       Fails Adequately to Protect the Interests of Copyright
       Holders................................................................... 13

II. The District Court Correctly Recognized That Triable Issues
Existed Regarding Vimeo's Eligibility for Safe Harbor, Given
that Reasonable Persons Could Doubt the Speculative
Justifications for Apparent Infringement Articulated by
Vimeo ............................................................................... 21

III.   The District Court Erred in Holding that Willful Blindness
       Evidence Must Identify Specific Works in Suit and Granting
       Summary Judgment on that Basis ................................................. 25

CONCLUSION ......................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) ...................................................................................................8

*Columbia Pictures Industries, Inc. v. Fung*, 710 F.3d 1020 (9th Cir. 2013) ...................................................................................................12

*Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) .................................................................22, 24, 25, 27, 28

*Virtual Works, Inc. v. Volkswagen of America, Inc.*, 238 F.3d 264 (4th Cir. 2001) ...............................................................................................8

*Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005) ....................................16

**STATUTES**

17 U.S.C. § 512(c)(1)...........................................................................................7

17 U.S.C. § 512(c)(1)(A) ............................................................................7, 10, 13, 20

17 U.S.C. § 512(c)(1)(A)(ii) ...............................................................14, 16, 22

17 U.S.C. § 512(c)(3)...........................................................10, 16, 17, 20, 21

17 U.S.C. § 512(d)(1)...........................................................................................7

17 U.S.C. § 512(d)(1)(B) ...................................................................................22

**LEGISLATIVE MATERIALS**

144 Cong. Rec. 18,770-71 (1998)...........................................................................11

144 Cong. Rec. 9242 (1998) .................................................................................11

150 Cong. Rec. 13,442 (2004) ...............................................................................12

H.R. Rep. No. 105-551, pt. 1 (1998) ....................................................................11

H.R. Rep. No. 105-551, pt. 2 (1998) ....................................................................12

iv

*Innovation in America (Part I and II): Hearings Before the Subcomm. on Intellectual Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2013) ..................................................... 19-20

S. Rep. No. 105-190 (1998) ....................................................6, 8, 11, 12

*Section 512 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) ..........................................................20

## OTHER AUTHORITIES

Bruce Boyden, *The Failure of the DMCA Notice and Takedown System: A Twentieth Century Solution to a Twenty-First Century Problem,* Ctr. For the Protection of Intell. Prop. (Dec. 5, 2013), http://cpip.gmu.edu/2013/12/05/the-failure-of-the-dmca-notice-and-takedown-system-2/ ....................................................................17

Comments of Mickey H. Osterreicher, General Counsel, National Press Photographers Ass'n, in U.S. Copyright Office, Request for Comments Regarding Studies On Remedies for Small Copyright Claims (Jan. 6, 2012), *available at* http://www.copyright.gov/docs/smallclaims/ comments/36_nppa.pdf ..........................................................18

Christopher S. Stewart, *As Pirates Run Rampant, TV Studios Dial Up Pursuit*, Wall St. J., Mar. 3, 2013, at A1, *available at* http://online.wsj.com/articles/SB1000142412788732490600457822932028509990 ...............................................................18

With the consent of all parties, *amicus curiae*, the Copyright
Alliance, respectfully submits this brief in support of Plaintiffs-
Appellees-Cross-Appellants Capitol Records *et al.*[1]

## INTERESTS OF *AMICUS CURIAE*

The Copyright Alliance is a nonprofit, nonpartisan public interest
and educational organization representing artists, creators, and
innovators across the spectrum of copyright disciplines.  It promotes
and protects the ability of creative professionals to earn a living from
their creative work.  The Copyright Alliance's members have a vested
interest in the enforcement of copyright and are harmed by the
unauthorized use of copyrighted works.  Members include individual
artists and creators, creative union workers, and small businesses in
the creative industries as well as the organizations and corporations
that support and invest in them.

While the Copyright Alliance and its members embrace the use of
new technologies – especially the distribution of works via the Internet

---

[1] Pursuant to F.R.A.P. 29(c)(5) and Local Rule 29.1, *amicus* states that
counsel for the parties have not authored this brief in whole or in part.
No one other than *amicus* and its members contributed money that was
intended to fund preparing or submitting this brief.

– the members rely on the protections of copyright and the DMCA in particular to ensure a vibrant marketplace for their work. The unauthorized, infringing use of members' works harms their livelihood and the demand for their creative efforts.

The Copyright Alliance's interest in this case goes beyond the infringing practices at Vimeo and to the continued viability of the copyright enforcement regime Congress created when it enacted the Digital Millennium Copyright Act ("DMCA"). The scope of Internet service providers' obligations regarding the hosting and distribution of infringing works is a core interest of the Copyright Alliance's membership. The consequences of the Court's decision will have a significant impact on how effectively copyright holders' rights will be protected online. The Copyright Alliance submits this brief to explain to the Court the importance to the entire community engaged in the creation and distribution of creative works of effective protection of the use of copyrighted materials on the Internet, and the importance of preserving the balance struck by Congress in the DMCA.

## SUMMARY OF ARGUMENT

This brief addresses two of the certified questions presented to this Court regarding Vimeo's eligibility for safe harbor under the DMCA: First, whether the record supported disqualification of Vimeo from the safe harbor based on "red flag" knowledge of facts or circumstances that made infringements "obvious to a reasonable person," and, second, whether Vimeo displayed "willful blindness" to the infringements at issue that should similarly disqualify it from the safe harbor.

1.     Both certified questions regarding Vimeo's eligibility for the DMCA safe harbors should be decided in light of the underlying purpose and policy balance behind the statute. Congress, in the DMCA, struck a careful balance in which a service provider's eligibility for the safe harbor was always intended to be conditioned upon a corresponding obligation proactively to remove content known or believed to be infringing. The positions taken by Vimeo, if accepted, would undo that balance. As a practical matter, the effect of those arguments would be to leave little to a service provider's obligations to qualify for the safe harbor than responding to takedown notices – a situation that ill serves

3

Congress's goals and fails to provide adequate protection to copyright owners against the online theft of their works.

2.     The District Court correctly applied the requirements of the statute, as well as this Court's *Viacom* decision, in its red flag knowledge ruling.  Whether a service provider is aware of facts and circumstances that would make "specific" infringements "obvious to a reasonable person" is a standard that looks to what a *reasonable* person would recognize as copyright infringement, not an invitation for service providers to speculate or concoct implausible doubts to justify keeping apparent infringing content on their services.  At a bare minimum, that standard required the Court to deny Vimeo's motion for summary judgment, which it properly did.  In this respect, the decision should be affirmed.

3.     The District Court erred, however, in granting summary judgment to Vimeo as to Plaintiffs' claims that Vimeo had been willfully blind to infringements in videos on the site other than those specifically viewed by Vimeo employees.  The District Court misapplied the willful blindness inquiry by requiring evidence of willful blindness to pertain specifically to works in suit.  However, such knowledge often will not be

available to a willfully blind service provider since willful blindness arises precisely because a provider has consciously *avoided* such knowledge of specifics. Instead, the District Court should have inquired into whether a jury reasonably could find that Vimeo had consciously avoided confirming suspected infringements of popular, copyrighted music, and whether knowledge as to *which* works were so infringed should accordingly be imputed.

## ARGUMENT

I.  **Congress Intended the DMCA to Balance the Rights of Copyright Holders with Internet Service Providers, and Vimeo's Interpretation of Section 512 Would Destroy this Balance**

The Internet provides a vibrant medium to distribute and enjoy creative works. Artists can share their art with anyone in the world who has a connection to Internet. But this flowering of opportunities created by the ease of digital reproduction and online distribution has significant costs to artists and copyright holders. The same Internet model that allows an unknown singer to share her music with the world also means that third-party infringers may also take a singer's work and reproduce it without her permission.

5

The ability of copyright holders to control how, when, and where their works are performed or displayed on the Internet is critical to a functioning artistic and intellectual culture and marketplace. The unchecked appropriation of copyrighted works from their creators limits the ability of creative professionals to make a living producing copyrighted works and deters others from joining creative industries altogether. The value of copyrights – and thus a primary incentive to create – is severely diminished if the copyright holders are unable to effectively enforce their copyrights on the Internet.

### A. The DMCA's Carefully Balanced Enforcement Regime Requires an Effective Red Flag Knowledge Eligibility Component to Ensure Cooperation by Service Providers

When Congress passed the DMCA sixteen years ago, it sought to balance the rights of copyright holders with the needs of Internet service providers to operate websites without the threat of copyright liability, including for unknown infringements by their users. S. Rep. No. 105-190, at 69 (1998) (Sen. Leahy describing the DMCA as "well-balanced package of proposals that address the needs of creators, consumers and commerce in the digital age and well into the next century.").

The DMCA's Section 512 copyright enforcement regime protects good faith service providers from liability for copyright infringement while allowing those service providers who knowingly host infringing works to be held liable for their infringement. 17 U.S.C. § 512(c)(1). The key to the regime's effectiveness is that eligibility for the DMCA's series of safe harbors is contingent on a corresponding series of requirements to ensure that service providers cooperate in good faith, rather than hiding behind a safe harbor to let rampant infringements go unaddressed.

Critically, to qualify for the DMCA's safe harbors protecting service providers from monetary liability for copyright infringement, providers must establish their eligibility – including, *inter alia*, that the provider must not have actual or "red flag" knowledge of infringing activity, or willfully blind itself to the same, and must promptly and proactively remove infringing material upon obtaining such knowledge. *See* 17 U.S.C. § 512(c)(1)(A) & (d)(1).

The condition that a service provider (to qualify for DMCA protection) must remove material known or believed to be infringing *proactively*, *without* waiting for a rightsholder affirmatively to notify

7

the provider (by means of a takedown notice issued pursuant to Section 512(c)(3) of the statute) is among the core obligations of service providers under the statute, and a pillar of ensuring that the overall statutory scheme is effective. *See* S. Rep. No. 105-190, at 45 (explaining that "[a] service provider wishing to benefit from the limitation on liability under subsection (c) must 'take down' or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, even if the copyright owner or its agent does not notify it of a claimed infringement.").

The DMCA's careful balance between the rights of copyright holders and the interests of service providers is at risk of being lost if the safe harbors are interpreted so broadly as to give sanctuary to website operators whose business models rely on the unauthorized use of infringing content. *See ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) ("The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, *i.e.*, at the moment it becomes aware that a third party is using its system to infringe."); *see also Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001) ("We do not

8

think Congress intended the safe harbor [under the Anti-Cybersquatting Consumer Protection Act] to protect defendants operating, at least in part, with unlawful intent.").

The eligibility requirements for the DMCA safe harbors – including the condition that service providers must proactively remove infringing content without a notice in order to qualify – help preserve this balance.  Without enforcement of a meaningful, proactive removal requirement for service providers, the only protection for rightsholders would be the DMCA's notice-and-takedown process (which, as discussed *infra*, has uses to rightsholders but is inadequate on its own).  Service providers would lack any incentive to cooperate meaningfully in helping to keep their own systems free of infringing materials.

In discussions regarding the respective burdens of rightsholders and service providers under the DMCA, advocates of relying almost exclusively on the takedown notice process, and accordingly confining the burdens to rightsholders, frequently claim that copyright owners are in better position to know which works they own than service providers, and thus better situated to address online infringement.  *See, e.g.*, Brief of Amici Curiae Electronic Frontier Foundation *et al.*, at 19

9

(July 30, 2014), Dkt. No. 84.  Leaving aside that such arguments overstate the extent to which information about copyright ownership is often readily accessible to service providers as well, the flipside is that service providers, such as Vimeo, will usually have substantially superior knowledge as to the nature of the content hosted or distributed on their platforms – and indeed often acquire it as part of their everyday operations – whereas such knowledge can be expensive and virtually impossible for copyright owners to acquire.  The policy underlying Congressional division of responsibilities – including not only the takedown regime under Section 512(c)(3), but also the affirmative removal obligations under Section 512(c)(1)(A), is that *both* parties share in the duties to act upon awareness of the availability of unauthorized works.  The burden was never meant to fall on rightsholders alone, as has increasingly become the practice as many providers have treated 512(c)(1)(A) as a dead letter and done no more than respond to notifications under 512(c)(3).

This compromise is reflected in the history of the DMCA. Congress recognized the novel and formidable challenges facing copyright owners as systemic infringement over the Internet became

possible, observing that "[t]he digital environment now allows users of electronic media to send and retrieve perfect reproductions of copyrighted material easily and nearly instantaneously, to or from locations around the world." H.R. Rep. No. 105-551, pt. 1, at 9 (1998); *see also* 144 Cong. Rec. 18,770-71 (1998) (Rep. Coble) ("While digital dissemination of copies will benefit owners and consumers, it will unfortunately also facilitate pirates who aim to destroy the value of American intellectual property."); 144 Cong. Rec. 9242 (1998) (Sen. Thompson) ("Unscrupulous copyright violators can use the Internet to more widely distribute copyrighted material without permission."). Congress recognized that, "[w]ith this evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted works." H.R. Rep. No. 105-551, pt. 1, at 9.

Cooperation from providers of digital networks was considered integral to fight widespread digital copyright infringement. Accordingly, Congress crafted the statute in order to reach a balance that "preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. No. 105-

190 at 20; H.R. Rep. No. 105-551, pt. 2, at 49 (1998). This included

allowing principles of contributory liability to remain in the digital

environment. *See* S. Rep. No. 105-190, at 19 ("Rather than embarking

on a wholesale clarification of these doctrines, the Committee decided to

leave current law in its evolving state. . . ."); *Columbia Pictures Indus.,*

*Inc. v. Fung*, 710 F.3d 1020, 1039-40 (9th Cir. 2013) (noting that "the

DMCA's legislative history confirms that Congress intended to provide

protection for at least some vicarious and contributory infringement,"

and explaining that the inquiries into contributory copyright

infringement and the prerequisites for one or more of the DMCA safe

harbors should be conducted independently), cert dismissed, 134 S. Ct.

624 (2013).[2]

---

[2] This principle has been reaffirmed since the passage of the DMCA.
*See, e.g.*, 150 Cong. Rec. 13,442 (2004) (Sen. Hatch) ("Though secondary
liability is nearly ubiquitous, it has almost always remained as a judge-
made, common-law doctrine-and for a good reason. Secondary liability
prevents the use of indirect means to achieve illegal ends.
Consequently, the scope of secondary liability must be flexible-
*otherwise, it would just instruct wrong-doers on how to legally*
*encourage or manipulate others into breaking the law.* The common-law
judicial process is ideally suited to evolve flexible secondary-liability
rules from the results of many individual cases." (emphases added)); *see*
*also id.* ("Congress rarely codifies secondary liability. . . . . In the Digital

Congress was thus concerned, in both the history of the DMCA and in its structure, with ensuring that service providers cooperate in affirmatively removing content known or believed to be infringing – not merely responding to takedown notices – and that service providers face meaningful incentives (in the form of the potential loss of their safe harbor immunity) to do so. Without meaningful enforcement of the eligibility requirements for the safe harbors, those incentives will be lost, and rightsholders will be left bearing the entire burden of confronting online infringement that Congress intended to be shared.

**B. Vimeo's Interpretation of Section 512 Would Turn the DMCA Into a Mere Notice & Takedown Statute, Which Fails Adequately to Protect the Interests of Copyright Holders**

As discussed below, arguments advanced by Vimeo and supporting *amici* in this case regarding the scope of the "knowledge" requirements of the DMCA, Section 512(c)(1)(A), if accepted, would as a practical matter remove what little remains of the obligation for service providers to act proactively to remove infringing content on their

---

Millennium Copyright Act, Congress codified a complex balance between opposed interests that expanded one type of secondary liability and narrowed another.").

services when they become aware of it during normal operations. As a result, Vimeo's position would turn Section 512 into nothing more than a statute that allows copyright owners to send takedown notices, and that requires service providers to respond to them as a condition of retaining immunity from monetary liability for copyright infringement on their systems. Whereas Congress envisioned the DMCA as creating a regime of joint responsibility, in which service providers would respond to notices from copyright owners with respect to unauthorized activity in instances where the copyright owner discover the infringement, but also act proactively where they acquired such knowledge independently, Vimeo's vision of the DMCA would effectively shift the entire burden of copyright enforcement onto rightsholders. Due to the inherent and practical limitations of the notice-and-takedown process, this crabbed interpretation would leave content owners with little meaningful protection against the online infringement of their works.

With respect to the "red flag" provision of the statute, under which a service provider must proactively remove apparent infringements as a condition of maintaining its safe harbor, *see* 17 U.S.C. § 512(c)(1)(A)(ii),

14

Vimeo's proposed interpretation of the requirement is so narrow as to render the condition effectively meaningless. According to Vimeo, knowledge that a well-known, copyrighted song is present in one of its hosted videos, coupled with knowledge that Vimeo lacks licenses from the record labels for such use, is insufficient to even raise a jury question as to whether it has red flag knowledge that the use of the song is infringing. Br. for Defendants-Appellants-Cross-Appellees, at 21 (2d Cir. July 23, 2014), Dkt. No. 72. The logic behind Vimeo's position is that infringement is not obvious if there exists some conceivable defense to copyright infringement, such as fair use or license. *Id.* at 23. Yet Vimeo then goes on to disclaim any obligation on the behalf of a service provider to actually assess whether those defenses might actually plausibly be available. *Id.* at 27 ("[n]or it is the service provider's burden to make such complex fair-use determinations in order to maintain the safe harbor defense"); *id.* at 30 ("[m]ere viewing of a video, without more, cannot reveal the licensing arrangements that may or may not authorize the use of music").

As discussed in Part II *infra*, Vimeo's position as to what sorts of evidence suffices to establish "red flag" knowledge of infringement

15

applies the incorrect legal standard, effectively asking what a service provider interested in avoiding triggering a takedown obligation might speculate, rather than asking what a *reasonable person* would be aware of. As a practical matter, however, Vimeo's stance would leave very little to the "red flag" provision in Section 512(c)(1)(A)(ii), as a service provider could virtually always concoct some speculative theory about how even the most clearly infringing activity might be justified or defended. *See, e.g.*, *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 77 n.8 (2d Cir. 2005) ("[T]he law does not equate 'knowledge' with certitude…"). The result of such a rule would be to turn the DMCA into a nothing more than a notice-and-takedown statute, in which a service provider's only meaningful obligation for maintaining its safe harbor would be to remove specific files for which it receives takedown notices.

The notice and takedown provisions in Section 512(c)(3) of the DMCA, which allow rightsholders to request the removal of unauthorized content, are one of the statute's several provisions to help respond to the problem of online copyright infringement. Indeed, many copyright owners have been forced to make extensive use of the notice-and-takedown process – at substantial effort and expense – to help

16

protect their rights in their content.  However, although the 512(c)(3)

notice-and-takedown process can in many circumstances act as a

valuable tool to help copyright owners assert their rights online, it was

never intended by Congress to be – and cannot viably function as – the

*sole* mechanism for confronting the problem of the rampant online theft

of intellectual property.

 That is in part because the costs to content owners of locating and

removing content using the 512(c)(3) process can be substantial –

"[e]ven for the largest media companies with the most resources at their

disposal, attempting to purge a site of even a fraction of the highest–

value content is like trying to bail out an oil tanker with a thimble."

Bruce Boyden, *The Failure of the DMCA Notice and Takedown System:*

*A Twentieth Century Solution to a Twenty-First Century Problem*, Ctr.

For the Protection of Intell. Prop. (Dec. 5, 2013), http://cpip.gmu.edu

/2013/12/05/ the-failure-of-the-dmca-notice-and- takedown-system-2/.

 The costs of locating and sending notices on infringing materials is

even more overwhelming for independent artists, as these

entrepreneurs will usually lack the resources required to engage in the

robust enforcement programs utilized (with limited success) by larger,

17

institutional rightsholders.  For instance, the *Wall Street Journal*
reported the example of Kathy Wolfe, the owner of a small independent
U.S. film-distribution company called Wolfe Video.  In 2012, she "found
more than 903,000 links to unauthorized versions of her films,"
equivalent to a loss of over $3 million in revenue in 2012 from her top
15 titles alone.  *See* Christopher S. Stewart, *As Pirates Run Rampant,
TV Studios Dial Up Pursuit*, Wall St. J., Mar. 3, 2013 at A1, *available at*
http://online.wsj.com/articles/SB100014241278873249060045782922320
28509990.  In addition to her lost revenues, Ms. Wolfe "spends over
$30,000 a year – about half her profit – just to send out takedown
notices for her titles."  *Id.*  This "very damaging trend" has forced her to
halve her marketing budget, cut her employees' pay, and discontinue
her own salary.  *Id.*  Ms. Wolfe's story is not an uncommon one.

Copyright infringement "takes a direct economic toll on these
small business owners, who must shoulder the burden of policing
infringements while at the same time" running their businesses, and
the "losses due to infringement have been devastating."  Comments of
Mickey H. Osterreicher, General Counsel, National Press
Photographers Ass'n, in U.S. Copyright Office, Request for Comments

18

Regarding Studies On Remedies for Small Copyright Claims at 2 (Jan. 6, 2012), *available at* http://www.copyright.gov/docs/smallclaims/ comments/36_nppa.pdf.

Tor Hansen, co-president and co-founder of YepRoc Records/Redeye Distribution and board member of the American Association of Independent Music ("A2IM"), pointedly summarized this predicament for the Judiciary Committee in the context of independent record labels:

> Unfortunately due to the ever-shrinking overall music market revenue base, [independent] music labels like mine as [small- and medium-sized music enterprises] simply do not have the financial means or resources to engage in widespread copyright monitoring on the Internet. The time and capital investment required for our community of like-minded, but proudly Independent small business people to monitor the web for usage and take subsequent legal action simply does not exist. [Independent] music labels do not have the financial means or resources to house a stable of systems people and lawyers to monitor the Internet and bombard users with DMCA takedown notices for seemingly endless illegal links to our musical copyrights.

*Innovation in America (Part I and II): Hearings Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the*

19

*Judiciary*, 113th Cong. 49 (2013) (statement of Tor Hansen, Co-President/Co-Founder YepRoc Records/Redeye).

Maria Schneider, a GRAMMY-winning independent musician testified before the House Judiciary Committee this past March about her inability to successfully protect her own copyrighted works through the notice-and-takedown process. *Section 512 of Title 17: Hearing Before the Subcomm. on Courts, Intellectual Prop., and the Internet of the H. Comm. on the Judiciary*, 113th Cong. 54 (2014) (statement of Maria Schneider). Schneider testified that "[t]aking my music down from [infringing] sites is a frustrating and depressing process . . . . As fast as I take my music down, it reappears again on the same site" like "an endless whack-a-mole game." *Id.*

It was never Congress's intention for the notice-and-takedown procedure in Section 512(c)(3) of the DMCA to stand alone – rather, its purpose was always to work in conjunction with the affirmative removal obligations of service providers under Section 512(c)(1)(A), thus requiring both rightsholders and service providers to cooperate in limiting online infringement. Vimeo's position would leave so little to the Section 512(c)(1)(A) requirements that the entire task of copyright

20

enforcement would fall to the 512(c)(3) process – which, alone, is not up to that burden.

## II. The District Court Correctly Recognized That Triable Issues Existed Regarding Vimeo's Eligibility for Safe Harbor, Given that Reasonable Persons Could Doubt the Speculative Justifications for Apparent Infringement Articulated by Vimeo

The District Court correctly declined to grant summary judgment to Vimeo under the DMCA with respect to the infringement of 18 specific music videos on the basis that evidence in the record prevented Vimeo from establishing, at the summary judgment stage, its entitlement to the safe harbor with respect to those videos. Specifically, the record showed that Vimeo's employees had interacted with the individual videos in question, and the Court – considering the totality of the circumstances, such as the length of the songs used, the nature of the videos, and the recognizability of the songs at issue – reasoned that a reasonable jury could have found the infringement apparent. That decision applied correctly the statutory scheme established by Congress and should be affirmed.

Under the balance struck by Congress in Section 512(c) of the DMCA, providers are ineligible for the safe harbor in instances when they are "aware of facts or circumstances from which infringing activity

21

[wa]s apparent." 17 U.S.C. § 512(c)(1)(A)(ii), (d)(1)(B). As discussed above, this so-called "red flag" requirement ensures that the burdens of controlling infringement do not fall solely on copyright owners through the takedown process, but are shared in part by service providers, who must act when they in the normal course of their operations become reasonably aware of infringing activity. More to the point, this *eligibility requirement* for the safe harbor is meant to ensure that service providers retain a meaningful incentive to act upon infringement when they come across it.

This Court's decision in *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ("*Viacom*"), affirmed that the so-called "red flag knowledge" requirement tests whether – irrespective of the provider's subjective state of mind – a service provider was "aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Id.* at 31. The record in this case represents precisely the type of situation this Court appeared to have in mind in *Viacom* when it envisioned a service provider becoming aware of facts and circumstances that would have made "specific" infringements "obvious to a reasonable person." The record left little

22

doubt that Vimeo had specific awareness that the videos at issue were on its service, and of the contents of those videos – its employees had interacted with them as part of the regular operation of the site. *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 500, 524 (S.D.N.Y. 2013). Vimeo's entitlement to safe harbor under the DMCA, therefore, centers around whether it would have been "obvious to a reasonable person" that those videos made infringing use of copyrighted sound recordings and musical compositions.

The District Court approached that question in precisely the correct way – by analyzing the surrounding facts and circumstances, including the attributes of the infringing videos themselves, the nature of the works at issue, and the facts surrounding Vimeo's acquisition of knowledge, and assessing whether a jury reasonably could conclude that the infringement was obvious based on the record before it. *Vimeo*, 972 F. Supp. 2d at 520-23. Such an inquiry into whether reasonable people would be able to recognize activity as infringing – which may merit summary judgment for plaintiffs in some cases, or require fact-finding by a jury in others – is precisely what the law requires.

23

The critical point here is that the "red flag" test is supposed to look to whether a "reasonable person" could recognize the apparent infringement, *Viacom*, 676 F.3d at 31, not whether a service provider interested in minimizing its exposure could concoct hypothetical or speculative justifications for why use of a copyrighted work might be permissible notwithstanding the apparent infringement. A *reasonable* person, for instance, might not (indeed, likely would not) leap to the conclusion that copyright owners had licensed the use of their music for individual users to synchronize to videos and post to Vimeo (a for-profit, commercial entity) in the manner at issue in this case, or that just synchronizing a popular song to a video could somehow be considered lawful. Thus, merely being able to articulate a speculative hypothetical defense for apparently infringing activity should not entitle service providers to summary judgment – at the very least, the plausibility of such claims would need to be tested by a jury. The District Court's decision carries out that objective faithfully and should, in that respect, be affirmed.

24

III.   **The District Court Erred in Holding that Willful Blindness Evidence Must Identify Specific Works in Suit and Granting Summary Judgment on that Basis**

The District Court erred, however, in granting summary judgment to Vimeo with respect to its willful blindness towards infringements *other* than the specific videos its employees had viewed and interacted with.  This Court's *Viacom* decision makes clear that for purposes of the DMCA, disqualifying knowledge of particular acts of infringement may be imputed to a defendant who chooses to willfully blind itself to those acts.  *Viacom,* 676 F.3d at 35.  Again, for the balance struck in the DMCA to work, service providers need to face a meaningful requirement that they will fail to qualify for safe harbor unless they proactively remove content known or believed to be infringing.  If accepted, the District Court's logic would create a legal framework in which service providers could easily circumvent their shared responsibilities under the DMCA by structuring their operations to avoid such knowledge, as Vimeo appears to have done.

The District Court here acknowledged evidence that Vimeo knew about the infringement of copyrighted music in videos posted to its system, and had taken steps to prevent itself from acquiring knowledge

25

that would identify those infringements with particularity – but believed that under *Viacom*, such evidence was not enough to disqualify Vimeo from the safe harbor because it was not "tailored to" the "specific infringing content at issue in the litigation" and did not "relate[] to the Videos-in-Suit." *Vimeo*, 972 F. Supp. 2d at 524-25. By limiting proof of willful blindness to evidence that relates to specific, identifiable acts of infringement at issue, however, the District Court misconstrued the concept of willful blindness. Knowledge of specific infringements is what is imputed *by* the willful blindness doctrine if its conditions are met, not a precondition for finding willful blindness in the first place.

The hallmark of a willfully blind defendant is that the defendant has *prevented* itself from acquiring specific knowledge about infringing material or activity on its system. By definition, a service provider that is willfully blind to infringing activity on its system has ensured that it will *not* have knowledge that is "tailored to" the "specific infringing content at issue," because that is the very knowledge the service provider has consciously avoided. *Vimeo*, 972 F. Supp. 2d at 524-25. That is why under the willful blindness doctrine, knowledge of the "particular infringing transactions" is instead *imputed* to a defendant

26

who suspects those infringements, but has prevented itself from gaining *actual* knowledge of them by conscious avoidance. *Viacom*, 676 F.3d at 35 (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 109 (2d Cir. 2010)).

Conversely, if a service provider *does* have knowledge of infringement down to such a granular level that the knowledge references the "specific infringing content at issue in the litigation," which the District Court believed was required to meet the willful blindness test, *see Vimeo*, 972 F. Supp. 2d at 524-25, then the service provider would already have either actual or red-flag knowledge of the specific infringements at issue. Requiring such specificity in the willful blindness context as well, therefore – as the District Court's decision does – renders application of the willful blindness doctrine superfluous.

The District Court should not have dismissed willful blindness claims based on evidence of Vimeo's suspicions regarding the infringement of music on its system and conscious avoidance of knowledge confirming those suspicions merely because such evidence did not pertain to specific videos in suit. Rather it should have asked whether a reasonable jury could find that Vimeo was "aware of a high

27

probability" that copyrighted works were being infringed by videos on its system, and then took steps to "consciously avoid[]" acquiring knowledge as to *which* specific works were being infringed.  *Viacom*, 676 F.3d at 35.

The record here contains ample evidence that would support a jury finding that Vimeo knew that its users were syncing unauthorized copies of copyrighted music to videos posted to its system.  Vimeo's business model and messaging to its users appeared to encourage such behavior.  Similarly, there was evidence to support a finding that Vimeo implemented policies precisely in order to avoid acquiring the type of specific knowledge of those infringing videos that would have triggered Vimeo's affirmative removal obligations under the DMCA.  Given the evidence supporting the presence of an intentional policy of willful blindness that precluded Vimeo from ever acquiring knowledge of the specific infringing videos at issue in the case, it was error for the Court to use the absence of such specific knowledge as a defense entitling Vimeo to summary judgment.

28

<u>CONCLUSION</u>

For the reasons stated, the District Court's ruling on red flag knowledge should be affirmed and its willful blindness ruling should be reversed and remanded.

Dated: October 29, 2014

Respectfully submitted,

/s/ ANDREW H. BART

ANDREW H. BART
JENNER & BLOCK LLP
919 THIRD AVENUE
NEW YORK NY 10022
(212) 891-1600

AND

LUKE C. PLATZER
J. DOUGLAS WILSON
JENNER & BLOCK LLP
1099 NEW YORK AVENUE #900
WASHINGTON, DC 20001
(202) 639-6000


Counsel for Amicus Curiae

29

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT <u>AND TYPE STYLE REQUIREMENTS</u>

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,431 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 and Century Expanded BT 14-point font.

Dated: October 29, 2014

                                        /s/ *ANDREW H. BART*
                                        ANDREW H. BART